JF
530

# PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  LEWIS                    SAMUEL                    W.
     (Last)                         (First)                      (Initial)

Prison Number  E05524

Institutional Address  P.O. Box 689, Soledad, CA 93960-0689

**FILED**

APR 28 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

=================================================================

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Samuel W. Lewis
(Enter the full name of plaintiff in this action.)

        vs.

B. Curry, Warden (A)

_____

_____

_____
(Enter the full name of respondent(s) or jailor in this action)

)
)
)
)
)
)
)
)
)
)
)
)

C 08    2191

Case No. _____
(To be provided by the Clerk of the Court)

JF

**PETITION FOR A WRIT
OF HABEAS CORPUS**

E-filing

**(PR)**

=================================================================

## Read Comments Carefully Before Filling In

### When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in this district if you are challenging the manner in which your sentence is being executed, such as the loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located.  If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution in which you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgement against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgement you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

    1.  What sentence are you challenging in this petition? Parole Suitability Hearing.

        (a)    Name and location of court that imposed sentence (for example, Alameda County Superior Court, Oakland):

|  |  |
|---|---|
| Superior Court | Los Angeles County |
| (Court) | (Location) |

(b) Case number, if known   A964645

(c) Date and terms of sentence   11/21/88, 15 years to life.

(d) Are you now in custody serving this time? (Custody meaning being in jail, on parole or probation, etc.)    Yes _X_     No _____

Where?

Name of institution:   Correctional Training Facility

Address:   P.O. Box 686, Soledad, CA 93960-0686

    2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second-degree Murder.

_____

_____

_____

3. Did you have any of the following?

    Arraignment:                               Yes _X____        No _____

    Preliminary Hearing:                  Yes _X____        No _____

    Motion to Suppress:                  Yes _X____        No _____

4. How did you plead?

    Guilty_____    Not Guilty_____    Nolo Contendere _X____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury_____    Judge alone _____    Judge alone on transcript_____

6. Did you testify at your trial?                  Yes _____        No _____

7. Did you have an attorney at the following proceedings:

| | | | | |
|---|---|---|---|---|
| (a) | Arraignment | Yes _X____ | No _____ |
| (b) | Preliminary hearing | Yes _X____ | No _____ |
| (c) | Time of plea | Yes _X____ | No _____ |
| (d) | Trial | Yes_____ | No _____ |
| (e) | Sentencing | Yes _X____ | No _____ |
| (f) | Appeal | Yes _____ | No _X____ |
| (g) | Other post-conviction proceeding | Yes _____ | No _X____ |

8. Did you appeal your conviction?        Yes _X____        No _____

    (a)        If you did, to what court(s) did you appeal?

                    Court of Appeal           Yes _X____        No _____

                    Year: _1995_        Result: _Denied_____

                    Supreme Court of California        Yes _X____        No _____

                    Year: _1996_        Result: _Denied_____

                    Any other court           Yes _X____        No _____

                    Year: 1996        Result: _Denied_____

    (b)        If you appealed, were the grounds the same as those you are raising in this

| | | | |
|---|---|---|---|
| 1 | petition? | Yes _____ | No _X____ |
| 2 | Was there an opinion? | Yes _____ | No _X___ |

3    (c)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                    Yes _____    No _X____

5    If you did, give the name of the court and the result:

6    N/A_____

7    _____

8    9. Other than appeals, have you previously filed any petitions, application or motions with

9    respect to this conviction in any court, state of federal?    Yes _X____    No _____

10    [Note; if you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: Los Angels Superior Court _____

19    Type of Proceeding: Habeas Corpus _____

20    Grounds raised (Be brief but specific):

21    a. Violation of due process (Parole Hearing) _____

22    b. Violation of due process (Plea Agreement) _____

23    c._____

24    d._____

25    Result: Denied _____ Date of Result:_____

26    II.    Name of Court: Calif. Court of Appeals _____

27    Type of Proceeding: Habeas Corpus _____

28    Grounds raised (Be brief but specific):

1     a. Violation of due process (Plea Agreement)

2     b. Violation of due process (Parole Hearing)

3     c.

4     d.

5     Result: Summarily denied     Date of Result: 01/16/08

6     III.     Name of Court: Calif. Supreme Court

7     Type of Proceeding: Petition For Review

8     Grounds raised (Be brief but specific):

9     a. Violation of due process (Plea Agreement)

10     b. Violation of due process (Parole Hearing)

11     c.

12     d.

13     Result: Summarily denied     Date of Result: 03/19/08

14     IV.     Name of Court:

15     Type of Proceeding:

16     Grounds raised (Be brief but specific):

17     a.

18     b.

19     c.

20     d.

21     Result:     Date of Result:

22     (b)     Is any petition, appeal or other post-conviction proceeding now pending in any court?

23     Yes _X___     No _____

24     Name and location of court: U.S. Dist. Court, Northern Dist. of Cal. C06-1727 JF (PR)

25     B. GROUNDS FOR RELIEF

26     State briefly every reason that you believe you are being confined unlawfully. Give facts to

27     support each claim. For example, what right or privilege were you denied? What happened? Who

28     made the error? Avoid legal arguments with numerous case citations. Attached extra paper if you

1   need more space.  Answer the same questions for each claim.

2       [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One:  The Board of Parole Hearings' use of multiple victim's violates the express

6   terms of Petitioner's plea agreement and his state and federal right to due process.

7       Supporting Facts:  **(CONTINUED ON PAGE 8)**

8

9

10

11      Claim Two:  The Board of Parole Hearings' denial of parole suitability violated the

12   some evidence standard and Petitioner's Constitutional right to due process under the
     5th and 14th Amendments to the United States Constitution.

13      Supporting Facts:   **(CONTINUED ON PAGE 12)**

14

15

16

17      Claim Three:  See Attached

18

19      Supporting Facts:

20

21

22

23       If any of these grounds were not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS                    - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that

2  they are an example of the error you believe occurred in your case.  Do not discuss the holding or

3  reasoning of these cases:

4    _____

5    _____

6    _____

7  Do you have an attorney for this petition?                    Yes _____          No _X____

8  If you do, give the name and address of your attorney:

9    In Pro Persona _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled

11  in this proceeding.  I verify under the penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___4/22/08_____          _____Samuel Lewis_____

14              Date                                Signature of Petitioner

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE BOARD OF PAROLE HEARINGS USE OF MULTIPLE
VICTIMS VIOLATED THE EXPRESS TERMS OF
PETITIONER'S PLEA AGREEMENT AND HIS STATE AND
FEDERAL RIGHT TO DUE PROCESS.

1) On November 21, 1988, Petitioner, Samuel Lewis, in the Los Angeles Superior Court, Case Number A964645, was convicted of one count of second-degree murder by plea of no contest.

2) Petitioner was sentenced to a term of 15 years to life.

3) Petitioner's Minimum Eligible Parole Date was February 19, 1997.

4) On October 12, 2007, Petitioner went before the Board of Parole Hearings for his fourth parole suitability hearing. Petitioner was found unsuitable for parole and received a one-year suitability denial after Petitioner had served more than 18 years in prison. (Exhibit 2, Parole Hearing Transcript.)

5) The Board's panel stated reasons for denial were: "There were multiple victims involved, as well as the fact that your last 115 was in '99. And you have six 115's, and we realize that the last one was administrative [non-serious in nature and over seven years old.]"

The commitment offense "was carried out in an exceptionally cruel, brutal, cold, and vicious manner [.]" "This offense was carried out in a manner which demonstrated exceptionally callous disregard for human life and suffering[.]" "[Y]ou did quit school so there's somewhat of an unstable history. You had juvenile arrests, one for Grand Theft Auto and the other for carrying a concealed weapon. As an adult, you were also arrested for carrying a concealed weapon, however, you did indicate you were released the next day when it was determined that the weapon belonged to the owner of the vehicle in which you were driving."

The Board panel further stated, "We know [the commitment offense] that is not ever going to go away and you are – and I can say on the record – that you are in fact a changed man at this time. You are not the 18 year old that you were at – during that time." "As for institutional behavior, you have programmed exceptionally well. Just since your last hearing you've been a co-facilitator of Alternative to Violence mini-workshop. You have completed 25 video reports; you've gotten certificates for 25 of those. You've got another certificate for 10 additional ones. You were a co-facilitator of a 21-hour Alternatives to Violence workshop. You did a Bible correspondence course,

1  Hope [Aglow]. You've done a – several anger management courses[,] you currently have two AA

2  degrees. You have got two vocations and one of them is forklift, and the other one is dry cleaning.

3  You also, and this has gone on since you've been incarcerated. You've got a – probably more self-

4  help courses in the things you have accomplished in self-help than all the inmates I've seen this

5  week[.]" (Exhibit 2, Board Hearing Transcript Decision.)

6      The Board panel found that the Psychological report from Dr. Macomber, Ph.D. was "totally

7  supportive as well as the last two evaluations. (Exhibits 3, 4, and 5, respectively.) They were also

8  supportive." The Board further stated that "your parole plans, they are viable and I will go on record

9  to say to the next panel that you should probably be paroled to Monterey County so that you can in

10  fact be in Salinas with your spouse." (Exhibit 2, p. 6 of the decision, Board Hearing Transcripts.)

11      I also agree with the previous panel in saying that you are moving in an exceptionally positive

12  area, but you just need more time, due to the nature of the crime itself, which involved multiple

13  victims[.]"

14      6) On May 15 2007, Petitioner filed a petition for writ of habeas corpus in the Los Angeles

15  County Superior Court, Case Number BH004703.

16      7) On December 3, 2007, the Los Angeles Superior Court denied the petition for writ of

17  habeas corpus. (Exhibit 6.)

18      8) On December 31, 2007, Petitioner filed for writ of habeas corpus in the California Court of

19  Appeals, Second Appellate District, Division Two, Case Number B204642.

20      9) On January 11, 2008, the California Court of Appeals "Summarily Denied" the petition for

21  writ of habeas corpus. (Exhibit 7.)

22      10) On January 28, 2008, Petitioner filed a Petition for Review in the Supreme Court of

23  California, Case Number S160345.

24      11) On March 19, 2008, the California Supreme Court denied the Petition for Review.

25  (Exhibit 8.)

26                          STANDARD OF REVIEW

27      This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

28  pursuant to the judgment of a state court only on the grounds that he is in custody in violation of the

1  Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be

2  granted with respect to any claim that was adjudicated on the merits in state court unless the state

3  courts' adjudication of the claim: "(1) resulted in a decision that was contrary to or involved an

4  unreasonable application of clearly established federal law, as determined by the Supreme Court of

5  the United States; or (2) resulted from a decision that was based on an unreasonable determination of

6  the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); see

7  Williams (Terry) v. Taylor, 529 U.S. 362, 409-413 (2000).  Section 2254(d) applies to a habeas

8  petition from a state prisoner challenging the denial of parole, See Sass v. California Board of Prison

9  Terms, 461 F.3d 1123, 1126-1127 (9th Cir. 2006).

10         Petitioner submits that the Los Angeles Superior Court's adjudication of the claims resulted in

11  a decision that is contrary to clearly established federal law and involved an unreasonable application

12  of clearly established federal law as determined by the Supreme Court of the United States.  Petitioner

13  further submits that the Los Angeles Superior Court's adjudication of the claims resulted in a decision

14  that was based on an unreasonable determination of the facts in light of the evidence presented in the

15  state court proceedings.

16         On November 21, 1988, Petitioner pled no contest to one count of second-degree murder.  As

17  part of the plea agreement, the remaining counts were dismissed.  (Exhibit 1, Plea Agreement

18  Transcript).

19         According to the California Supreme Court, "When a guilty plea is entered in exchange for

20  specific benefits such as the dismissal of other counts or an agreed maximum punishment, both parties

21  including the state, must abide by the terms of the agreement." People v. Walker (1991) 1 Cal.Rptr.2d

22  902, 908; People v. Panizzon (1996) 51 Cal.Rptr.2d 851.  "[both the People and the accused should be

23  held to the terms of a plea bargain.]"

24         In the instant case, Petitioner entered a guilty plea in exchange for the specified benefits of the

25  dismissal of other counts and a lesser punishment.  The use of the dismissed counts by the Board of

26  Parole Hearings, specifically the factor "multiple victims" being attacked, violates petitioner's plea

27  agreement.

28         The California Supreme Court further determined in both Walker, supra, and Panizzon, supra,

1   that "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so

2   that it can said to be part of the inducement or consideration, such promise must be fulfilled."

3   (Santobello v. New York [(1971]) 404 U.S. [257,] 262 [92 S.Ct. 495, 499, 30 L.Ed.2d 427].) [¶] The

4   Supreme Court has thus recognized that due process applies not only to the procedure of accepting the

5   plea (see Boykin v. Alabama (1969) 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274]), but that the

6   requirements of due process attach also to implementation of the bargain itself. It necessarily follows

7   that violation of the bargain by an officer of the state raises a constitutional right to some remedy." In

8   the case at bar, the "implementation" of the bargain was the dismissal of counts, and these dismissed

9   counts would no longer be used against the Petitioner. To dismiss the counts as part of the plea

10  agreement, then later allow the Board of Parole Hearings to use the dismissed counts as a factor to

11  deny parole violates Petitioner's state and federal due process. This plea clearly rests significantly on

12  the promise of the prosecutor and the court that these counts would be dismissed. (See Exhibit 1, Plea

13  Agreement Transcript and Sentencing Transcript.)

14      In People v. Toscano, (2004) 20 Cal.Rptr.3d 923, 926, the court found that "[A] plea

15  agreement is interpreted according to the same rules as other contracts. (Brown v. Poole (9thCir.

16  2003) 337 F.3d 1155, 1159) [.]" "Were we to view the agreement as ambiguous we would reach the

17  same result – because plea agreements are interpreted according to the general rule 'that ambiguities

18  are construed in favor of the defendant. Focusing on the defendant's reasonable understanding also

19  reflects the proper constitutional focus on what induced the defendant to plead guilty.' (U.S. v. De la

20  Fuente, supra, 8 F.3d at p. 1337, fn. 7.)" In the case at bar, the ambiguities are to be construed in

21  favor of the Petitioner. In this case, Petitioner's reasonable understanding was that the dismissed

22  counts would be dismissed and not used against him.

23      "In addition to their contractual qualities, plea agreements also have a constitutional

24  dimension. A criminal defendant's constitutional due process right is implicated by the failure to

25  implement a plea bargain according to its terms." People v. Knox (2004) 20 Cal.Rptr.3d 877, 880.

26      The California Supreme Court ruled in People v. Walker (1991) 1 Cal.Rptr.2d 902, 910, that

27  "violation of a plea bargain is not subject to harmless error analysis." Petitioner contends that the

28  Superior Court's finding that the Board may consider the charges which were dismissed is contrary to

1    and involved an unreasonable application of clearly established federal law as determined by the

2    Supreme Court of the United States. "[W]hen a plea rests in any significant degree on a promise or

3    agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such

4    promises must be fulfilled." Santobello v. New York, (1971) 404 U.S. 257, 262.

5        For these reasons the plea agreement and Petitioner's due process has been violated. Petitioner

6    respectfully requests an evidentiary hearing be conducted to determine what the Petitioner reasonably

7    understood the terms and benefits of this plea bargain were.

8                THE BOARD OF PAROLE HEARINGS' DENIAL OF PAROLE
             SUITABILITY VIOLATED THE "SOME EVIDENCE"
9            STANDARD AND PETITIONER'S CONSTITUTIONAL
             RIGHT TO DUE PROCESS UNDER THE 5TH AND 14TH
10           AMENDMENTS OF THE UNITED STATES CONSTITUTION.

11       California's parole scheme creates a cognizable liberty interest on parole. This interest is

12   protected by the procedural safeguards of the due process clause of the United States Constitution.

13   (U.S. Constitution, 5th and 14th Amendments; Biggs v. Terhune 334 F.3d 910, 914-915 (9th Cir.

14   2003).) See Sass, 461 F.3d at 1127-1128; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz

15   v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1 (1979); California Panel Code §

16   3041(b).

17       A Parole Board's decision satisfies the requirements of due process if "some evidence"

18   supports the decision. Sass, 461 F.3d at 1125-1129(adopting some evidence standard for disciplinary

19   hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-455 (1985).

20       The Ninth Circuit Court of Appeals in Hayward v. Marshall, 572 F.3d 536, 542-543 (9th Cir.

21   2008) determined "[W]hen [ ] assess[ing] whether a state Parole Board's suitability determination was

22   supported by "some evidence" in a habeas case, our analysis is framed by the statutes and regulations

23   governing parole suitability determinations in the relevant state." 'Accordingly, regulations

24   promulgated by the Board pursuant to California Penal Code Section 3040(a) provide that 'a life

25   prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner

26   will pose an unreasonable risk of danger to society if released from prison.' Cal. Code Regs., tit. 15, §

27   2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by applying

28   factors it has set forth in the California Code of Regulations."

1    "Even though these suitability and unsuitability factors are helpful in analyzing whether a

2    prisoner should be granted parole, California courts have made clear that the "findings that are

3    necessary to deem a prisoner unsuitable for parole," Irons, 505 F.3d at 850, are not that a particular

4    factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger

5    public safety. In re Dannenberg, 156 Cal.Ap.4th at 1400, 68 Cal.Rptr.3d at 198 (Cal. Ct. App. Nov.

6    16, 207), modified, 2007 WL 4227229, ___Cal.Ct.App.___, ___Cal.Rptr.3d.___ (Cal.CT.App. Dec. 3,

7    2007); In re Lee, 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Cal.Ct.App. 2006); In re Scott,

8    133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 [.]"  The court further determined that for its purposes

9    "'[t]he test is not whether some evidence supports the reasons the [Board] cites for denying parole, but

10   whether some evidence indicates a parolee's release unreasonably endangers public safety.  Some

11   evidence of the existence of a particular factor doe not necessarily equate the parolee's release

12   endangers public safety." Lee, 143 Cal.App.4th at 1408, 49 Cal.Rptr.3d 931 (citations and footnote

13   omitted); see also In re Elkins, 144 Cal.App.4th 475, 499, Cal.Rptr.301 503 (Cal.Ct.App. 2006)."

14       In the instant case, the Board used the commitment offense, and Petitioner's last 115 (prison

15   disciplinary) as "some evidence" to support their determination that Petitioner would pose an

16   unreasonable risk of danger to society or threat to public safety if released from prison.

17       In finding Petitioner's commitment offense to have been carried out "in an extremely cruel,

18   brutal, cold and vicious manner [.]"  The Board relied on the factor of multiple victims being attacked.

19   (Cal Code Regs., tit. 15 § 2402, subd. (c) (1) (A)).  The use of this factor as previously stated violates

20   the plea agreement contract, and Petitioner's state and federal due process in the execution of the

21   terms of this plea agreement. "Under Santobello v. New York, 404 U.S. 257, 261-262 (1971), a

22   criminal defendant has a due process right to enforce the terms of a plea agreement."  Buckly v.

23   Terhune (9th Cir. 2006) 441 F.3d 688, 694.  This due process right is confirmed by the federal

24   constitution. Browne v. Pool, (9th Cir. 2003) 337 F.3d 1155, 1159; People v. Walker (1991) 1

25   Cal.Rptr.2d 902, 908; People v. Panizzo (1996) 51 Cal.Rptr.2d 851.  Without the use of this factor, the

26   Board's finding that the commitment offense was "extremely cruel, brutal, cold and vicious" does not

27   fit the criteria required by § 2402 (c) (1) of the Cal. Code of Reg., Div. 2., tit. 15.  Petitioner submits

28   that after more than 18 years the Board's reliance on the offense, specifically, the use of multiple

13

1    victims, does not indicate Petitioner's release would significantly endanger public safety.

2    In recent years, both the California Appellate and Federal District courts found a commitment

3    offense which involves multiple victims insufficient to sustain a denial of parole many years later.

4    In October 2006, the Appellate Court in In re Lee 48 Cal.RPtr.3d 931, 936, found that after 17

5    years the second-degree murder and attempted premeditated murder for which he had been convicted

6    no longer provided some evidence supporting parole denial.

7    In December 2006, another Appellate Court in In re Weider 52 Cal.Rptr.3d 147, 161, found

8    that while "[t]he evidence that two additional victims were injured shows that the crime was callous

9    and showed Weider's indifference to human life when he fired the gun in the restaurant. But this does

10   not make the murder [ ] so excessively violent or vicious that it suggests Weider remains a public

11   safety risk."

12   In May 2006 the U.S. District Court for the Northern District in Martin v. Marshall (N.D. Cal.

13   2006) 431 F.Supp.2d 1038, 1048, found that the commitment offense did not provide "some

14   evidence" sufficient to justify a denial of parole. In this case Martin killed two people and wounded a

15   third.

16   In May 2007, the Apellate Court in In re Barker 59 Cal.Rptr.3d 746, found that [t]he Board's

17   observation that "[m]ultiple victims were also killed is of course, accurate, [but] given the lapse of

18   2[9] years and exemplary rehabilitative gains made by [Barker] over that time, continued reliance on

19   the aggravating facts of the crime no longer amount(s) to 'some evidence' supporting denial of parole.

20   (Elkins, supra, 144 Cal.App.4th at 498, 50 Cal.Rptr.3d 503.)" In this case, Barker had been convicted

21   of one count of first-degree murder and two counts of second-degree murder.

22   In three of these court cases, the petitioners were convicted of multiple counts. Lee was

23   convicted of second-degree murder and attempted murder. Weider was convict of second-degree

24   murder and two counts of assault with a firearm. Barker was convicted of first-degree murder and two

25   counts of second-degree murder. In the case at bar, Petitioner was convicted of one count of second-

26   degree murder. Petitioner contends that the commitment offense is insufficient to sustain a denial of

27   parole after almost two decades. Given his multiple psychological evaluations which the Board found

28   to be totally supportive of parole, and significant evidence in the record of Petitioner's positive

1  institutional behavior. Accordingly, the Board's use of the commitment offense, without additional

2  evidence demonstrating that Petitioner is presently a threat to public safety, does not provide the

3  necessary some evidence to support a finding of unsuitability.

4          On April 8, 2006, Petitioner was evaluated by a CDCR psychologist, (see attached Exhibit 3).

5  This psychological evaluation conducted by M. Macomber, Ph.D., assessed Petitioner's potential for

6  violence to be "no greater than the average citizen in the community." "This conclusion is supported

7  by the administration of the Level of Service Inventory – Revised, which is an actuarial measure that

8  assesses criminal history, substance abuse history, academic achievements and social factors to

9  determine the risk level on parole. His [Petitioner's] score on this assessment is 4.2 cumulative

10 frequency for prison inmates. This means that if 100 men were released on parole, he would do better

11 than 95 of them. This is a very low risk level. He no longer poses a risk to society." During October

12 2005, a Life Prisoner Evaluation Report was completed by Correctional Counselor I, M. Rubio. (See

13 Exhibit 9.) This evaluation concluded that "Lewis has a valid residence and viable work skills. He

14 has met the BPT recommendations and should have a successful parole. This writer has witnessed his

15 growth and maturity over the years. He has been a positive example to his peers, his daughter and his

16 nephew(s)."

17         On February 25, 2004, Dr. E.W. Hewchuk, Ph.D., found that, "currently inmate Lewis has a

18 risk potential no greater than the average citizen, and is a suitable candidate for release consideration."

19 (Exhibit 4.)

20         On November 15, 2001, Dr. Joe Reed, Ph.D., found that Petitioner's "violence potential is

21 considered to be below average relative to this Level II inmate population." (Exhibit 5.)

22         In addition to the psychological evaluations and life prisoner evaluation, Petitioner attaches

23 two previous life prisoner evaluations. (Exhibits 10 and 11 respectively). Additionally, Petitioner has

24 received a number of laudatory documents from various correctional and other staff members,

25 attesting to Petitioner's everyday attitude and behavior. They contain statements such as, (1) "There

26 are many inmates who have similar traits and a will to succeed. Lewis is the first I have witnessed to

27 strive so hard and doggedly to achieve his life, educational and work goals. I feel inmate Lewis's

28 determination to succeed and his positive attitude will carry into his life once [he] attains his release."

1    (2) "I have no doubt inmate Lewis' exceptional work and personal ethics will allow him to be a

2    productive member of society when released from custody." (3) "I believe his sincere desire to

3    succeed and his positive attitude will carry into his life when he is released." (4) "It is my formal

4    judgment that inmate Lewis could be a productive citizen if given the opportunity to do so." (Exhibit

5    12.) These statements demonstrate that Petitioner has matured into a positive responsible and

6    productive person.

7        In addition to the documentary evidence Petitioner submits, "[t]he reliability of the facts of

8    [Petitioner's] crime as a predictor of his dangerousness is further diminished by Petitioner's age at the

9    time of the offense." Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1085. Petitioner

10   was an 18-year-old high school drop out when he committed his offense. After dropping out of High

11   School, Petitioner began working in a gang-infested neighborhood. While working at a store

12   Petitioner was confronted by the neighborhood gang many times, resulting in conflict. Peer pressure

13   and the desire to be accepted eventually led Petitioner to associate with members of this street gang.

14   This association eventually led to the commitment offense. "As the Supreme Court recently

15   recognized, the evidentiary/predictive value of the conduct of such a young person is diminished."

16       "The susceptibility of juveniles to immature and irresponsible conduct is not as morally

17   reprehensible as that of an adult. Thompson [v. Oklahoma 487 U.S. 815, 835, 108 S.Ct. 2687, 101

18   L.Ed.2d 702 (1988)] (plurality opinion). Their own vulnerability and comparative lack of control over

19   their immediate surroundings means juveniles have a greater claim than adults to be forgiven for

20   failing to escape negative influences in their environment. See Stanford [v. Kentucky 492 U.S. 361,

21   395, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)]."

22       As noted by Rosenkrantz v. Marshall, supra, at p. 1085; Roper v. Simmons 543 U.S. 561-562,

23   125 S.Ct. 1183, 161 L.Ed.2d (2005); see also Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct.

24   2687, 101 L.Ed.2d 702 (1988) (Stevens, J.) (plurality opinion) ("[L]ess culpability should attach to a

25   crime committed by a juvenile than to a comparable crime committed by an adult. The basis of this

26   conclusion is too obvious to require extensive explanation. Inexperience, less intelligence and less

27   education makes a teenager less able to evaluate the consequences of his or her conduct while at the

28   same time he or she is more apt to be motivated by mere emotion or peer pressure than as an adult.")

1    With the passage of time the commitment offense has little, if any predictive value for future

2    criminality. The Parole Board's continued reliance on the commitment offense violates due process,

3    because it has resulted in an arbitrary decision. The offense no longer constitutes "some evidence"

4    with "some indicia of reliability" of Petitioner's dangerousness. See Superintendent v. Hill (1985)

5    472 U.S. at 455; Hatward v. Mashall (9th Cir. 2008) 512 F.3d 536; Biggs v. Terhune (9th Cir. 2003)

6    334 F.3d 910, 916-917; In re Lee (2006) 49 Cal.Rptr.3d 931, 939; In re Elkins (2006) 50 Cal.Rptr.3d

7    503, 518.

8    For these reasons Petitioner's commitment offense no longer amounts to some evidence

9    supporting the conclusion that Petitioner would presently pose an unreasonable risk of danger to

10    society if released on parole.

11    The second finding used by the Board to support their determination that Petitioner would

12    pose an unreasonable risk of danger to society was "the fact that your last 115 was in '99 and you

13    have six 115's and we realize that the last one was administrative [.]" (Exhibit 2, p. 76.) This finding

14    as used by the Board does not demonstrate that Petitioner's release unreasonably endangers public

15    safety public safety. As the commissioner pointed out, the last CDC 115 in 1999 was administrative,

16    which means non-serious.

17    There is significant evidence in the record of Petitioner's positive institutional behavior, which

18    reasonably mitigates the effect Petitioner's past violations have on his suitability for parole. Petitioner

19    has demonstrated exemplary behavior and evidence of rehabilitation for a significant period of time.

20    He came to prison as an 18-year-old High School dropout. Since his incarceration Petitioner has

21    completed his G.E.D., earned an Associate Degree in Business Management, graduating with honors

22    and an Associates Degree in Paralegal Studies, again graduating with honors. He is presently working

23    toward a Bachelors of Science Degree in Business Administration with a major in marketing and

24    needs only 10 classes to complete this degree. Petitioner has also completed vocational forklift

25    operations and vocational dry cleaning. He has consistently received exceptional work supervisor

26    reports. (See Exhibit 13.) As stated by the Board commissioner, "You are not the 18 year old that

27    you were at – during that time." (Exhibit 2, p. 79, l. 5-10.) "As for institutional behavior, you have

28    programmed exceptionally well. Just since your last hearing you've been a co-facilitator of

1   Alternatives to Violence mini-workshop. You have completed 25 video reports. You've got
2   certificates for 25 of those. You've got another certificate for 10 additional ones. You were a co-
3   facilitator of a 21 hour Alternatives to Violence Project workshop. You did a Bible correspondence
4   course, Hope at Will. You've done a – several anger management courses [ ] You also, and this has
5   gone on since you've been incarcerated. You've got a – probably have more self-help courses in the
6   things that you have accomplished in self-help than all the inmates I've seen this week [.]" (Exhbit 2,
7   p. 81, l. 12-15.) Clearly evidence of rehabilitation for a significant period of time.

8        The psychological reports prepared in November 2001, February 2004 and April 2006,
9   considered the rule violation reports, and concluded that Petitioner would be a low risk of
10  dangerousness upon release. In the 2001 Mental Health Evaluation, Dr. Joe Reed, Ph.D., determined
11  that "While in CDC, [Petitioner] has obtained seven CDC-115 violations [.] On the other hand,
12  however, [Petitioner] has not received a significant disciplinary for violent behavior in approximately
13  seven years. He shows significant improvement over the last six years, and he appears to have
14  profited from his participation in numerous self-help groups. He has shown consistent goal attainment
15  ability by obtaining his AA degrees in 1999 and 2000. Moreover, his achievements indicate, over the
16  last six years, good acceptance of responsibility, good behavior controls and a strong pattern of pro-
17  social behavior. No further association with gangs was found. Therefore, in light of these factors, his
18  violence potential is considered to be below average relative to this Level II inmate population.
19  (11/15/01), (Exhibit 5).

20       In the 2004 psychological evaluation, Dr. E.W. Hewchuk, Ph.D. found that "Since
21  [Petitioner's] last BPT psychological evaluation in 2001, inmate Lewis has continued to program well
22  within the institutional framework, with no 115's on file. [ ] Currently, inmate Lewis has a risk
23  potential no greater than the average citizen, and is a suitable candidate for release consideration."
24  (2/25/04), (Exhibit 4).

25       In the most recent Mental Health Evaluation, Dr. M. Macomber, Ph.D. stated that "In
26  considering potential for dangerous behavior in the institution, he has not had a serious disciplinary
27  since 1999. His last cell fight was in 1994. This was 12 years ago. He is no longer the irresponsible
28  [18] year old he was at the time of the commitment offense. In comparison to other inmates, his

18

1   potential for dangerous behavior is below average.  In considering potential for dangerous behavior
2   when released to the community I agree with the previous two psychological evaluations that stated
3   his potential for violence is no greater than the average citizen in the community.  This conclusion is
4   supported by the administration of the Level of Service Inventory – Revised, which is an actuarial
5   measure that assesses criminal history, substance abuse history, academic achievements, and social
6   factors to determine the risk level on parole.  His score on this assessment is 4.2 cumulative frequency
7   for prison inmates.  This means that if 100 men were released on parole, he would do better than 95 of
8   them.  This is a very low risk level.  He no longer poses a risk to society." (Exhibit 3.)

9           Three separate and independent psychologists considered the past rule violation reports, and
10  concluded that Petitioner would be a low risk of dangerousness upon release.  Additionally, there is
11  significant evidence in the record of Petitioner's positive institutional behavior, which reasonably
12  mitigates the effect that Petitioner's past violations have on his suitability for parole.  Some evidence
13  of the existence of rule violations does not necessarily equate to some evidence that Petitioner's
14  release unreasonably endangers public safety.

15          In Valdivia v. Brown (E.D. Cal. March 14, 2008), No. 05-00416, 2005 WL 706927, the
16  District Court when considering the disciplinary history of Valdivia determined that, "the Superior
17  Court [ ] unreasonably applied the some evidence standard.  It's description of the three rules
18  violations alleged relied on by the BPT do not support the conclusion that Petitioner's release will
19  unreasonably endanger public safety.  At most they lend some correlation to a conclusion that one of
20  the factors the BPT may consider that "the prisoner has engaged in serious misconduct while in
21  prison," indicates parole unsuitability.  See Cal. Code Regs., tit. 15, § 2402(c)(6).  Yet, some evidence
22  of the existence of a particular Cal. Code Regulations factor applied by the BPT to decide if a prisoner
23  is suitable for parole "does not necessarily equate to some evidence the parolee's release unreasonably
24  endangers public safety."  Hayward, 512 F.3d at 543 (citation omitted).  On its own, and viewed in the
25  context of the overwhelming evidence that Petitioner is rehabilitated, it does not establish that
26  Petitioner's release unreasonably endangers public safety.  As a result, the Superior Court's
27  conclusion that Petitioner was unsuitable for parole is an unreasonable application of the some
28  evidence standard."

1    In Guardado v. Perez, (N.D. Cal. April 9, 2008) No. 03-00194, 2008 WL _____, the District

2  Court, when considering the disciplinary record of Guardado determined that, "that he has committed

3  no serious misconduct in prison. His disciplinary history consists of one instance of mutual combat in

4  1998, and failure to clean his cell in 1993."

5    The Ninth Circuit Court of Appeals in Hayward v. Marshal, 512 F.3d 536 determined that

6  "[t]he test is not whether some evidence supports the reasons the [Board] chose for denying parole,

7  but whether some evidence indicates a parolee's release unreasonably endangers public safety."

8  "Some evidence of the existence of a particular factor does not necessarily equate to some evidence

9  the parolee's release unreasonably endangers public safety."

10    Petitioner contends that the Superior Court's conclusion that there is some evidence to support

11  the Board's finding that the Petitioner's institutional behavior supports a finding of unsuitability is an

12  unreasonable determination of the facts in light of the evidence of rehabilitation presented in the state

13  court proceedings.

14    In the case at bar there is no evidence that Petitioner's release would unreasonably endanger

15  public safety. The over whelming evidence indicates Petitioner's no longer poses a risk to society.

16                                                CONCLUSION

17    Petitioner respectfully requests this court conduct an evidentiary hearing to determine what the

18  Petitioner reasonably understood the terms and benefits of his plea agreement were.

19    Petitioner also requests this court find, since no evidence supports his parole denial, his

20  continued imprisonment violates his state and federal right to due process, depriving him of his liberty

21  interest in parole, and order the state to hold a parole hearing which comports with due process as

22  defined herein within 45 days.

23    Respectfully submitted,

24

25

26

27  Date: _April 22___, 2008

28                                                          Samuel Lewis, Petitioner
                                                           In pro per

## PROOF OF SERVICE BY MAIL

### (C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                     ) SS.
COUNTY OF MONTEREY )

I, ___Samuel Lewis_____, am a resident of the State of California,

County of Monterey. I am over the age of 18 years and I   am/am not   a party to the within action.

My   business/residence   address is P.O. Box 689, Soledad, California, 93960-0689.

On ___April 22_____, 20 _08____, I served the foregoing:

___Petition for Writ of Habeas Corpus and Attached Exhibits_____

_____

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage

fully prepaid in the United States mail at Soledad, California, addressed as follows:

```
CLERK OF THE UNITED STATES
DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
BOX:  36060
SAN FRANCISCO, CALIFORNIA
94102
```

There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Executed this ___22ND__ day of ___APRIL_____, 20 _08_____, at

Soledad, California.

/S/ _Samuel Lewis_____
SAMUEL LEWIS, PETITIONER
IN PRO SE

EXHIBIT 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NORTHWEST "M"                    HON. ALAN HABER, JUDGE


THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                       )
                          Plaintiff,   )
                                       )    A964 645
          vs.                          )
                                       )
SAMUEL WILLIAM LEWIS,                  )
                                       )
                          Defendant.   )
_____)


REPORTER'S TRANSCRIPT

October 31, 1988
November 21, 1988


APPEARANCES:


For the People:            IRA REINER, District Attorney
                           BY: Sandra Goen Harris, Deputy
                           210 West Temple Street
                           Los Angeles, California 90012


For the Defendant:         RONALD LEVINE
                           Alternate Defense Counsel
                           207 South Broadway
                           Suite 600
                           Los Angeles, California 90012



                           JOAN RUBEY KOTELES, CSR NO. 1911




1

VAN NUYS, CALIFORNIA, MONDAY, OCTOBER 31, 1988, 11:10 A.M.

DEPARTMENT NORTHWEST "M"            HON. ALAN HABER, JUDGE

-oOo-

THE COURT:  We will go on the record outside the
presence of the jury with Mr. Lewis.

The record will show Mr. Lewis is present with
Mr. Levine, his counsel.

Miss Harris for the district attorney.

Informally, so that the record is clear and
there is no mistake about it, you indicated to me informally
you thought that your client wanted to be heard; is that
correct?

MR. LEVINE:  Yes.

I understand Mr. Lewis wants to address the
Court.

THE DEFENDANT:  There is no chance of my family
being able to hire an attorney of our own at this point,
sir?

THE COURT:  Well, that question -- I will try to
give you as straight an answer as I possibly can, and I
can't just say yes or no.

It should be obvious to you that we have
already started the jury selection.

THE DEFENDANT:  Yes, sir.

THE COURT:  And I can't imagine that it would be
humanly possible for a lawyer to do it, but if you were
to bring a new lawyer in that would be prepared to take over
where Mr. Levine left off, who said he is ready to properly

1    represent you, it would be a mistake on my part to say no

2    you can't.

3              But I don't see another lawyer here.

4              If you are asking for a continuance of this

5    case to hire another lawyer, the answer is no.  I can't do

6    it.

7              The trial has started.

8              The case -- you know I haven't had the case

9    from the beginning.

10              Where is Mr. Lewis' file?  I have it right

11    here.

12              I have it buried.

13              This case goes back to March.

14              I know from looking at the minute order that an

15    effort was made to have another lawyer appointed, and there

16    have been lots of continuances.

17              Your attorney has told me, in fact, he is

18    ready.

19              There has been an awful lot of investigation

20    that has been done in this case.

21              I can tell that from the amount of money that

22    has been paid to the investigator for the number of hours

23    that he has put in.

24              Again, the answer is no.

25              I can't continue this case to let your family

26    go and hire a lawyer, no.

27              THE DEFENDANT:  Well, sir, seeing there is a conflict

28    of interest between me and this attorney here --

1        MR. LEVINE:  At this point, your Honor, I would ask

2   that the prosecutor --

3        THE COURT:  I understand.  I know at what point to

4   close the courtroom.

5           Let me just do this.  Would you mind not going

6   out that way.

7        MS. HARRIS:  You want me to wait in the jury

8   room?

9        THE COURT:  You are welcome to go through the hall.

10          I am afraid if you go out -- I have a number

11  of jurors waiting out there -- they may think something is

12  peculiar.

13       MS. HARRIS:  Either the jury room or the hall.

14       THE COURT:  Yeah.  The hall.

15          And if you need to go down to outside, you can

16  go through Department "R" next door.

17          Can I ask you to just tell the jurors that

18  there has been a hitch, and it is just going to be awhile

19  and they should be on hold.

20          It could easily be 15, 20 minutes before we

21  resume.

22

23          (Whereupon the following proceedings

24          were had in a closed session:)

25

26       THE COURT:  All right.

27          I have closed the courtroom, Mr. Lewis, at your

28  request and the attorney's request.

1          I have asked the district attorney to leave.

2          The only people here are the court staff,

3    and I want you to understand that whatever you say is

4    confidential.  Okay.  It can't be used when the trial

5    resumes,.

6          You say there is a conflict of interest.

7          What is the -- why do you say that?  What is

8    the conflict?

9          THE DEFENDANT:  Well, sir, being as the seriousness

10   of this case I would think that all the evidence I would

11   supposedly have to know about it, right?

12          Whereas things -- something detrimental to the

13   case popped up just recently, and it is like I have no other

14   choice now but to take the 15 to life now, because I don't

15   think this man here will represent me to my -- to his full

16   ability to or in my best cause, and I don't want to end up

17   going to trial and being an old man when I get out of jail.

18          THE COURT:  Well, I can understand that.

19          That is certainly a concern and we -- I can't

20   say that we talked about it last week when the matter was

21   here because there wasn't much of a discussion between you

22   and I.

23          I think I merely asked you if you understood

24   what I had said, and I did indicate to you without trying to

25   pressure you or threaten you in any way.  That is not my

26   style.

27          I am here to see to it that you have a fair

28   trial, and I feel very strongly that is exactly what my

1    function is to make sure that you are presumed innocent and

2    you have a fair trial.

3         Now, you claimed, and you have a right to do

4    that, that there is a conflict of interest between you and

5    Mr. Levine, and I am going to try to get to the bottom of it

6    and see.

7         I don't want you to feel pressured to do

8    anything, to plead guilty.

9         In fact, if you did indicate, and I don't want

10   to get ahead of myself, but if you were to have any interest

11   in pleading guilty and claim that you are being forced into

12   it by the circumstances, I probably wouldn't let you plead

13   guilty, because I don't believe in it.

14        All right.

15        What I am going to do is see if your claim

16   there is a conflict of interest is a good one.

17        If you have a valid legitimate argument that

18   there is a conflict of interest, then I will consider taking

19   measures.

20        All right.

21   THE DEFENDANT:  Yes, sir.

22   THE COURT:  So tell me, exactly what you are referring

23   to.

24   THE DEFENDANT:  Well, sir, this case has been going

25   on since February.

26        We went through preliminary, through pretrials.

27        I felt that there were motions that should have

28   been filed.

1          I don't know the names of the motions.

2      THE COURT:  What kind of motions?

3      THE DEFENDANT:  There is a motion of discovery.

4      THE COURT:  All right.

5      THE DEFENDANT:  Then there is some type of ongoing

6  discovery.

7          Well, just Friday I was informed of something

8  that was very detrimental to this case when it should have

9  been brought to my attention months ago.

10          It is supposed to have been in his book since

11  February.

12      THE COURT:  Okay.

13          Now, let's start from the beginning.

14          Mr. Levine, indicate for the record if you

15  would the extent and nature of your experience in

16  representing people charged with felonies and misdemeanors.

17      MR. LEVINE:  Well, your Honor, I became a member of

18  the California State Bar in 1969.

19          The day after I was sworn in I became a

20  member of the Los Angeles County Public Defender's Office

21  and worked with that office from 1969 through the calendar

22  year 1972.

23          After about six months with the L.A. County

24  Public Defender's Office I was assigned right out here to

25  the Van Nuys branch where I did misdemeanors and was sent

26  from here to Sylmar Juvenile Hall where I did my juvenile

27  experience, back to Van Nuys where I did misdemeanor trials,

28  and then up to do felonies.

1            I worked in the calendar department in 1970

2     or '71 of the Superior Court in this building which was when

3     Judge Rosenthal was sitting here and Deputy District

4     Attorney Chuck Peven was the calendar deputy.

5            After doing felony trials, I went back

6     downstairs as misdemeanor supervisor supervising nineteen

7     attorneys for the L.A. County Public Defender's Office.

8            I left that office in 1972, went into private

9     practice, where I engaged in the criminal defense work

10    during thirteen years along with some civil real estate

11    matters.

12           As of May of 1986, I joined the alternate

13    defense counsel, was assigned to a felony case load, trial

14    load, and have been doing that continuously ever since,

15    having -- I don't know -- at least ten Superior Court or

16    seven or eight to ten Superior Court jury trials during that

17    period of time.

18        THE COURT:  How many homicide cases have you handled

19    over your career as an attorney?

20        MR. LEVINE:  That very question was asked of me by

21    Mr. Lewis.

22           I can't give you a number.  I will say that

23    most of them settled.

24           I recall -- I can't give your Honor a figure.

25           I can recall Mr. Ernie Norris of the District

26    Attorney's Office who is now downtown on a case that was

27    about ready to go to jury offering my client immunity, the

28    same situation we are faced in this case with two immunized

1    witnesses in which my client took that offer.

2            But I can't give your Honor a figure.

3        THE COURT:  All right.

4            Did you hear Mr. Lewis claim that there is a

5    conflict of interest.

6            His explanation offered to me was he feels

7    there should have been discovery.

8            He said there should have been motions filed.

9            He wasn't sure of the exact nature of them

10    except he referred to a discovery motion and complained of

11    some evidence being very detrimental to his case being

12    received Friday.

13            Can you respond to that charge or charges?

14        MR. LEVINE:  Yes, your Honor.

15            The district attorney and myself have pursuant

16    to the Superior Court policy manual involved ourselves in

17    informal discovery on a continuing basis.

18            I was given a murder book, copy of a

19    preliminary hearing transcript.

20            The transcript was two days in length, went

21    over two sessions.

22            Subsequent to that I asked for duplication of

23    photos and other items.

24            I thought I had received everything.

25            At some point, some months back, Miss Harris

26    was not sure whether I had everything and gave me a Xerox

27    copy of another murder book.

28            I did not at that time check page for page with

1    the information I had previously gotten.

2            It is true and Mr. Lewis' claim is correct that

3    having gone through and starting to index all of this stuff

4    as it appeared the settlement was unlikely and preparing

5    myself for trial, I did come across a statement that was not

6    otherwise seen or known to me.

7            THE COURT:  When was that?

8            MR. LEVINE:  That was last Thursday sometime and --

9            THE COURT:  Excuse me.

10           MR. LEVINE:  Sure.

11

12           (Pause in the proceedings.)

13

14           THE COURT:  I am sorry for the interruption.

15           MR. LEVINE:  That's all right, your Honor.

16            It was last Thursday sometime.

17            Upon discovering it as we are not in session

18    on Friday on this matter, I immediately contacted the

19    investigator who the Court correctly stated has done a lot

20    of work on this case.

21            In fact, the investigator and myself made trips

22    out to Wayside and asked permission, although Mr. Lewis was

23    housed at Wayside medium north, to go back inside and not

24    talk on the phones, to spend a lot of time with Mr. Lewis

25    to get him to tell us a complete story so we could do a

26    competent job for him.

27            It was Mr. Everest's and my feeling as well

28    that we had never gotten the full story from Mr. Lewis.

1          But having discovered this and thinking it
2    was as important as it was, the investigator was notified
3    and was told that we have to see Mr. Lewis and let's do it
4    Friday after work.

5          He agreed.

6          At 6:00 Friday after work we went down to new
7    county jail.

8          Mr. Lewis was on the phone talking to his girl
9    friend and also the mother of his child.

10         We waited until that conversation was through.

11         I had a conversation with her.  She is listed
12   as a People's witness.

13         In fact, she asked to go in, if it was possible
14   she go in and speak to Mr. Lewis herself, because I think
15   she felt she knew it was in his best interests and that is
16   not to try to hide someone, but to be completely honest with
17   the attorney that is trying to represent him.

18         So we filled out a slip for her as a material
19   witness although she had a youngster outside.

20         Apparently Mr. Lewis got lost in the shuffle.

21         That is to say, that between the public
22   visiting area, his module number and the attorney visiting
23   room it took over an hour for them to come down.

24         She couldn't wait because the sheriff's
25   indicate they don't run a babysitting service outside.

26         She just left.

27         The investigator and myself told Mr. Lewis what
28   the statement was, told him the effect of, the potential

1    daming affect upon him of it.

2              He questioned why it wasn't found earlier.

3         THE COURT:  That's a reasonable question.

4         MR. LEVINE:  And it was reasonable.

5              He asked if it could at least be verified.

6              I told him that was reasonable and I understood

7    that.

8              After leaving the jail Friday night I asked

9    Mr. Lewis, Mr. Everest, the investigator, to please verify

10   it.

11             I got on the phone with him Saturday morning

12   where he indicated to me that the person, the declarant in

13   this statement, had apparently moved.

14             The address of that house was vacant.  There

15   was nothing on the windows either.

16             I made several inquiries of Mr. Everest and

17   thereafter personally went down to the location myself,

18   went up and down the block asking about knowledge of this

19   particular declarant, and came across a woman who gave me

20   some information.

21             Mr. Everest, in fact, spoke to that declarant

22   this morning, confirmed what Mr. Lewis asked that we

23   confirm.

24             That yes this person did make the statement.

25             That the statement not only was made to the

26   police but he believed it to be true.

27             And then Mr. Lewis was faced with the situation

28   of knowing exactly what the situation was.

1      And it was my impression based upon knowing

2  the evidence against him, that he had decided that it would

3  be in his best interests to take the People's offer, (and I

4  personally advised it,) because either Mr. Lewis has to be

5  quite candid and fully explain everything to his lawyer or

6  he is put in the position where the People's evidence

7  against him which would be unexplained in my opinion would

8  be proof beyond a reasonable doubt, and he would run the

9  risk of being convicted of three attempted firsts and a

10  first, and neither situation is good.

11      THE COURT:  I understand that.

12      Is there anything further that you wish to say,

13  Mr. Lewis?

14      THE DEFENDANT:  I just don't understand how 8 months

15  can go by and some case load like this shouldn't be studied

16  closer than that.

17      THE COURT:  I can understand your concern, but he may

18  have found it and it may have been in your best interests if

19  he found it out.

20      What if -- look, you know if you are guilty of

21  one or more of these charges and I am not here to discuss

22  that right now with you.

23      You know.  I don't know.  Neither does your

24  lawyer.

25      He may have some idea of how good -- (I am sure

26  he has some idea of whether the prosecution has a good case,

27  a bad case, a poor case, an excellent case.

28      I don't know.

1    I don't know anything about the case other than

2    the charges, that's true.

3    Now, your attorney if he is advising you to

4    plead guilty, it may be in your best interests if either you

5    are guilty and/or the prosecution has a case where they can

6    convict you of all four of these counts.

7    I don't want to remind you, because I am not

8    saying it to pressure you, you mentioned to me that you

9    don't want to spend the rest of your life in jail, and I

10   don't blame you, but if you were convicted on all four of

11   these four counts, you run that risk.

12   You have got a lot at stake.

13   You are a young man and I don't want to assume

14   you are guilty.

15   I still presume you are innocent, and you are

16   a very articulate young man and I understand your concern.

17   But your attorney assuming he is acting in your

18   best interests.

19   He doesn't work for me.  He doesn't work for

20   the district attorney.

21   He is obviously here to give the district

22   attorney a run for their money and make them prove their

23   case.

24   But if you are guilty, and your attorney

25   advises you to plead guilty, and you are doing it

26   voluntarily, then you ought to consider doing it.

27   If you are not guilty, have your trial, because

28   you will get a fair trial in this court.

1          Now, you haven't told me enough.

2          I can understand your upsettedness about just

3 learning of this evidence which apparently doesn't help your

4 case and in fact hurts your situation.

5          But fortunately it was discovered before we got

6 to the district attorney putting on evidence.

7          You asked your lawyer to verify whether or not

8 the statement was made and they immediately went out over

9 the weekend and did it.

10         You don't have to be in love with your lawyer

11 and have, you know, but you have got a good lawyer.

12         You have got a very competent experienced

13 lawyer who cares about what happens to you.

14         So you haven't told me anything that would

15 justify replacing him with another attorney or lawyer, and I

16 find there is no conflict of interest.

17         And that's how the Court rules.

18         Now, we will have to get Miss Harris back in

19 here.

20      THE DEFENDANT:  Excuse me, sir.

21         As far as caring about what happens to me --

22      THE COURT:  Excuse me one minute.

23         Would you check next door and/or call down to

24 the office and have her stand by.

25         I don't want to go through a ten minute time

26 gap in getting her.

27         Yes, Mr. Lewis.

28      THE DEFENDANT:  I was told he could give a shit less

1    what happens to me in the holding tank.

2            THE COURT:  Well, I don't know the context.

3            If that was said, I don't know the context in

4    which it was said.

5            I mean he is fighting.  He has got all these

6    motions.

7            He is trying to pick a fair jury.  Did you say

8    that?

9    MR. LEVINE:  Yes, your Honor, and I might state

10   also at this point being I feel Mr. Lewis has not seen fit

11   to fully tell me the specifics in this matter I have taken

12   the position at this time that everyone is out in front of

13   me.

14           In other words, trust everyone but cut the

15   deck.

16           And in that response in furtherance of that

17   I have already checked information that was given to me

18   regarding the prior record of a potential immunized witness

19   where it was related to me by the district attorney's office

20   that he had no priors and no promises were made.

21           Well, after learning about certain things,

22   apparently Mr. Lewis doesn't know this yet either, is that

23   one of the people that was alleged to have no priors and

24   only a pending 11352 pending in downtown, that is Leon

25   Milton, M-i-l-t-o-n, case number A958414, no promise being

26   made, no priors, I come to learn that, in fact, he does have

27   a prior, A785338.

28           He is on probation out of Department 117.

1          So I guess what I am trying to state is certain

2   discovery was given to me.  Some of it in pieces.  Some of

3   it late.

4          At this point everything is being checked out.

5          In fact, even the allegations that a potential

6   immunized witness doesn't have any priors we learn today

7   that he does have a prior.

8          So Mr. Lewis because I have felt that he has

9   been less than candid for whatever reason, and I felt that

10  he is not being helpful, and he is just trying to find

11  fault, which is perfectly his right, I indicated to him that

12  if he doesn't accept that offer, whatever happens happens

13  and I could care less, and maybe the terminology that was

14  used by Mr. Lewis is true, because it is certainly his

15  choice.

16          That is not to say I wouldn't try to do the

17  best for him.

18          THE COURT:  I understand.

19          It could be out of frustration that Mr. Levine

20  feels it is in your best interests to plead guilty to the

21  offer because under the circumstances -- I don't want to

22  keep repeating it.

23          You understand me.

24          If you are guilty or if the district attorney

25  has a hell of a case, you are a fool not to accept the

26  offer, and maybe he is frustrated, because there is going --

27  if you are convicted of these four counts, there are four

28  life terms involved, and I think it would be tragic -- two

1    things would be tragic.

2         One, for you to be found guilty if you are not

3    guilty; for you to plead guilt in you are not guilty, or

4    for you to get found guilty of all counts if you are guilty

5    having passed up an offer to accept a plea to one count of

6    murder in the second degree.

7         Do you hear me?

8         THE DEFENDANT:  Yes, sir.

9         THE COURT:  All right.

10        Now, I can understand your attorney's

11   frustration if you had the offer.

12        He believes that you haven't been honest, and

13   believes the district attorney can prove the case of one

14   or more of these counts, I can see his frustration.  Okay.

15        But he is a very competent lawyer.  I don't

16   just say that.

17        I have let lawyers go when I feel they didn't

18   do the job correctly.

19        You don't have a basis for relieving Mr. Levine

20   or the alternate defense counsel's office, and you are going

21   to have to make --

22        You don't have to do anything.

23        You can just sit there and I am not here to try

24   to induce you to plead guilty.

25        I have a jury waiting outside.

26        It is now time for me to bring in Miss Harris.

27        So we have concluded that hearing and we will

28   resume with the jury selection if that's the route we are

1  going to take.

2        THE DEFENDANT:  No, sir.

3        THE COURT:  Pardon me?

4        THE DEFENDANT:  No, sir.

5        THE COURT:  No, sir, what?

6        THE DEFENDANT:  Is it my right to plead nolo

7  contendere instead of second degree?

8        THE COURT:  Let's have Miss Harris.

9             This is the time she has to be present, and we

10  can talk about it, and I will answer your question.

11

12             (Ms. Harris entered the

13             courtroom, and the following

14             proceedings were had:)

15

16        THE COURT:  The record will now show Miss Harris of

17  the District Attorney's Office is present.

18             We have concluded the Marsden hearing, and it

19  is now time to resume.

20             I sort of overlapped and told Mr. Lewis it is

21  now time to bring the jury in.

22             He then asked me if it is possible for him to

23  plead guilty -- to plead no contest to a count of murder in

24  the second degree.

25             Mr. Lewis, let me explain to you that, number

26  one, I am very reluctant to take a no contest plea.

27             I would want to hear what Miss Harris has to

28  say about a no contest plea.

1           Frankly, if you were to plead no contest, if I

2  were to decide that it is appropriate to do it, you would

3  have to assume that it would be treated the same as a guilty

4  plea for my purposes, and when it comes time for sentence, I

5  am going to assume that you are guilty of murdering another

6  human being.

7          You understand that?

8      THE DEFENDANT:  Yes, sir.

9      THE COURT:  Miss Harris, what is your position with

10  respect to a no contest plea?

11      MS. HARRIS:  Actually I would leave that to the

12  Court.

13         We take those downtown all the time.

14      THE COURT:  I do it here.

15         I don't like them because it is very

16  uncomfortable, particularly on a case with a life sentence,

17  because you read a probation report, and you are informed

18  that Mr. Lewis is capable of telling a probation officer

19  that he didn't do it;

20         That he felt pressured into doing it, and he

21  did it to avoid a lengthier possible prison stay, and it

22  is just not nice to send people to prison, Mr. Lewis, if

23  they are not guilty.

24         That's why I want you to have a trial if you

25  are not guilty.

26         But if you want to plead no contest, I am not

27  going to stand in the way.

28         But you have to be doing it voluntarily and

1   freely.

2          THE DEFENDANT: Yes, sir.

3          THE COURT: If you sit there or stand there and tell

4   me that you are being pressured into it, I am not going to

5   participate in it.

6              You hear me?

7          THE DEFENDANT: Yes, sir.

8          THE COURT: Are you being pressured into it?

9          THE DEFENDANT: No, sir.

10         THE COURT: Are you going to do this freely and

11  voluntarily?

12         THE DEFENDANT: Yes.

13         THE COURT: All right.

14             Are you prepared to go forward? I shouldn't be

15  presumptuous.

16             Is that still agreeable with the district

17  attorney?

18         MS. HARRIS: Yes, your Honor.

19             That's fine.

20             Mr. Lewis, in the beginning of this case his

21  Honor read to you the charges or read to the jury in open

22  court the charges that are alleged against you.

23             Do you understand what you are charged with

24  in information number A96 46 45?

25         THE DEFENDANT: I don't understand the number but I

26  understand what I am being charged with.

27         MS. HARRIS: Okay.

28             Do you understand what you are being charged

1    with is my question?

2            THE DEFENDANT:  Yes, ma'am.

3        MS. HARRIS:  Have you had an opportunity to talk to

4    your attorney about the facts of this case and any possible

5    defenses?

6            THE DEFENDANT:  Somewhat.

7            THE COURT:  Well, do you need more time?

8            THE DEFENDANT:  He stated that he had been at Wayside

9    to visit me several times, whereas he came to visit me twice

10   was the most, stayed five minutes once and the second time

11   was the time he talked to me.

12           THE COURT:  All right.

13           MR. LEVINE:  That's not true.

14           THE COURT:  You are you saying you need more time to

15   speak to Mr. Levine.

16           Is that what you are saying?

17           THE DEFENDANT:  No, sir.

18           THE COURT:  Okay.

19       MS. HARRIS:  Now, before I take a plea of no contest

20   in this case you have certain constitutional rights that you

21   need to understand, and you would have to waive and give up

22   those rights in order for me to take the plea.

23           First of all, you have the right to a jury

24   trial.

25           That is what was about to take place in this

26   courtroom, where your lawyer and myself select twelve

27   individuals from the community.

28           They sit here in this box behind me.

1        They listen to all the evidence, and they have

2    to be convinced of your guilt beyond a reasonable doubt,

3    each and every one of them.

4        Do you understand what a jury trial is?

5        THE DEFENDANT:  Yes.

6        MS. HARRIS:  Do you give up your right to a jury

7    trial?

8        THE DEFENDANT:  Yes.

9        MS. HARRIS:  In addition you would have the right

10    to a court trial, although we passed that stage in the

11    proceedings.

12        A court trial is a hearing in which the Judge

13    would sit and listen to all the evidence, and the Judge

14    would have to be convinced of your guilt beyond a reasonable

15    doubt.

16        Do you understand what a court trial is?

17        THE DEFENDANT:  Yes.

18        MS. HARRIS:  Do you waive and give up your right to a

19    court trial?

20        THE DEFENDANT:  Yes.

21        MS. HARRIS:  You also have the right to confront

22    and cross examine the witnesses against you, and you have

23    the right of the subpoena power through the Court.

24        That means at the time of the jury trial or a

25    court trial, if you had elected to have that, you would have

26    the right to be in the courtroom when the witnesses

27    testified against you, to see them testify, hear them

28    testify and ask them questions through your attorney to see

1   if they are telling the truth or not.

2            Do you understand your right to confront and

3   cross examine the witnesses?

4            THE DEFENDANT:  Yes.

5            MS. HARRIS:  And do you give up that right?

6            THE DEFENDANT:  Yes.

7            MS. HARRIS:  The right of the subpoena power through

8   the Court means at the time of this court trial or jury

9   trial the Court would issue a piece of paper, a document

10  called a subpoena, ordering witnesses if you have such

11  witnesses to come in and to testify for you at no expense to

12  you whatsoever.

13           Do you understand what your right of subpoena

14  power through the Court is?

15           THE DEFENDANT:  Yes.

16           MS. HARRIS:  Do you give up that right?

17           THE DEFENDANT:  Yes.

18           MS. HARRIS:  Finally you have the right to remain

19  silent.

20           That means at the time of this court or jury

21  trial you don't have to put on any defense whatsoever.

22           You don't have to take the stand and testify

23  and neither the court nor the jury could use that against

24  you in any way.

25           You could require the People to prove their

26  case beyond a reasonable doubt.

27           If you plead no contest in this case, a no

28  contest plea is treated the same as a guilty plea for the

1    purpose of sentencing in this court.

2                Do you understand that?

3         THE DEFENDANT:  Yes.

4         MS. HARRIS:  Now, if you plead guilty -- plead no

5    contest today, you are incriminating yourself when you do

6    so.

7                Do you understand what your right to remain

8    silent is?

9         THE DEFENDANT:  Yes.

10        MS. HARRIS:  Do you give up that right?

11        THE DEFENDANT:  Seems as though I already did.

12        MR. LEVINE:  Well, by pleading guilty, in effect, you

13   are incriminating yourself.

14               That's why she is asking if you are waiving or

15   giving up that right.

16        THE DEFENDANT:  Yes.

17        MS. HARRIS:  Now, you understand that a plea of no

18   contest in this case, that a plea to a second degree murder

19   carries a maximum of fifteen years to life.

20               Do you understand this?

21        THE DEFENDANT:  Yes.

22        THE COURT:  That is the sentence.

23               I mean period.

24        MS. HARRIS:  That's correct.

25               That is the sentence.

26        THE COURT:  When you come back, you have to

27   understand before I permit you to plead guilty -- excuse

28   me -- no contest, that when you come back to court for

1    sentencing in approximately three weeks' time or three

2    weeks' time, there is not going to be any discretion on my

3    part.

4            You are going to be sentenced to state prison

5    for that term.

6            You understand that?

7        THE DEFENDANT:  Yes.

8        THE COURT:  Okay.

9            Furthermore, there is one thing that needs to

10   be dealt with.

11           Count 1 alleges murder in the first degree.  I

12   suppose we can simply by taking a stipulation -- I am trying

13   to avoid the necessity of your filing an amendment to the

14   information.

15       MS. HARRIS:  Take it as a lesser included.

16       THE COURT:  Well, it is not technically a lesser

17   included.

18           It is not a lesser included technically

19   speaking, but we can stipulate second degree murder is an

20   included offense as set forth in Count 1 of the information.

21       MR. LEVINE:  So stipulated.

22       MS. HARRIS:  So stipulate.

23       THE COURT:  All right.

24       MS. HARRIS:  If you are placed on parole at some

25   point, and you violate any of the terms and conditions of

26   parole, you could be sent back to state prison for up to an

27   additional year for each violation.

28           Do you understand this?

1         THE DEFENDANT:  Yes.

2        MS. HARRIS:  Now, the law requires that the Judge

3    impose a fine of between 100 and $10,000 to be paid to the

4    victim's restitution fund.

5            Failure to pay this fine could result in your

6    parole being violated if the Judge finds you have the

7    ability to pay this.

8         Do you understand this?

9        THE DEFENDANT:  Yes.

10         Why was I never informed of this before I take

11    this plea?

12        MR. LEVINE:  The fines?

13        THE DEFENDANT:  Yes.

14        MR. LEVINE:  It is true I never informed you of the

15    fines because we never reached the point where you indicated

16    that you were going to go through with this.

17        THE COURT:  That's the least of your concerns are the

18    fines.

19          All right.

20        THE DEFENDANT:  So if I get out and I start working

21    to support my family, that money is going to be taken out of

22    my pocket to pay somebody else?

23        THE COURT:  That could happen, yes.

24           There is a limit to how much the fine could be.

25    It can't exceed $10,000, if I decide to impose that amount

26    of fine, and the Court isn't going to be able to supervise

27    the collection of the fine.

28         Do you understand that?

1    murder book or anything?

2          THE COURT:  At this point?

3          THE DEFENDANT:  Sometime before I get sentenced.

4          THE COURT:  Well, that could create a bit of a

5    problem.

6                I suppose Mr. Levine would like to hold onto

7    it.

8                I don't know if it is possible to have a

9    copy.

10          MR. LEVINE:  I guess here we go on the record again.

11                Mr. Lewis -- the first time I visited Mr. Lewis

12    I indicated just what appeared in Saturday's L.A. Times;

13    there was a danger regarding jailhouse snitches getting

14    ahold of materials should it be given to him.

15                They really sort of befriend him, come up

16    with information only to extricate themselves for their own

17    problems.

18                Since the case has been ongoing I have seen

19    Mr. Lewis maybe five or six times, a couple of times at new

20    county jail with Mr. Everest and also at Wayside as I

21    indicated on a couple of occasions.

22                I have given him a full copy of the preliminary

23    hearing transcript after being checked out by the Sheriff's

24    Department.

25                I have not given him a lot of extra material

26    that I have because I needed it for this trial.

27                Should he want that information -- I don't know

28    what need he would have for it at this point -- I have some

1   idea -- however, I would be prepared after sentencing in

2   this matter to Xerox copies so our office has a copy of it

3   and make it available to him.

4        THE COURT:  I understand your need for a copy or the

5   original of what you have.

6            I know that.

7        THE DEFENDANT:  So this is stated on the record that

8   a guarantee that I will have it.

9        THE COURT:  I will make sure you get it.  How is

10  that?

11       THE DEFENDANT:  Thank you sir.

12       THE COURT:  Now, I need to satisfy myself first of

13  all you understand each and every one of your constitutional

14  rights.

15           Do you understand those rights?

16       THE DEFENDANT:  Yes, sir.

17       THE COURT:  Do you have any questions about any one

18  of those rights?

19       THE DEFENDANT:  No, sir.

20       THE COURT:  Do you have any questions at all that

21  you would like to ask me, Mr. Lewis, at this point,

22  anything?

23       THE DEFENDANT:  Just last week when you gave me that

24  court order to see the doctor, they called me while I was in

25  court and haven't called me again.

26       THE COURT:  All right.

27           I will sign an order for an examination.

28       THE DEFENDANT:  Thank you, sir.

1          THE COURT:  All right.

2                  Now, you want to go ahead with this no

3      contest plea understanding when you come back to court

4      in three weeks' time I am going to sentence you to the

5      Department of Corrections for a term of fifteen years to

6      life?

7          THE DEFENDANT:  Yes.

8          THE COURT:  You want to go ahead with this?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  There is not going to be any changing

11     your mind when you come back here.

12         THE DEFENDANT:  No, sir.

13         THE COURT:  This is it.

14                 You understand me?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Okay.

17                 I am satisfied that Mr. Lewis understands each

18     and every one of his constitutional rights, and that he has

19     knowingly and intelligently and voluntarily waived and

20     given up each and every one of those rights, completely

21     understanding the consequences of his expected plea of no

22     contest.

23                 You may now take the plea.

24         MS. HARRIS:  Thank you, your Honor.

25                 Mr. Samuel William Lewis, how do you plead

26     to Count 1 as stipulated second degree murder in information

27     number A964645, that on or about February 18th of 1988, here

28     in the County of Los Angeles, you committed the crime of

1   second degree murder, in violation of Penal Code Section

2   187, a felony, that you willfully and unlawfully with malice

3   aforethought murdered Chivogne Perry, a human being, and

4   further that it is a serious felony within the meaning of

5   Penal Code Section 1292.7 --

6          THE COURT: 11.

7          MS. HARRIS: 1192.7(c)(1), how do you plead to that

8   count?

9          THE DEFENDANT: No contest.

10          THE COURT: I take it you are not seeking an

11   admission to any of the enhancements; is that correct?

12          MS. HARRIS: Correct.

13          THE COURT: All right.

14          MR. LEVINE: For the record --

15          THE COURT: Just one minute.

16              Go ahead.

17          MR. LEVINE: Whether Mr. Lewis wants it or not, I

18   believe there was some prior discussion that at the time of

19   P and S the Court would consider housing Mr. Lewis at the

20   California Youth Authority pursuant to 1731.5, and whether

21   Mr. Lewis wants it or the Court in its discretion --

22          THE COURT: I will certainly give him consideration.

23          MR. LEVINE: -- in its discretion choses to do it or

24   not.

25          THE COURT: We will talk about it at the sentencing.

26              I am not ruling it out certainly, and I will

27   hear from the district attorney and see what the district

28   attorney has to say.

1        MR. LEVINE:  Very well.

2        THE COURT:  I will find Mr. Lewis has knowingly and

3    intelligently and voluntarily entered his plea of no contest

4    to this offense.

5            And we will set a sentencing date of November

6    21st.

7            That's the three week date.

8        MR. LEVINE:  That's fine.

9        THE COURT:  All right.

10           Mr. Lewis, you are ordered to return to this

11   court at 9:00 a.m., November 21, 1988.

12           The other counts will go over to November 21st

13   for further treatment of that at that time.

14       THE DEFENDANT:  Sir, the other counts?

15       THE COURT:  Pardon me?

16       THE DEFENDANT:  The other counts?

17       MR. LEVINE:  The attempted murder counts which will

18   be dismissed or stated in effect dismissed after the

19   sentence, depending on the continuing validity of your plea

20   in this case.

21           I would assume that to be the case.

22       THE COURT:  Are you concerned about the other counts,

23   what is going to happen to them?

24       THE DEFENDANT:  I was told they will be dropped.

25       THE COURT:  They will be dropped.

26           If I sentence you, which I intend to do, on

27   November 21st for this, the agreement entered into between

28   you, the defense lawyer, Mr. Levine, and the district

1    attorney in return for pleading guilty to the one count of

2    murder in the second degree the district attorney is

3    agreeing to drop and dismiss the three counts of attempted

4    murder.

5           And I am here to see to it when you are

6    sentenced that the district attorney -- I don't think it is

7    going to be a problem -- but they carry out their part of

8    the bargain, okay.

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  All right.

11               We will see you on the 21st, Mr. Lewis.

12

13               (Whereupon the defendant left

14               the courtroom, and further

15               proceedings were had in the

16               presence of the prospective jury

17               panel, not transcribed herein.)

18

19

20               (The matter was continued to

21               Monday, November 21, 1988, at

22               9:00 a.m.)

23

24

25

26

27

28

1    VAN NUYS, CALIFORNIA, MONDAY, NOVEMBER 21, 1988, 9:40 A.M.

2    DEPARTMENT NORTHWEST "M"                HON. ALAN HABER, JUDGE

3                                -oOo-

4        THE COURT:  People versus Samuel William Lewis.

5                The record will show Mr. Lewis is present with

6    Mr. Levine.

7                Miss Harris for the District Attorney's

8    Office.

9                This matter is on calendar for sentencing

10   proceedings.

11               Are both sides ready to proceed?

12       MR. LEVINE:  Yes, your Honor.

13               However, the defendant has asked me to do one

14   thing.

15               The defendant is desirous of getting married.

16               I called your clerk and indicated the

17   defendant's desire to legitimize a child and get married.

18               Your clerk informed me that under no

19   circumstances does your Honor do that.

20       THE COURT:  That's correct.

21       MR. LEVINE:  I informed the defendant of that and the

22   fact that he could get married at Chino.

23               He wishes to waive time to forum shop to see

24   who will marry him, and I indicated it is not my idea of

25   good policy.

26       THE COURT:  Unfortunately that is just not a

27   sufficient reason to continue the matter.

28       MR. LEVINE:  Right.

1      THE COURT:  If it would make a difference, and you

2  can locate someone in the building that will do it, I will

3  make sure that he doesn't get transported back to the county

4  jail until late in the day, if that will do any good.

5      MR. LEVINE:  Well, my inclination if he was desirous

6  of getting married so much, he could do it in Chino.

7      THE DEFENDANT:  Chino doesn't marry people.  I called

8  Chino.

9      THE COURT:  You can talk to the chaplain in the

10  county jail.

11      You are not going to be taken to the

12  Department of Corrections until the latter part of this

13  week.

14      My guess is probably not until the early part

15  of next week.

16      That is just not a sufficient reason,

17  Mr. Lewis, for me not to sentence you.

18      It really isn't.

19      MS. HARRIS:  People are ready.

20      THE COURT:  Pardon me?

21      MR. LEVINE:  I was just inquiring.

22      The defendant had previously expressed a

23  desire not to be housed in juvenile even though sentenced

24  to prison.

25      THE COURT:  In other words he doesn't want to be

26  sentenced pursuant to 1731.5(c).

27      MR. LEVINE:  That was my understanding, and I just

28  wanted to confirm that, and he indicated that is correct.

1        He does not want that, although I believe it is
2   in his best interests.

3        He does not want that.

4        THE COURT:  Well, you are nineteen and a half years
5   of age.

6        I frankly think it should be up to the
7   Department of Corrections to make the decision where to
8   house him.

9        Do you wish to be heard, Miss Harris?

10       MS. HARRIS:  I was just going to point out what
11  your Honor just did;

12       That he is nineteen years of age.

13       I am not sure that the Youth Authority would
14  house him or not, but it is up to the Court.

15       THE COURT:  Well, it is really up to the Department
16  of Corrections to make that decision, and I feel more
17  comfortable in allowing that entity to make the decision
18  where they think he should be housed.

19       You still have under all circumstances --
20  first of all if I wanted to, I could not commit you directly
21  to the Youth Authority.

22       The law does not provide for it.

23       But there is a provision whereby the Department
24  of Corrections can make the decision where you are better
25  housed.

26       Under all circumstances you will have a
27  Department of Corrections number, if that's what you are
28  concerned about.

1            Let me inquire if both sides waive any

2    objection to proceeding even though this report was not

3    prepared in a timely manner.

4            MR. LEVINE:  Waive nine days notice.

5            MS. HARRIS:  People so waive.

6            THE COURT:  You waive arraignment for judgment?

7            MR. LEVINE:  Yes.

8            THE COURT:  Is there any legal reason why sentence

9    should not now be imposed?

10           MR. LEVINE:  None.

11           THE COURT:  All right.

12           I have read and considered the probation

13   report.

14           The report is received into evidence.

15           Would you like to be heard?

16           MR. LEVINE:  Submit it on the report.

17           MS. HARRIS:  People submit it as well.

18           THE COURT:  All right.

19           Is it your request, Mr. Levine, that the Court

20   exercise its discretion and sentence him to the Department

21   of Corrections but under the provisions of 1731.5(c)

22   allowing the Department of Corrections to decide whether to

23   house him during a certain part of the sentence in the Youth

24   Authority?

25           MR. LEVINE:  Yes, your Honor.

26           It has always been my thought that that

27   would be in the defendant's best interests, and

28   notwithstanding his desire I still think that it is in

1    his best interests.

2         THE COURT:  Mr. Lewis, you are committed for the

3    term prescribed by law for the charge of murder in the

4    second degree.

5         That is 15 years to life.  That's the judgment

6    of this Court.

7         The presentence credit is indicated as 276

8    days.

9         Is that accurate?

10    MR. LEVINE:  Yes, your Honor.

11         THE COURT:  Do you have any quarrel with that number,

12    Miss Harris?

13    MS. HARRIS:  No, I do not, your Honor.

14    THE COURT:  That would be 276 plus 138 for a total of

15    414 days presentence credit.

16         Mr. Lewis is committed pursuant to 1731.5(c) of

17    the Welfare and Institutions Code.

18         The minute order should reflect that the

19    Court is desirous of the Department of Corrections deciding

20    whether to house Mr. Lewis at a Department of Corrections

21    facility during some portion of his commitment.

22         Pursuant to 13967a of the Government Code a

23    $100 restitution fine is imposed.

24         Pursuant to 13967c of the Government Code a

25    $10,000 restitution fine ordered payable to the immediate

26    family members of the deceased.

27         In this matter I have given the presentence

28    credit.

1          MR. LEVINE:  Yes, sir.

2          THE COURT:  There is no --

3               Are there remaining counts?

4          MS. HARRIS:  People move to dismiss the remaining

5     count.

6          THE COURT:  Granted.

7               That should take care of it.

8               I will find Mr. Lewis does not have the

9     money to repay this county for the cost of providing

10    counsel.

11              Therefore, no order will be made.

12         MR. LEVINE:  Thank you, your Honor.

13         THE DEFENDANT:  By any chance can you stipulate --

14    I know you can't order anything -- that I be -- when they

15    do move me to the Department of Corrections stipulate that

16    if it is possible that I be moved to CMC.

17              Just stipulate it in the record.

18         THE COURT:  It won't do any good.

19              I can tell you if I thought it would do any

20    good.

21              I just know from experience that the

22    Department of Corrections just doesn't pay any attention

23    to a recommendation as to where someone should be housed.

24              They are going to classify you according to

25    the nature of the offense and your background and where they

26    think you ought to be housed.

27              If I thought it would do any good, but it

28    won't.

1      THE DEFENDANT:  One last question.

2      THE COURT:  Yes.

3      THE DEFENDANT:  If I find a Judge that will marry us,

4   is there any way I can get back to this court building in

5   order to be married?

6            In the county jail I have checked already

7   they -- the chaplain can't marry you.

8            The only place else you can get married is here

9   and wherever they send you.

10           If they send you up north, you have to go

11   through a lot of paperwork.

12      THE COURT:  Perhaps Mr. Levine can find someone.

13           If you can work it out before you are

14   transported to the Department of Corrections by the Los

15   Angeles County Sheriff, the attorney can come in here and I

16   have your case.

17           I will order you out here to the building.

18      THE DEFENDANT:  Thank you very much.

19      THE COURT:  You are welcome.

20

21           (The above proceedings

22           were concluded.).

23

24

25

26

27

28

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NORTHWEST "M"                HON. ALAN HABER, JUDGE


| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | A964 645 |
| vs. ) | |
| ) | |
| SAMUEL WILLIAM LEWIS, ) | REPORTER'S |
| ) | CERTIFICATE |
| Defendant. ) | |

STATE OF CALIFORNIA   )
                      )  ss.
COUNTY OF LOS ANGELES )


                I, JOAN RUBEY KOTELES, Official Reporter of the

Superior Court of the State of California, for the County of

Los Angeles, do hereby certify that the foregoing pages, 1

through 40, inclusive, are a true and correct transcript of

the proceedings had in the above-entitled matter on October

31 and November 21, 1988.

                Dated this 28th day of August, 1989.




                _____CSR NO. 1911
                        Official Reporter

# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                      )     CDC Number E-05524
SAMUEL W. LEWIS )
                      )
_____)

INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 12, 2006

PANEL PRESENT:

ARCHIE JOE BIGGERS, Presiding Commissioner
RAMON ESTRADA, Deputy Commissioner

OTHERS PRESENT:

SAMUEL W. LEWIS, Inmate
PAT FOX, Attorney for Inmate
NANCY NAFTEL, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Anna E. McGaughy                 House of Scribes

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings . . . . . . . . . . . . . . . . . . . . . | 1 |
| Case Factors. . . . : . . . . . . . . . . . . . . . | 10 |
| Pre-Commitment Factors. . . . . . . . . . . . . . | 26 |
| Post-Commitment Factors . . . . . . . . . . . . . | 39 |
| Parole Plans. . . . . . . . . . . . . . . . . . . | 53 |
| Closing Statements. . . . . . . . . . . . . . . . | 70 |
| Recess. . . . . . . . . . . . . . . . . . . . . . | 75 |
| Decision. . . . . . . . . . . . . . . . . . . . . | 76 |
| Adjournment . . . . . . . . . . . . . . . . . . . | 87 |
| Transcriber Certification . . . . . . . . . . . . | 88 |

1

1       P R O C E E D I N G S

2              **DEPUTY COMMISSIONER ESTRADA:** We're on.

3              **PRESIDING COMMISSIONER BIGGERS:** Okay. This

4       is a Subsequent Parole Consideration Hearing for

5       Samuel W. Lewis, L-E-W-I-S. CDC Number is E-05524.

6       Today's date is October 12, 2006 and we're located at

7       the Correctional Training Facility, Soledad. The

8       inmate was received on January the 4th, 1989 from Los

9       Angeles County. The life term began on January the

10      4th, 1989. The minimum eligible parole date was

11      February 19, 1998. The controlling offense for which

12      the inmate has been committed is Murder, Second

13      Degree. The Case Number A-964645, one count,

14      violation of Penal Code 187. Before I go any further,

15      there was also some -- three other counts. Were they

16      stayed or --

17             **DEPUTY DISTRICT ATTORNEY NAFTEL:** I don't

18      think that he was convicted of those.

19             **PRESIDING COMMISSIONER BIGGERS:** Okay.

20             **DEPUTY DISTRICT ATTORNEY NAFTEL:** It was a

21      plea. Was this a plea? So they were -- yes.

22             **PRESIDING COMMISSIONER BIGGERS:** Okay. All

23      right, thank you.

24             **DEPUTY DISTRICT ATTORNEY NAFTEL:** You're

25      welcome.

26             **PRESIDING COMMISSIONER BIGGERS:** The inmate

27      received a term of 15 years to life with a minimum

2

1    eligible parole date of February the 19th, 1998.  Now,

2    Mr. Lewis, this hearing is going to be -- is being

3    tape-recorded and for the purpose of voice

4    identification, each of us will state our first and

5    last names, spelling our last name.  When it's your

6    turn, sir, would you please spell your last name and

7    please give us your CDC number.  My name is

8    Archie Joe Biggers, B-I-G-G-E-R-S, and I'm a

9    Commissioner with the Board of Parole Hearings.

10            **DEPUTY COMMISSIONER ESTRADA:**  R. Estrada,

11    E-S-T-R-A-D-A, Deputy Commissioner, Board of Parole

12    Hearings.

13            **DEPUTY DISTRICT ATTORNEY NAFTEL:**

14    Nancy Naftel, N-A-F-T-E-L, Deputy District Attorney,

15    Los Angeles County.

16            **ATTORNEY FOX:**  Pat Fox, F-O-X, Attorney for

17    Mr. Lewis.

18            **INMATE LEWIS:** Samuel Lewis, L-E-W-I-S, CDC

19    Number E-05524.

20            **PRESIDING COMMISSIONER BIGGERS:**  Thank you,

21    Mr. Lewis.  And for the record, we will note that we

22    have two correctional officers present that are here

23    for security purposes only and will not be

24    participating in the hearing.  Before we begin, sir,

25    there is an ADA Statement in front of you.  Would you

26    please read that out loud for us.

27            **INMATE LEWIS:** "ADA, Americans With

3

1       Disabilities Act.  The Americans With

2       Disabilities Act, ADA, is now -- is a law to

3       help people with disabilities.  Disabilities

4       are problems that make it harder for some

5       people to see, hear, breathe, talk, walk,

6       learn, think, work or take care of

7       themselves than it is for others.  Nobody --

8       nobody can be kept out of public places or

9       activities because of a disability.  If you

10      have a disability, you have the right to ask

11      for help to get ready for your BPT hearing,

12      get to the hearing, talk, read forms and

13      papers and understand the hearing process.

14      BPT will look at what you asked for to make

15      sure that you have a disability that is

16      covered by the ADA and that you have asked

17      for the right kind of help.  If you do not

18      get help or if you don't think you got the

19      right kind of -- kind of help, you may ask

20      for a BPT-1074 Grievance Form.  You can also

21      get help to fill it out."

22            **PRESIDING COMMISSIONER BIGGERS:**  Sir, in

23   your own words, what does that mean to you?

24            **INMATE LEWIS:**  It means that if you're

25   unable to understand, hear, talk or being

26   (indiscernible), whatever is necessary in order for

27   you to be able to communicate effectively with the

4

1    Panel, then the Board will help you get that.

2            **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank

3    you.  That also includes mobility, too, so you can

4    walk.

5            **INMATE LEWIS:**  Yes, sir.

6            **PRESIDING COMMISSIONER BIGGERS:**  I see that

7    you signed a BPT Form 1073 on June the 17th, 2005.

8    Have you not signed one for 2006 yet?  A BPT-1073 for

9    ADA?

10           **ATTORNEY FOX:**  I don't believe he did

11   because there was a postponement.

12           **PRESIDING COMMISSIONER BIGGERS:**  Right.

13           **ATTORNEY FOX:**  But I've been his attorney

14   for a number of years.  I have no concerns but we --

15           **PRESIDING COMMISSIONER BIGGERS:**  So you want

16   to waive the --

17           **ATTORNEY FOX:**  We waive the document.

18           **PRESIDING COMMISSIONER BIGGERS:**  --

19   document?  Okay, thank you.

20           **ATTORNEY FOX:**  You're welcome.

21           **PRESIDING COMMISSIONER BIGGERS:**  I see also,

22   before I go any further, I know that you had a

23   postponement in '05 -- I mean '06.

24           **ATTORNEY FOX:**  Yes.

25           **PRESIDING COMMISSIONER BIGGERS:**  And that

26   was prior to you doing your EOC file review, which was

27   also in June, June 17.  And you recently went through

5

1  your C-file?

2        INMATE LEWIS:  Yes, sir.

3        PRESIDING COMMISSIONER BIGGERS:  When did

4  you go through it again?

5        INMATE LEWIS:  Approximately 30 days, 60

6  days ago.

7        PRESIDING COMMISSIONER BIGGERS:  Okay.

8  Well, I don't see a file on that.  Maybe there's one

9  in there but we'll get to that.

10       ATTORNEY FOX:  Again, if it's not there, we

11 would waive in the regulating as to that.

12       PRESIDING COMMISSIONER BIGGERS:  All right,

13 good.  Thank you.  I appreciate that.  I just want to

14 make sure for the record (indiscernible).  Okay.  Is

15 all the information still correct, as to that form?

16       INMATE LEWIS:  Yes, sir.

17       PRESIDING COMMISSIONER BIGGERS:  The 1073?

18 Do you wear glasses?

19       INMATE LEWIS:  No, sir.

20       PRESIDING COMMISSIONER BIGGERS:  Do you have

21 any hearing impairment?

22       INMATE LEWIS:  No, sir.

23       PRESIDING COMMISSIONER BIGGERS:  You ever

24 been involved in Triple CMS or EOP?

25       INMATE LEWIS:  No, sir.

26       DEPUTY COMMISSIONER ESTRADA:  Do you know

27 what those are?

6

1        INMATE LEWIS:  Yes, sir.

2        DEPUTY COMMISSIONER ESTRADA:  What are they?

3        INMATE LEWIS:  EOP, as I understand it, is

4   an inpatient treatment.  You can't -- you have to

5   actually be housed at a specific facility and have

6   mental disabilities.

7        PRESIDING COMMISSIONER BIGGERS:  Mental

8   health issues.

9        INMATE LEWIS:  Yes, mental health issues.

10  Triple CMS is you take medication, which helps you

11  function.

12       PRESIDING COMMISSIONER BIGGERS:  That's

13  good.  I just wanted to make sure that you know that

14  (indiscernible).  Do you suffer from any disability

15  that would prevent you from participating in today's

16  hearing?

17       INMATE LEWIS:  No, sir.

18       PRESIDING COMMISSIONER BIGGERS:  All right.

19  Ms. Fox, do you feel as though your client's rights

20  have been met?  I mean, his ADA rights have been met?

21       ATTORNEY FOX:  Yes, I do, Commissioner.

22       PRESIDING COMMISSIONER BIGGERS:  Thank you,

23  ma'am.

24       ATTORNEY FOX:  You're welcome.

25       PRESIDING COMMISSIONER BIGGERS:  This

26  hearing is being conducted pursuant to Penal Code

27  Sections 3041 and 3042 and the rules and regulations

7

1    of the Board of Prison Terms governing parole

2    consideration hearings for life inmates.  The purpose

3    of today's hearing, once again, is to consider the

4    number and nature of the crimes you were committed

5    for, your prior criminal and social history and your

6    behavior and programming since your commitment.  We

7    have had the opportunity to review your central file

8    and prior transcript and you will be given the

9    opportunity to correct or verify the record.  We will

10   reach a decision today and inform you whether or not

11   we find you suitable for parole and the reason for our

12   decision.  If you are found suitable for parole, the

13   length of your confinement will be explained to you.

14   Nothing that happens here today will change the

15   findings of the court.  This Panel is not here to

16   retry your case.  This Panel is here for the sole

17   purpose of determining your suitability for parole.

18   Do you understand that?

19            INMATE LEWIS:  Yes, sir.

20            PRESIDING COMMISSIONER BIGGERS:  The hearing

21   will be conducted in three phases.  I will discuss

22   with you the crimes for which you were committed, your

23   prior criminal and social history.  The Deputy

24   Commissioner will then go through your post-

25   convictions factors, to include your psychological

26   evaluation.  Then I will return and come back and talk

27   to you about parole plans and any letters of support

8

1    or opposition that may be in your file.  Now, once

2    that is concluded, both Commissioners, the District

3    Attorney and your attorney will be given the

4    opportunity to ask you questions.  Questions from the

5    District Attorney shall be asked to the Chair and you

6    will direct your answers to the Panel and not to the

7    District Attorney.  Next, the District Attorney and

8    then your attorney and then you will be given the

9    opportunity to make a final statement regarding your

10   parole suitability.  Your statement should address why

11   you feel you are suitable for parole.  The Panel will

12   then recess, clear the room and deliberate.  Once the

13   deliberations are complete, the Panel will resume the

14   hearing and announce its decision.  Now, the

15   California Code of Regulations state that regardless

16   of time served, a life inmate shall be found

17   unsuitable for and denied parole if, in the judgment

18   of the Panel, the inmate would pose an unreasonable

19   risk of danger to society if released from prison.

20   You have certain rights.  Those rights include, a

21   timely notice of this hearing, the right to review

22   your central file, which you indicated you had done

23   about 60 days ago, and the right to present relevant

24   documents.  I'm going to ask now, Ms. Fox, if you feel

25   that your rights have been met, as to this hearing?

26          **ATTORNEY FOX:**  Yes, I do.  Thank you.

27          **PRESIDING COMMISSIONER BIGGERS:**  You have an

9

1    additional right to be heard by an impartial panel.

2    Do you have any objection to the Panel, sir?

3            **INMATE LEWIS:**  No, sir.

4            **PRESIDING COMMISSIONER BIGGERS:**  I'm going

5    to ask the Deputy Commissioner if there's any

6    confidential that will be used?

7            **DEPUTY COMMISSIONER ESTRADA:**  There is

8    confidential information in the inmate's central file

9    but it was -- it will not be used today.

10           **PRESIDING COMMISSIONER BIGGERS:**  All right.

11   Thank you.  I'm going to mark the Life Inmate Parole

12   Consideration Checklist as Exhibit 1 and give it to

13   your attorney, as well as to the District Attorney to

14   ensure that we're all working off of the same set of

15   documents.

16           **ATTORNEY FOX:**  Yes, I do have all those

17   documents and I did submit a few others.

18           **PRESIDING COMMISSIONER BIGGERS:**  Yes, we've

19   got those.

20           **ATTORNEY FOX:**  Okay, thank you.  Oh well,

21   one thing that isn't checked on that is a letter of

22   opposition.  There is one from the police department.

23   Perhaps that comes under the purview of official

24   letters.

25           **PRESIDING COMMISSIONER BIGGERS:**  Yeah, it

26   does.

27           **ATTORNEY FOX:**  Okay, thank you.  Thank you.

10

1       **DEPUTY DISTRICT ATTORNEY NAFTEL:**  And I have

2   everything, also.

3       **PRESIDING COMMISSIONER BIGGERS:**  All right.

4   Thank you both.  Let the record reflect that both

5   attorneys do have all the documents.  In addition to

6   that, the additional documents that I would ask would

7   be timely submitted by your attorney prior to, so we

8   do have some additional documents (indiscernible).

9       **INMATE LEWIS:**  Yes, sir.

10       **PRESIDING COMMISSIONER BIGGERS:**  Any

11   preliminary objections?

12       **ATTORNEY FOX:**  No, thank you.

13       **PRESIDING COMMISSIONER BIGGERS:**  Will

14   Mr. Lewis be speaking to the Panel?

15       **ATTORNEY FOX:**  Yes, he will.

16       **PRESIDING COMMISSIONER BIGGERS:**  Mr. Lewis,

17   would you please raise your right hand?  Do you

18   solemnly swear or affirm that the testimony you give

19   here at this hearing will be the truth and nothing but

20   the truth?

21       **INMATE LEWIS:**  Yes, sir.

22       **PRESIDING COMMISSIONER BIGGERS:**  All right,

23   thank you.  I'm going to read into the record the

24   (indiscernible) and circumstances of the offense from

25   the Probation Officer's Report.

26       "Marcus Villega, V-I-L-L-E-G-A, got into a

27           verbal dispute with the inmate over gang

11

1          territory.  The inmate challenged him to

2          fight but the victim's brother would not let

3          him.  The inmate stated he was going to get

4          his homeboys and return with friends.  After

5          another argument, it was stated that it was

6          their neighborhood and that he was going to

7          get them both.  Later in the evening, the

8          victim and a number of (indiscernible) were

9          sitting on the front porch when the inmate

10         approached, carrying a sawed-off shotgun.

11         Five or six rounds were fired and victim

12         Lovel Bllard, B-L-L-A-R-D, was shot in the

13         arm.  Victim Perry (phonetic) got up from

14         the couch to run and was shot in the back.

15         He then shot at Villega and missed.

16         April Purcel, P-U-R-C-E-L, was then shot.

17         Witnesses identified the inmate as the

18         shooter (indiscernible)."

19    Is that pretty much what transpired, sir?

20         **INMATE LEWIS:**  Yes, sir.

21         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Were

22    you a member of a gang at that time?

23         **INMATE LEWIS:**  No, sir.

24         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

25    Well, what were you doing?  When you say you were

26    going home to get your homies, who were you referring

27    to?

12

1          INMATE LEWIS:  It was gang members that I
2     knew.  The shooting was an initiation.  Like, it was
3     supposed to be to get in the gang.
4          PRESIDING COMMISSIONER BIGGERS:  Okay.  So
5     you were being initiated and that's why you
6     participated in this act?
7          INMATE LEWIS:  Yes, sir.
8          PRESIDING COMMISSIONER BIGGERS:  Okay.  So
9     how long had you been associating with them prior to
10    this initiation?
11         INMATE LEWIS:  On and off for about a year.
12         PRESIDING COMMISSIONER BIGGERS:  A year?  Do
13    you realize the severity of this?
14         INMATE LEWIS:  Yes, sir.
15         PRESIDING COMMISSIONER BIGGERS:  After this
16    happened, how did you feel?
17         INMATE LEWIS:  Immediately after this
18    happened, I would describe myself as being numb.  I
19    didn't want to accept what I had done.
20         PRESIDING COMMISSIONER BIGGERS:  Um-hum.
21         INMATE LEWIS:  I didn't want to admit it.  I
22    didn't want to face myself.  When I look back at how I
23    responded initially, there was guilt but I didn't want
24    to face it.
25         PRESIDING COMMISSIONER BIGGERS:  Okay.  Now,
26    I know that.  We're going to work our way up to that.
27    My question to you now is, immediately after that when

13

1    you fired the weapon at those individuals, the rival

2    gang members as part of your initiation --

3              INMATE LEWIS:  Yes, sir.

4              PRESIDING COMMISSIONER BIGGERS:  -- and you

5    saw three or four people go down, how did you feel?

6              INMATE LEWIS:  I actually didn't see them go

7    down.  I was more scared and trying to just get away

8    then looking to see what I had done.

9              PRESIDING COMMISSIONER BIGGERS:  Well, when

10   did you find out that one person had died?

11             INMATE LEWIS:  When they arrested me.

12             PRESIDING COMMISSIONER BIGGERS:  When was

13   that?  How long?

14             INMATE LEWIS:  About 45 minutes later.

15             PRESIDING COMMISSIONER BIGGERS:  About45

16   minutes later, okay.  How did you feel at that point?

17             INMATE LEWIS:  Scared.

18             PRESIDING COMMISSIONER BIGGERS:  Just

19   scared?

20             INMATE LEWIS:  I knew it was --

21             PRESIDING COMMISSIONER BIGGERS:  So they put

22   you in cell overnight and you had time to reflect back

23   on what had happened?

24             INMATE LEWIS:  I did and the best way that I

25   can describe it is, I was scared.  I didn't fully, at

26   that time, comprehend what I had done.

27             PRESIDING COMMISSIONER BIGGERS:  Okay.  When

14

1    did you finally realize that you had taken someone's

2    life and could have conceivably taken more lives at

3    that time?

4           INMATE LEWIS:  Prior to being sentenced.

5           PRESIDING COMMISSIONER BIGGERS:  Prior to

6    being sentenced, okay.  And I understand you did do a

7    plea agreement.  Is that correct?

8           INMATE LEWIS:  Yes, sir.

9           PRESIDING COMMISSIONER BIGGERS:  How do you

10   feel now?

11          INMATE LEWIS:  (indiscernible) words to

12   describe the first way that I -- as being horrible.  I

13   feel bad, ashamed.  I'm looking for words to describe

14   how I feel now because I think more and I'm facing

15   that it's something that I did and I can't change it.

16   For example, if you were to steal a car and wreck it,

17   you can always pay for that car.  You can restore it

18   back, the person's property that you had taken it for

19   them.  This is a human life.  This is something that's

20   more valuable than anything, any possession, anything

21   that you have here on Earth.  And understanding and

22   knowing that I took this life and it can't be brought

23   back, it's a deep pain that's hard to describe.  It's

24   -- I think about it when I wake up in the morning and

25   I say my prayers (indiscernible) and I ask for

26   forgiveness of myself.  That's the first thing that

27   comes to my mind.  That's something that I can never

15

1   change.

2          PRESIDING COMMISSIONER BIGGERS:  When did
3   you come to this realization, sir?

4          INMATE LEWIS:  The depth, I can give you
5   almost the exact date.  It would be March 13, 1994.

6          PRESIDING COMMISSIONER BIGGERS:  Okay.  And
7   what led you to that decision?

8          INMATE LEWIS:  When you review my C-file, I
9   was in the hole at that time.  My daughter's birthday
10  is March 14 and I had got into a physical altercation
11  on March 10.

12         PRESIDING COMMISSIONER BIGGERS:  Um-hum.

13         INMATE LEWIS:  And I was in the hole.  When
14  she came to visit me, I was chained up.  She had never
15  seen me shackled like that before and she didn't
16  understand it.  She was seven years old.  And when I
17  looked at her, the first person I thought about was
18  Shevon (phonetic) Perry.  I went back to the hole and
19  in the hole you don't have anything.  You've got books
20  and that's when I really started thinking about it.  I
21  thought about what I had done to Shevon's family.

22         PRESIDING COMMISSIONER BIGGERS:  And you
23  were in the hole for quite a length.

24         INMATE LEWIS:  Yes, sir.

25         PRESIDING COMMISSIONER BIGGERS:  And you got
26  into another fight in 1999.

27         INMATE LEWIS:  No, sir.  Not in '99.

16

1          PRESIDING COMMISSIONER BIGGERS:  You did not

2   get into a mutual altercation in '99?

3          INMATE LEWIS:  No, sir.

4          PRESIDING COMMISSIONER BIGGERS:  What

5   happened when you got a 115 in '99?

6          INMATE LEWIS:  In '99, I was

7   (indiscernible).

8          PRESIDING COMMISSIONER BIGGERS:  I'm sorry.

9   Wasn't there another fight?

10         INMATE LEWIS:  Yes, sir.  That was 1990.

11   That was prior to that.

12         PRESIDING COMMISSIONER BIGGERS:  Okay.  I

13   know you had been (indiscernible).  Have you seen any

14   of your former gang members?

15         INMATE LEWIS:  I've seen three since I've

16   been incarcerated.

17         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

18   where are they?

19         INMATE LEWIS:  I don't know where they're at

20   now.  One was actually (indiscernible).

21         PRESIDING COMMISSIONER BIGGERS:  Okay.  Do

22   you still associate with them?

23         INMATE LEWIS:  No, sir.

24         PRESIDING COMMISSIONER BIGGERS:  If you were

25   to be allowed out and you happened to run into some of

26   those former gang members and they started talking

27   about old times, what would you do?

17

1       INMATE LEWIS:  Well, I wouldn't even take

2  the time to associate with them.  That's one way --

3  one reason why I've attempted to establish a residence

4  here in this area, as far away from the Los Angeles

5  area as I possibly can get.

6       PRESIDING COMMISSIONER BIGGERS:  Don't you

7  have relatives in L.A.?

8       INMATE LEWIS:  Yes, sir.

9       PRESIDING COMMISSIONER BIGGERS:  And the

10  possibility is that you're going to be able to get out

11  and visit relatives down there.

12       INMATE LEWIS:  I would choose not to.

13  Honestly, I would choose not to go back to Los

14  Angeles.  If I were to go back to Los Angeles, it

15  would be to involve myself in things that would deter

16  youth from being involved in gangs.

17       PRESIDING COMMISSIONER BIGGERS:  I see since

18  your last Board hearing you got married.  Is that

19  correct?

20       INMATE LEWIS:  Yes, sir.

21       PRESIDING COMMISSIONER BIGGERS:  You got

22  married while you've been here?

23       INMATE LEWIS:  Yes, sir.

24       PRESIDING COMMISSIONER BIGGERS:  And you've

25  known her for five years?

26       INMATE LEWIS:  Yes.

27       PRESIDING COMMISSIONER BIGGERS:  And where

18

1  did you meet her?

2      INMATE LEWIS:  Well, actually she saw a

3  picture of me from a mutual friend whose wife knows

4  her.  And she saw a picture of me and she started

5  corresponding.

6      PRESIDING COMMISSIONER BIGGERS:  Not to be

7  facetious but it was romance by mail?

8      INMATE LEWIS:  Somewhat.  It was -- it

9  didn't start off as romance.  It was a pen pal thing

10  at first.

11      PRESIDING COMMISSIONER BIGGERS:  Yeah, I

12  know but you said she's known you for five years.

13      INMATE LEWIS:  Yes, sir.

14      PRESIDING COMMISSIONER BIGGERS:  So again,

15  pen pal and then you proposed in '04?

16      INMATE LEWIS:  Yes, sir.

17      PRESIDING COMMISSIONER BIGGERS:  And then

18  got married in '05?

19      INMATE LEWIS:  No, I actually proposed --

20  yes, October --

21      PRESIDING COMMISSIONER BIGGERS:  Well,

22  that's not what the record says.

23      INMATE LEWIS:  Yes.  I proposed the 23rd of

24  2004.

25      PRESIDING COMMISSIONER BIGGERS:  '04 and you

26  got married in '05.

27      INMATE LEWIS:  Yes, sir.

19

1          PRESIDING COMMISSIONER BIGGERS:  And I see,

2   just as I'm going to through and looking at some of

3   the (indiscernible) that we'll talk about later, that

4   she's out there really pushing for you.

5          INMATE LEWIS:  Yes.

6          PRESIDING COMMISSIONER BIGGERS:  And she

7   also has a daughter, right?

8          INMATE LEWIS:  Yes, sir.

9          PRESIDING COMMISSIONER BIGGERS:  How old is

10  her daughter?

11         INMATE LEWIS:  Twenty-two.

12         PRESIDING COMMISSIONER BIGGERS:  Twenty-two?

13         INMATE LEWIS:  She just turned 22 in

14  September.

15         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

16  you were 19 when the crime was committed.  Is that

17  correct?

18         INMATE LEWIS:  Yes, sir.

19         PRESIDING COMMISSIONER BIGGERS:  And you're

20  37 now.

21         INMATE LEWIS:  No.  No, sir.  I was 18.

22         PRESIDING COMMISSIONER BIGGERS:  Eighteen.

23  That's right.  And you're 37 now?

24         INMATE LEWIS:  Yes, sir.

25         PRESIDING COMMISSIONER BIGGERS:  And how old

26  is your wife?

27         INMATE LEWIS:  She's 47.

20

```
1    PRESIDING COMMISSIONER BIGGERS:  Forty?

2    INMATE LEWIS:  Forty-seven.

3    PRESIDING COMMISSIONER BIGGERS:  Forty-

4  seven?

5    INMATE LEWIS:  Yes, sir.

6    PRESIDING COMMISSIONER BIGGERS:  So she's

7  ten years older?

8    INMATE LEWIS:  Yes, sir.

9    PRESIDING COMMISSIONER BIGGERS:  And

10  (indiscernible) daughter?

11    INMATE LEWIS:  Yes, sir.

12    PRESIDING COMMISSIONER BIGGERS:  How do you

13  think that's going to work out once you get out?

14    INMATE LEWIS:  What do you mean?

15    PRESIDING COMMISSIONER BIGGERS:  In other

16  words, if you've got someone that's slightly older

17  than you are and she has a daughter that's slightly

18  younger than you are?

19    INMATE LEWIS:  Well, we visit so there's --

20  it's going to work out fine.  We have excellent

21  communication.  I've talked to her daughter.

22  Actually, I convinced her daughter to finishing up her

23  -- she's a registered dental assistant now.  And one

24  of the things that I tell her -- she's got some self-

25  esteem problems.  One of the things that I told her is

26  just believe in yourself.  You know, push.  She

27  finished up her registered dental assistant and now
```

21

1   she's working.  I don't see that there will be a

2   problem.  I mean --

3               PRESIDING COMMISSIONER BIGGERS:  You've been

4   down for going on 18 years.  Is that correct?

5               INMATE LEWIS:  Yes, sir.

6               PRESIDING COMMISSIONER BIGGERS:  And

7   transitioning back from being incarcerated to your

8   family is sometimes difficult.

9               INMATE LEWIS:  I understand that, sir.

10              PRESIDING COMMISSIONER BIGGERS:  And --

11              INMATE LEWIS:  If I may?

12              PRESIDING COMMISSIONER BIGGERS:  Yeah.

13              INMATE LEWIS:  Actually, my wife and I, we

14  discussed this.  I actually told her, I said, you're

15  going to have to help me adjust and reprogram back

16  into society.  I said, it's going to be a lot of

17  things I'm going to need your help in and she said,

18  look, I'm here every weekend.  She said, just like I'm

19  here every weekend, when you get parole and it's time

20  for you to come home, we (indiscernible).

21              PRESIDING COMMISSIONER BIGGERS:  Now,

22  according to the Psychological Report, it indicated

23  that drugs or alcohol was not involved in this crime.

24  Is that correct?

25              INMATE LEWIS:  That's correct, sir.

26              PRESIDING COMMISSIONER BIGGERS:  And were

27  you involved in that at all?

22

1          INMATE LEWIS:  I had experimented but I
2    didn't use on a regular basis.  I tried it but didn't
3    like it.

4          PRESIDING COMMISSIONER BIGGERS:  And do you
5    -- you mentioned the remorse for the victim.  How
6    about the other two individuals that you wounded?

7          INMATE LEWIS:  That takes into consideration
8    them, too.  I know, as I understand, I believe it was
9    April Purcel, she had a hand injury and the bullet was
10   actually removed in the hospital.  As I understand it,
11   they're both okay now but I do understand what I think
12   are the problems that I sent them through.

13          PRESIDING COMMISSIONER BIGGERS:  One guy was
14   shot in the arm.  Is that correct?

15          INMATE LEWIS:  I think one -- it was his
16   shoulder.

17          PRESIDING COMMISSIONER BIGGERS:  Shoulder?
18          INMATE LEWIS:  Yes, sir.
19          PRESIDING COMMISSIONER BIGGERS:
20   Lovel Bllard, who was severely injured from -- he was
21   severely injured from a shotgun blast to his arm, it
22   says here.  And the other one was --

23          INMATE LEWIS:  More than anything else, I
24   find relief in knowing that I didn't harm them worse
25   than I did.  I know I harmed them.  I hurt them
26   physically and emotionally and mentally.  But I find
27   some relief in knowing that I didn't take their lives

23

1    because that was a very real possibility, also.

2              PRESIDING COMMISSIONER BIGGERS:  Very much

3    so.  All right.  There's a lot of other things in this

4    file that I don't -- I'm not going to retry your case.

5    Is there anything else you want to add to the crime

6    itself?

7              INMATE LEWIS:  Other than what -- we have to

8    give something back.  In my everyday actions -- I know

9    I can't repair what I did but I can contribute in a

10   positive way in order to --

11             PRESIDING COMMISSIONER BIGGERS:  When you

12   say give something back, what are you speaking of?

13             INMATE LEWIS:  Helping kids.  More than

14   everything else, helping kids.  I understand what I

15   did and I understand why I did it.  More than

16   anything, I wanted to be accepted.

17             PRESIDING COMMISSIONER BIGGERS:  Accepted?

18             INMATE LEWIS:  Accepted into the wrong kind

19   of people.  That was the first thing.  Running with

20   the wrong crowd of people and wanting to be accepted

21   and I understand the level of peer pressure.  I didn't

22   understand peer pressure, as I understand it now.  I

23   see what my nephews have gone through as they grew up.

24   Both of them are in college and doing well now and

25   what my daughter went through.  She's also in college

26   and doing well now.  But the peer pressure that they

27   faced, I could never explain it to them.  Look, I know

24

1    what you're going through.  I went through it and I

2    made some horrible choices.  I made some choices

3    because I wanted that bad just to be accepted by a

4    group of people, who I look back on now, I wouldn't

5    even associate with unless they changed their lives.

6              PRESIDING COMMISSIONER BIGGERS:  When you

7    say that you were associated with those people, you

8    know, and I understand peer pressure, too.  But I --

9    why was it -- are you sure it was not the fun part of

10   what they were doing than it was more than being

11   accepted?   I.E., for example, if they hang around,

12   you know, the gang mentality, socialization.

13             INMATE LEWIS:  Some of it was but when I

14   look back, I actually (indiscernible) some of the same

15   gang members that I actually had conflicts with prior

16   to.  I worked at a dairy right in that area on Second

17   Area and some of these (indiscernible) come.  They

18   would do things like take stuff out of the store

19   (indiscernible).  And I would actually get into it

20   with them because I worked there.

21             PRESIDING COMMISSIONER BIGGERS:  Then why

22   did you join them -- want to join them?  I don't think

23   that's peer pressure.  I think -- did you not have a

24   good social setting?  Everything I read is that you

25   apparently were doing pretty well.

26             INMATE LEWIS:  I did but I still wanted to

27   be accepted by them (indiscernible).  I wanted to be

25

1    respected and accepted by and believed that by being

2    accepted, I would be respected.  It was a backwards

3    way of immature thinking.

4              PRESIDING COMMISSIONER BIGGERS:  Okay.  When

5    they -- when you were given the shotgun for your

6    initiation, did you what, did you not even think about

7    the consequences when they gave you that and said

8    fire?

9              INMATE LEWIS:  I hadn't thought about it.  I

10   didn't think about the consequences until I had

11   actually started walking down the street and then I

12   started trying to figure out how to get out of it.  At

13   that point, I actually was scared and I -- what can I

14   do?  Can I just -- if I stop now, what's going to

15   happen?  And --

16             PRESIDING COMMISSIONER BIGGERS:  You don't

17   think that since you had known them for quite some

18   that you could have said I can't do this?

19             INMATE LEWIS:  Actually, I was afraid to.

20             PRESIDING COMMISSIONER BIGGERS:  You were

21   afraid to.

22             INMATE LEWIS:  Yes, sir.

23             PRESIDING COMMISSIONER BIGGERS:  You went up

24   there and fired into the crowd.

25             INMATE LEWIS:  Yes, sir.

26             PRESIDING COMMISSIONER BIGGERS:  All right.

27   I'm -- do you have any questions on the crime, sir?

26

1          DEPUTY COMMISSIONER ESTRADA:  No questions.

2          PRESIDING COMMISSIONER BIGGERS:  I'm going

3    to move over to your social history, sir.  You were

4    born to the union of Samuel Lewis and Sherry Lewis on

5    March the 23rd, 1969 in Los Angeles, California?

6          INMATE LEWIS:  Yes, sir.

7          PRESIDING COMMISSIONER BIGGERS:  You have

8    three sisters and three brothers?

9          INMATE LEWIS:  Yes, sir.

10         PRESIDING COMMISSIONER BIGGERS:  Are any of

11   them involved in any problems with law enforcement?

12         INMATE LEWIS:  No, sir.

13         PRESIDING COMMISSIONER BIGGERS:  Your

14   parents got divorced when you were seven years old.

15         INMATE LEWIS:  Yes, sir.

16         PRESIDING COMMISSIONER BIGGERS:  And you

17   stayed with your mother?

18         INMATE LEWIS:  Yes, sir.

19         PRESIDING COMMISSIONER BIGGERS:  And you

20   worked at Altadina (phonetic) Dairy and you talked

21   about that.

22         INMATE LEWIS:  Yes, sir.

23         PRESIDING COMMISSIONER BIGGERS:  You went to

24   high school and you were active in sports.  What did

25   you play in sports?

26         INMATE LEWIS:  Track and football.

27         PRESIDING COMMISSIONER BIGGERS:  Track and

27

1    football?

2            INMATE LEWIS:  Yes, sir.

3            PRESIDING COMMISSIONER BIGGERS:  Yeah, you

4    look like a football player.  What position did you

5    play?

6            INMATE LEWIS:  Safety and I was much smaller

7    then them.

8            PRESIDING COMMISSIONER BIGGERS:  Well, if

9    you have speed you don't have to worry about it.

10   That's the thing about it.  If you've got your

11   football friends you were playing football with, why

12   was it necessary to get involved with the gang?

13           INMATE LEWIS:  Some of my football friends

14   wanted to get involved with the gang.

15           PRESIDING COMMISSIONER BIGGERS:  Okay.  You

16   were married once before?

17           INMATE LEWIS:  I --

18           PRESIDING COMMISSIONER BIGGERS:  You married

19   a Joan Moore?

20           INMATE LEWIS:  Joann Moore.

21           PRESIDING COMMISSIONER BIGGERS:  Joann

22   Moore?

23           INMATE LEWIS:  Yes, sir.

24           PRESIDING COMMISSIONER BIGGERS:  And what

25   happened there?  You were divorced in 1990.

26           INMATE LEWIS:  Yes, sir.  That's my

27   daughter's mother.

28

1           PRESIDING COMMISSIONER BIGGERS:  Right.

2           INMATE LEWIS:  We couldn't deal with the

3 situation, me being in here and her being out there.

4 I was younger, far more immature.  It was better that

5 we split up.

6           PRESIDING COMMISSIONER BIGGERS:  Do you

7 still communicate?

8           INMATE LEWIS:  Yes, sir.  We do.

9           PRESIDING COMMISSIONER BIGGERS:  Because of

10 your daughter.  Your daughter is grown now.

11          INMATE LEWIS:  Yes, sir.

12          PRESIDING COMMISSIONER BIGGERS:  Okay.  In

13 '96 you married Tracey Steele (phonetic) Lewis and you

14 had two stepdaughters (indiscernible)?

15          INMATE LEWIS:  No, sir.  Joanne has two

16 daughters.  I have two stepdaughters from Joanne, the

17 relationship with Joanne.

18          PRESIDING COMMISSIONER BIGGERS:  Okay.  Did

19 you not marry a Tracey?

20          INMATE LEWIS:  Yes, sir.  She has no kids.

21          PRESIDING COMMISSIONER BIGGERS:  Okay.  So

22 you were divorced from her in '97.  You met her while

23 you were incarcerated, as well?

24          INMATE LEWIS:  Yes, sir.

25          PRESIDING COMMISSIONER BIGGERS:  And you

26 were divorced in 1997 so you were only married for a

27 year?

29

1        INMATE LEWIS:  Yes, sir.

2        PRESIDING COMMISSIONER BIGGERS:  What

3    happened there?

4        INMATE LEWIS:  From actually going to the

5    Board and being denied parole and not wanting to have

6    kids while I was still able.  It was while

7    incarcerated with its related problems.  I wanted to

8    wait.  I thought it would be better and she didn't

9    feel that she should have to wait.  It's something

10   that we should have discussed prior to getting

11   married.  I thought we did (indiscernible).

12       PRESIDING COMMISSIONER BIGGERS:  And then

13   you remarried seven years later?

14       INMATE LEWIS:  Yes, sir.  Well, let's -- can

15   we back up?  In 1991, I was married also to

16   Wanda Johnson but we never -- we ended up annulling

17   the marriage in like seven months.

18       PRESIDING COMMISSIONER BIGGERS:  So you had

19   four?  Three previous marriages and then

20   (indiscernible)?

21       INMATE LEWIS:  Yes, sir.

22       PRESIDING COMMISSIONER BIGGERS:  Okay.

23   Since you've had three and I won't say failed

24   marriages but marriages that did not quite work out.

25   What makes you think that this fourth one, especially

26   if you get out, is going to be able to survive?

27       INMATE LEWIS:  Entirely different

30

1   circumstances.  And what I mean by that is prior to

2   getting married, we discussed -- I explained that I've

3   been married before.  I told her all of the things to

4   expect while I'm in here.  I told her it's going to be

5   hard.  It's going to be difficult, you know.  We --

6   before I even proposed to her she asked me, she said,

7   "Why haven't you ever approached that subject?"  I

8   said, "Well, I actually thought it would be better if

9   I waited because you know my history, as far as being

10   married and being in here.  I'm not going to ask you

11   to put your life on hold for me."

12          PRESIDING COMMISSIONER BIGGERS:  Were the

13   three previous wives either younger or older than you

14   are?

15          INMATE LEWIS:  My first wife, Destiny's

16   mother, was ten years older than me.  My second wife

17   was one year older than me and my third wife was three

18   years older.

19          PRESIDING COMMISSIONER BIGGERS:  I see here

20   that you never served in the military.  Is that

21   correct?

22          INMATE LEWIS:  No, sir.

23          PRESIDING COMMISSIONER BIGGERS:  And you

24   used alcohol and marijuana at the age of 18.  Is there

25   anything I left out in any of your -- on your social

26   history that you want to add to the record?

27          INMATE LEWIS:  No, sir.

31

1    Commissioner Biggers, I would like to say, my present

2    marriage is unlike any marriage, any relationship I

3    have ever been in.  You name it, we've talked about

4    it.  I mean, we have a communication and a bond that's

5    unreal.  And in this setting, it's something that it's

6    hard to explain.

7              PRESIDING COMMISSIONER BIGGERS:  I can

8    understand that.  And the only reason I was even going

9    there was the fact that I wanted to make sure, you

10   know, that you understand.  That one of the things you

11   take when we start talking about parole for the

12   inmate, is that we want to place him in the best

13   possible scenario that we can in order for them to be

14   able to make it out there.

15             INMATE LEWIS:  Yes, sir.

16             PRESIDING COMMISSIONER BIGGERS:  And of

17   course, that involves spouses and everyone else.

18             INMATE LEWIS:  Yes, sir.

19             PRESIDING COMMISSIONER BIGGERS:  And you

20   married her and you haven't been living with her --

21             INMATE LEWIS:  Yes, sir.

22             PRESIDING COMMISSIONER BIGGERS:  -- because

23   you've been here for several years and you have a

24   history --

25             INMATE LEWIS:  Yes, sir.

26             PRESIDING COMMISSIONER BIGGERS:  -- of

27   marrying women while you're in the institution and

32

1   then suddenly it dissolves.  And even though you can

2   talk, you know, to each other (indiscernible), it's

3   going to be difficult.  I'm not knocking that but I'm

4   just telling you.  That's where I was going with the

5   questions because the adjustment period can be even

6   tougher for people who think that they can -- you

7   know, they'll not have any problems at all.  It's

8   tough for people that are married and with each other

9   every day.

10          INMATE LEWIS:  Yes, sir.

11          PRESIDING COMMISSIONER BIGGERS:  You

12  understand?  That's where I was going with that.  I

13  understand so, you know, if you say you're perfectly

14  happy with that, that's fine.

15          INMATE LEWIS:  And just -- this is -- when

16  you talk about the adjustment period, we expect it to

17  be difficult.  We don't expect it not to be difficult.

18  We expect it to be difficult.  But communication and

19  patience -- we both understand we are two different

20  people.  We have -- see the world out of two sets of

21  eyes.  But as a team working together as one, we can

22  get through whatever problems we're faced with.

23          PRESIDING COMMISSIONER BIGGERS:  What

24  happens when you have your first disagreement?

25          INMATE LEWIS:  We've had disagreements

26  already and we've agreed -- we've agreed to --

27  sometimes we can't find middle ground so we agree to

33

1   disagree.  She has some different views than I have

2   and when it comes down to it, okay, I'll agree to

3   disagree and we do just that.

4        PRESIDING COMMISSIONER BIGGERS:  How do you

5   -- how would you handle that if you are living with

6   her?  And I don't want to get into your personal life

7   and all that.  The fact of the matter is that you're

8   in here.  You can just get up and walk away and boom,

9   and go back to your cell.  But here you're going to be

10  living in the same household --

11       INMATE LEWIS:  Yes, sir.

12       DEPUTY COMMISSIONER ESTRADA:  -- primarily

13  with her until you get yourself on your feet and you

14  can start bringing in any income or anything.

15       INMATE LEWIS:  Yes, sir.

16       PRESIDING COMMISSIONER BIGGERS:  How are you

17  going to be able to handle that in the event that you

18  all have disagreements?

19       INMATE LEWIS:  I know and understand that

20  she's very independent and I know that there's an

21  adjustment.  We will have to adjust.  When we

22  disagree, the one thing we both promised each other,

23  we won't let the day end being upset or disagreeing.

24  We'll find middle ground even if just to say we agree

25  to just disagree.  She's had prior relationships and

26  we've gone over those and we've talked about it.  We

27  both bring baggage from prior relationships.  I mean,

34

1   this is something that we went into in depth.

2          PRESIDING COMMISSIONER BIGGERS:  Don't say

3   baggage.  I mean, you've had difficulties, not

4   baggage.

5          INMATE LEWIS:  What you're talking about is

6   we actually got (indiscernible).

7          PRESIDING COMMISSIONER BIGGERS:  No, not

8   baggage.

9          INMATE LEWIS:  Okay.

10          PRESIDING COMMISSIONER BIGGERS:  All right.

11   Nobody brings baggage, per se.  I understand.  Go

12   ahead.

13          INMATE LEWIS:  But we understand that there

14   are issues that we'll both have to deal with.  There's

15   some things that she experienced in her past.  There's

16   some things that I experienced in my past but we're

17   dealing with it.  It's what we have to do.

18          PRESIDING COMMISSIONER BIGGERS:  I'm -- has

19   she been married before?

20          INMATE LEWIS:  Yes, sir.

21          PRESIDING COMMISSIONER BIGGERS:  How many

22   times?

23          INMATE LEWIS:  One time.

24          PRESIDING COMMISSIONER BIGGERS:  One?

25          INMATE LEWIS:  Yes, sir.

26          PRESIDING COMMISSIONER BIGGERS:  All right.

27   Her husband was not incarcerated, was he?

35

1        INMATE LEWIS:  No, sir.

2        PRESIDING COMMISSIONER BIGGERS:  All right.

3  And I see here that you never served in the military,

4  you said.

5        INMATE LEWIS:  No, sir.

6        PRESIDING COMMISSIONER BIGGERS:  Okay.

7  Anything you want to add on your social history?

8        INMATE LEWIS:  Just that her mother will

9  also be dealing with us.

10       PRESIDING COMMISSIONER BIGGERS:  I have a

11  letter from your mother.  We'll talk about that.

12       INMATE LEWIS:  No, her mother.  Lisa's

13  mother.

14       PRESIDING COMMISSIONER BIGGERS:  Her mother.

15  I've got that.

16       INMATE LEWIS:  Yes, sir.

17       PRESIDING COMMISSIONER BIGGERS:  We'll talk

18  about that a little later on.  On your priors, you

19  were arrested in 1987 for Grand Theft Auto?

20       INMATE LEWIS:  Yes, sir.

21       PRESIDING COMMISSIONER BIGGERS:  And what

22  happened there?

23       INMATE LEWIS:  That case was dismissed with

24  prejudice because it turned out that I actually owned

25  the car and I had (indiscernible).

26       PRESIDING COMMISSIONER BIGGERS:  No, I'll

27  take your word for that.  Then you were -- what

36

1    happened about Carrying  Concealed Weapon in '87?

2         **INMATE LEWIS:**  I was -- I was found guilty

3    and given probation.

4         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  What

5    were you doing carrying a weapon at that time?  You

6    were only, what, 18 years old?

7         **INMATE LEWIS:**  Seventeen.

8         **PRESIDING COMMISSIONER BIGGERS:**  Seventeen.

9    What were you doing carrying a weapon?

10        **INMATE LEWIS:**  Personal protection.

11        **PRESIDING COMMISSIONER BIGGERS:**  From what?

12        **INMATE LEWIS:**  Partially dealing with the

13   gang.  I --

14        **PRESIDING COMMISSIONER BIGGERS:**  I thought

15   you had a member.

16        **INMATE LEWIS:**  I wasn't.  I wasn't at that

17   -- I wasn't.  At that time, I told you we -- I had had

18   previous conflicts and I bought the gun figuring I

19   needed some protection.  I had actually got into

20   fights in the parking lot at the dairy with a couple

21   of these guys.

22        **PRESIDING COMMISSIONER BIGGERS:**  And then

23   yet you wanted to join them?

24        **INMATE LEWIS:**  I can't explain it.  All I

25   can tell you is I look back and I folded to peer

26   pressure.  I buckled.  I know that I did.  It's

27   stupid.  That's the best description that I can give.

37

1    PRESIDING COMMISSIONER BIGGERS:  That's not

2    something that I can use but I have to agree with you.

3    Here you are fighting these guys.  You've got a gun.

4    You walk around with a gun and all of a sudden you get

5    with them and decide they want to initiate you.  And

6    then they give you a shotgun and tell you to go shoot

7    at a bunch of people.

8        INMATE LEWIS:  Yes, sir.

9        PRESIDING COMMISSIONER BIGGERS:  That's

10   beyond stupid.

11       INMATE LEWIS:  Yes, sir.

12       PRESIDING COMMISSIONER BIGGERS:  All right.

13   I'm on my soapbox here.  You're the one that said

14   stupid, not me.

15       INMATE LEWIS:  I know.

16       PRESIDING COMMISSIONER BIGGERS:  I'm just

17   agreeing with you.

18       INMATE LEWIS:  That's the term that I would

19   still use.  That is stupid.  You're honest.

20       PRESIDING COMMISSIONER BIGGERS:  All right.

21   On -- in '88, you were arrested for Carrying a

22   Concealed Weapon as an adult.

23       INMATE LEWIS:  I was actually stopped in the

24   car.

25       PRESIDING COMMISSIONER BIGGERS:  You had the

26   gun and released (indiscernible).

27       INMATE LEWIS:  I was actually released

38

1  because the car belonged to someone else and they were

2  driving the car and it was their gun.  But I was -- we

3  was both brought in.

4         PRESIDING COMMISSIONER BIGGERS:  Did you

5  know about the gun being in there?

6         INMATE LEWIS:  No, sir.  I didn't.  It was

7  under the driver's seat of the person that was driving

8  the car.

9         PRESIDING COMMISSIONER BIGGERS:  Where was

10  your gun at the time?

11         INMATE LEWIS:  I didn't have a gun at the

12  time, sir.

13         INMATE LEWIS:  Well, you had one the year

14  before.

15         INMATE LEWIS:  Yes, sir.

16         PRESIDING COMMISSIONER BIGGERS:  What did

17  you do with the gun that you had?

18         INMATE LEWIS:  After doing --

19  (indiscernible), I didn't want another gun, actually.

20         PRESIDING COMMISSIONER BIGGERS:  What did

21  you do with it?

22         INMATE LEWIS:  The one that I had?

23         PRESIDING COMMISSIONER BIGGERS:  Um-hum.

24         INMATE LEWIS:  They took it when they

25  arrested me.

26         PRESIDING COMMISSIONER BIGGERS:  Okay.  You

27  didn't get another one?

39

1          INMATE LEWIS:  No, sir.

2          PRESIDING COMMISSIONER BIGGERS:  Okay.  All

3    right.  Those are the only priors that I see in your

4    record.  Is there anything I left out about your prior

5    social or your priors that you want to talk about?

6          INMATE LEWIS:  No, sir.

7          PRESIDING COMMISSIONER BIGGERS:  Okay.  I'm

8    going to ask the Deputy Commissioner to go over your

9    post-conviction factors.

10          DEPUTY COMMISSIONER ESTRADA:  Thank you.

11    Good morning, Mr. Lewis.

12          INMATE LEWIS:  Good morning, sir.

13          DEPUTY COMMISSIONER ESTRADA:  Documents

14    reviewed for post-conviction information is your

15    central file, the last Prisoner Evaluation Report

16    prepared for the October 2005 calendar by Correctional

17    Counselor I M. Rudio, R-U-D-I-O.  Post-conviction

18    (indiscernible) Report, covering the period of October

19    of 2004 to the present.  And a report prepared by

20    Correctional Counselor I Rudio and S. Martinez.  Sir,

21    your Psychological Evaluation prepared for the May

22    2006 calendar by Dr. M. Macomber, spelled

23    M-A-C-O-M-B-E-R, PhD.  At the time of Mr. Lewis' last

24    parole consideration hearing on October 28, 2004, he

25    was housed at CTF Soledad.  The Board took action and

26    denied parole for one year and recommended that the

27    inmate stay disciplinary free and get self-help.  Now

40

1  Mr. Lewis, your classification score at your last

2  hearing was 19 and continues to be 19, correct?

3          INMATE LEWIS:  Yes, sir.

4          DEPUTY COMMISSIONER ESTRADA:  Your prior

5  custody level at your last hearing was about medium-A

6  and continues to be medium-A, correct?

7          INMATE LEWIS:  Yes, sir.

8          DEPUTY COMMISSIONER ESTRADA:  Now, I see

9  that you did -- in regards to vocations, you did

10  complete the vocational forklift operator program on

11  April 13, 1998.  Is that correct?

12          INMATE LEWIS:  Yes, sir.

13          DEPUTY COMMISSIONER ESTRADA:  Now, you also

14  indicated that you completed vocational dry cleaning?

15          INMATE LEWIS:  Yes, sir.

16          DEPUTY COMMISSIONER ESTRADA:  When did you

17  complete -- complete that?

18          INMATE LEWIS:  March of '97.

19          DEPUTY COMMISSIONER ESTRADA:  Okay.  Do you

20  have the certificate?

21          INMATE LEWIS:  Yes, sir.

22          DEPUTY COMMISSIONER ESTRADA:  It's March 2,

23  1997.  Okay, very good.  I know there was two

24  vocational programs that you completed, correct?

25          INMATE LEWIS:  Yes, sir.

26          DEPUTY COMMISSIONER ESTRADA:  Now, referring

27  to academics, you did complete your GED on 9/13/91,

41

1  correct?

2          INMATE LEWIS:  Yes, sir.

3          DEPUTY COMMISSIONER ESTRADA:  Okay.  Now,

4  you completed quite a bit of college courses and I did

5  see you indicated that you completed two AA degrees,

6  correct?

7          INMATE LEWIS:  Yes, sir.

8          DEPUTY COMMISSIONER ESTRADA:  Okay.  And I

9  see that you have a degree from the Center for Degree

10  Studies in Associate of Specialized Business with

11  honors and Business Management and that's July 12,

12  1999.  Is that correct?

13          INMATE LEWIS:  Yes, sir.

14          DEPUTY COMMISSIONER ESTRADA:  Now, the

15  second one you completed College for Professional

16  Studies, School of Paralegal Studies and a Specialized

17  Associate Degree in Paralegal Studies and that's March

18  27, 2001.  Is that correct?

19          INMATE LEWIS:  Yes, sir.

20          DEPUTY COMMISSIONER ESTRADA:  Yeah.  And

21  that would be your second one, correct?

22          INMATE LEWIS:  Yes, sir.

23          DEPUTY COMMISSIONER ESTRADA:  And then there

24  was all kinds of certificates, I guess, leading up to

25  that Associate Degree in real estate law, legal

26  research, law office management, correct?

27          INMATE LEWIS:  Yes, sir.

42

1         PRESIDING COMMISSIONER BIGGERS:  And that
2    was all towards the degree for paralegal studies,
3    correct?
4         INMATE LEWIS:  Yes, sir.
5         DEPUTY COMMISSIONER ESTRADA:  Okay.  Very
6    good.  Very good.
7         INMATE LEWIS:  Thank you.
8         DEPUTY COMMISSIONER ESTRADA:  Now, to the
9    present, you completed -- okay, you're enrolled in
10   Coastline Community College and you completed a
11   leadership course with a B+, correct?
12        INMATE LEWIS:  Yes, sir.  But that would be
13   Indiana Institute of Technology, the leadership
14   course, sir.  I took one course from Coastline but it
15   was intro to psychology.
16        DEPUTY COMMISSIONER ESTRADA:  Okay.  And you
17   did complete psychology with a A, correct?
18        INMATE LEWIS:  Yes, sir.
19        DEPUTY COMMISSIONER ESTRADA:  Okay.  So I
20   have it backwards then.  You have an A in Psychology
21   100 and that was completed in June 7, 2005, correct?
22        INMATE LEWIS:  Yes, sir.
23        DEPUTY COMMISSIONER ESTRADA:  And then --
24   and this was in the Coastline?
25        INMATE LEWIS:  Yes, sir.
26        DEPUTY COMMISSIONER ESTRADA:  Okay.  And
27   then you did complete a leadership course but that was

43

1   with the Indiana Institute of Technology?

2             INMATE LEWIS:  Yes, sir.

3             DEPUTY COMMISSIONER ESTRADA:  Okay.  Indiana

4   Institute of Technology, B+, leadership.

5             INMATE LEWIS:  Yes.

6             DEPUTY COMMISSIONER ESTRADA:  We have that.

7   Okay.  What else have you completed?

8             INMATE LEWIS:  I've also completed a

9   business analyst.  This came through Indiana Institute

10  of Technology, the Institute of Technology.

11            DEPUTY COMMISSIONER ESTRADA:  Do you have

12  that here?

13            INMATE LEWIS:  Yes, it should be there.

14            DEPUTY COMMISSIONER ESTRADA:  I may have it

15  here.  Can I see that?  Okay.  So you have a business

16  analyst and that's from the Indiana -- it was Indiana

17  Tech.

18            INMATE LEWIS:  Yes, sir.

19            DEPUTY COMMISSIONER ESTRADA:  And that's an

20  A, correct?

21            INMATE LEWIS:  Yes, sir.

22            DEPUTY COMMISSIONER ESTRADA:  Okay.

23  Anything else?

24            INMATE LEWIS:  I also completed three-month

25  courses in --

26            DEPUTY COMMISSIONER ESTRADA:  Yeah, we'll

27  get to that.  I'm talking more academic right now.

44

1          INMATE LEWIS:  Academic, okay.  I don't have

2     my final grades for the last two classes that I'm

3     taking, which were e-commerce or quality management.

4     But for quality management, I did receive three of the

5     four exams that are required to complete the course,

6     the grades for those.  I'm currently waiting for those

7     and one -- one for electronic commerce.  I haven't

8     received --

9          DEPUTY COMMISSIONER ESTRADA:  Electronic

10    what?

11         INMATE LEWIS:  Electronic commerce but I

12    haven't received the final grade.  All the coursework

13    has been completed though.

14         DEPUTY COMMISSIONER ESTRADA:  Okay.  So

15    they're sending final grades?

16         INMATE LEWIS:  Yes, sir.

17         DEPUTY COMMISSIONER ESTRADA:  Okay, very

18    good.  I don't have that.  And this is through where?

19         INMATE LEWIS:  That's also through Indiana

20    Tech.

21         DEPUTY COMMISSIONER ESTRADA:  Okay.  Looks

22    pretty good so far.  You should get an A on those,

23    right?

24         INMATE LEWIS:  Yes, sir.

25         DEPUTY COMMISSIONER ESTRADA:  And that's --

26    anything else on -- regarding academics?

27         INMATE LEWIS:  That's it for academics.

45

1      **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Now

2  with regard to work participation, it appears that

3  you've been working as a laundry clerk.  Is that

4  correct?

5      **INMATE LEWIS:**  Yes, sir.

6      **DEPUTY COMMISSIONER ESTRADA:**  Since December

7  of 1998?

8      **INMATE LEWIS:**  Yes, sir.

9      **DEPUTY COMMISSIONER ESTRADA:**  And in

10  reviewing your work supervisor reports, you've had

11  exceptional work supervisor reports, correct?

12      **INMATE LEWIS:**  Yes, sir.

13      **DEPUTY COMMISSIONER ESTRADA:**  And I believe

14  your attorney gave me a whole slew of laudatory

15  chronos in regards to your work.  I'll go through

16  them.  4/13/04 by Altez (phonetic) Rodriguez.  He says

17  he's observed you -- or the correctional officer

18  observed you working there and you had exceptional

19  communication, diplomatic ability was (indiscernible)

20  inmates regarding their laundry.  Another one by

21  J. Brown, dated 7/4/04.

22          "Inmate has exceptional communication and

23          diplomatic skills."

24  There's another one August 17, 2005 from

25  (indiscernible) Laundry Supervisor II.

26          "Being courteous and (indiscernible) with

27          inmates and has positive -- has a positive

46

1          attitude."

2    Next is -- let's see.  Another one is Clancy --

3    J.L. Clancy, community (indiscernible).

4    (indiscernible) participation.  Oh, this is

5    (indiscernible).  Another one from Osborne, laundry

6    officer, dated May 4, 2006.

7          "I observed (indiscernible).  He continues

8          to be professional and courteous."

9    And we have those and -- several -- a couple of them

10   are from your participation in the MAC, Men's Advisory

11   Council.  One from S.R. Vasquez dated September 26,

12   '06, commending you for your participation and your

13   (indiscernible) and behavior while (indiscernible).

14   Continue to strive through your actions and

15   (indiscernible).  And the other one is from a

16   J.L. Clancy, (indiscernible) your participation in the

17   advisory council.  There's another one from a

18   S. Rothman (phonetic), second (indiscernible)

19   counselor, dated August 20, 2005.  Says he's known you

20   for more than 13 years.  You've been a central

21   employee for seven years and you have been positive.

22   You have been a professional leader even when faced

23   with special situations (indiscernible)

24   confrontations.  (indiscernible).

25          **ATTORNEY FOX:**  (indiscernible).

26          **DEPUTY COMMISSIONER ESTRADA:**  This one from

27   Correctional Officer Iulad (phonetic), dated June 6,

47

1    2002, indicating reluctance to submit laudatory

2    chronos but feels that you deserved one and spoke

3    very, very highly of you, as your (indiscernible)

4    indicates your work and feels that you're prepared and

5    determined (indiscernible).  Okay.  So yes, so you're

6    taking care of work, right?

7            INMATE LEWIS:  Yes.

8            PRESIDING COMMISSIONER BIGGERS:  Next, you

9    haven't received any psychiatric treatment during this

10   reporting period, correct?

11           INMATE LEWIS:  No, sir.

12           DEPUTY COMMISSIONER ESTRADA:  Okay.  Now, I

13   did see nine chronos regarding self-help, directed to

14   your participation in AA, dated December 20, 2004,

15   January 31, 2005, March 15, 2005, 4/18/05, 6/18/05,

16   9/31/05, January 6, '06, 4/3/06 and 7/7/06.  Are you

17   still doing to NA/AA?

18           INMATE LEWIS:  Yes, sir.

19           DEPUTY COMMISSIONER ESTRADA:  How often do

20   you do?

21           INMATE LEWIS:  Once a month on Monday or

22   Tuesday.  One -- Monday is usually AA.  Tuesday is

23   usually NA.

24           DEPUTY COMMISSIONER ESTRADA:  Okay.  Do you

25   know your steps?

26           INMATE LEWIS:  Yes, sir.

27           DEPUTY COMMISSIONER ESTRADA:  Do you know

48

1    all 12 of them?

2              INMATE LEWIS:  Yes, sir.

3              DEPUTY COMMISSIONER ESTRADA:  Now -- and I

4    already indicated participation in the MAC program

5    from (indiscernible) chronos here.  (indiscernible)

6    that would indicate your participation in AA, dated

7    February 24, 2005, indicating you completed the

8    (indiscernible) Family Effectiveness Training in the

9    Home Self-Help Program.  This is also indicated.

10   Okay.  November 19, 2005, chrono from Imam Akasmah,

11   spelled A-K-A-S-M-A-H, indicating you successfully

12   participated and completed the (indiscernible)

13   Development Center 12-week anger management course.

14   December 8, 2005, from John Lindsey (phonetic),

15   indicating you completed a 12-week anger management

16   class and that's in the Protestant chapel.  There's

17   another (indiscernible) from James Brown, Correctional

18   Officer.  I indicated that one.  November -- yeah, I

19   already indicated that one, November 4, 2004.  Next,

20   February 23, 2006 by (indiscernible) Linda Bevere,

21   B-E-V-E-R-E, Healing For the Angry Heart video series.

22   Okay.  This one's dated July 5, 2006 from S. Martinez,

23   Correctional Counselor I, indicating that when you

24   were arrested you were identified as a gang member of

25   the (indiscernible) in the Los Angeles County area.

26   Currently, there's no gang activity but it is noted

27   that you have had no gang involvement while

49

1    incarcerated.   Therefore, your gang status should be
2    recognized as inactive.  And this is 9/14/06 by
3    J. Greiger, G-R-E-I-G-E-R, academic principal,
4    indicating that you successfully completed the first
5    series of 25 education video reports and the CTF Video
6    Reports Program.  Okay.  And that is -- let's deal
7    with the certificates and go through them.  Some of
8    those have already been completed -- indicated so I
9    won't indicate them.  Okay.  8/21/06, Certificate of
10   Participation for completion for ten video reports,
11   program facilitator, H-E-M-A-L-D-S.  April 4, 2006,
12   indicated you completed the Bible Doctrine Course
13   April 4, 2006.  And this is -- you've completed the 16
14   lesson Basic Doctrine Bible Study Course with a final
15   grade of A.  Then I have a certificate for anger
16   management, dated February 23, 2006.  December 22,
17   2005, another anger management course.  There's an
18   anger management Fatherhood, October 1, 2005.  Okay.
19   Now we're talking about the Energy Management
20   Institute, (indiscernible), indicating you completed
21   an independent study course in radiological emergency
22   management, dated May 2, 2005.  Introduction to
23   Medication, dated February 25, 2005.  You took part in
24   the Homeland Security emergency planning, dated
25   December 2, 2004.  Department of Homeland Security,
26   developing and managing volunteers, November 18, 2004.
27   Department of Homeland Security, basic incident

50

1    command system, November 8, 2004.  And the

2    professional emergency management, dated November 8,

3    2004.  Now, since you arrived in State Prison,

4    Mr. Lewis, you have received a total of seven 115's

5    and your last one was in 1999 on August 7, 1999 for

6    refusing a direct order, for which you received 25

7    hours extra duty and reprimanded.  So you haven't had

8    any 115's for seven years, two months.  Is that

9    correct?

10             INMATE LEWIS:  That's correct, sir.

11             PRESIDING COMMISSIONER BIGGERS:  Now, since

12   you arrived at State Prison, you have had a total of

13   seven counseling chronos and your last one was on

14   February 27, 1994 for being out of bounds.  So you

15   haven't had any counseling chronos for 12 years, 7

16   months?

17             INMATE LEWIS:  Yes, sir.

18             DEPUTY COMMISSIONER ESTRADA:  Now, according

19   to your CC-I report by Rudio CC-I indicated that you

20   would benefit from updating your support letters

21   (indiscernible) and updating your positive behavior.

22   Now, the Psychological Report by Dr. Macomber does

23   indicate Axis I -- a diagnosis of Axis I; no mental

24   disorder, Axis II; no personality disorder and you

25   have a GAF score of 95, which is real high, very high,

26   which is good.  Good for you.

27             INMATE LEWIS:  Yes, sir.

51

1        **DEPUTY COMMISSIONER ESTRADA:**

2        "In regards to the assessment of dangerous

3        and consideration for -- potential for

4        dangerous behavior in this -- in the

5        institution, he has not had a serious

6        disciplinary since 1999.  His last

7        (indiscernible) was in 1994.  This was 12

8        years ago.  He no longer -- he is no longer

9        the irresponsible 19-year-old that he was at

10       the time of the commitment offense.  In

11       comparing him to other inmates, potential

12       for dangerous behavior is below average.  In

13       comparing potential for dangerous behavior

14       when released to the community, I agree with

15       the previous two psychological evaluations,

16       as stating that his potential for violence

17       is no greater than the average citizen in

18       the community."

19   The doctor concludes that you are no longer -- you no

20   longer pose a threat to society and that there are no

21   significant risk factors in this case.  And believes

22   that your prognosis for success within the community

23   is excellent.  Mr. Lewis, is there anything I may have

24   missed?

25       **INMATE LEWIS:**  Yeah -- yes, sir.  I have two

26   chronos.  We just started an Alternatives to Violence

27   Program here in Soledad and I took these courses in

52

1   the early nineties to become a facilitator.  We just

2   started facilitating or conducting these courses.  We

3   conducted one in July and August and we did --

4               DEPUTY COMMISSIONER ESTRADA:  What is that?

5               INMATE LEWIS:  -- a workshop in September.

6   Those are programs that we finally got going here for

7   self-help.

8               DEPUTY COMMISSIONER ESTRADA:  Okay, thank

9   you.

10              INMATE LEWIS:  You're welcome.

11              DEPUTY COMMISSIONER ESTRADA:  Okay.  Okay.

12   They're both dated -- are they the same chrono?

13   They're different.  They're from J. Sisk, S-I-S-K,

14   Associate Warden, Correctional Training Facility and

15   they're both dated September 25, 2006.  Your -- you

16   are commended for your volunteered participation and

17   (indiscernible) to promoting a peaceful, non-violent

18   programming environment and for your contribution to

19   the Alternatives Violence Project Program at CTF.

20   Okay.  And that you did help in the two-hour mini

21   workshop.  Okay.

22              "My interaction with (indiscernible) and

23              eight other impact facilitators."

24   He gives a brief description of the program.  The

25   second one indicated you voluntarily contributed 21

26   hours of your time during a two-day period as a

27   facilitator for the Alternative to Violence Project

# EXHIBIT 3

INMATE COPY

### MENTAL HEALTH EVALUATION FOR
### THE BOARD OF PRISON HEARINGS
### May, 2006 Lifer Calendar

### CORRECTIONAL TRAINING FACILITY SOLEDAD
### APRIL, 2006

| | |
|---|---|
| **NAME:** | **LEWIS, SAMUEL** |
| **CDC#:** | **E-05524** |
| **DOB:** | **3/23/69** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **2/18/88** |
| **SENTENCE:** | **15 YEARS TO LIFE** |
| **MEPD:** | **3/21/98** |
| **EVALUATION DATE:** | **4/8/06** |

## I.    IDENTIFYING INFORMATION:

Mr. Samuel Lewis is a 37 year old, first term, African-American, married male from Los Angeles County. He has served 18 years on his sentence. He is a Christian.

### SOURCES OF INFORMATION:

This evaluation is based upon a single 2 hour interview plus review of the central and medical files.

The Psychological Evaluation prepared for the BPT on 11/16/01, by Dr. Reed, at CTF-Soledad, is still current and valid. This includes a Psychosocial Assessment that is still current and valid. As a result, this information will not be repeated at this time.

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Lewis related during the interview in a serious, open, friendly and cooperative manner. His mental status was within normal limits. There are no mental or emotional problems in this case. Hygiene and grooming were good. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. Affect was appropriate. There was no evidence of anxiety or of depression. Intellectually, he was functioning in the high average range. His eye contact was good. His memory was intact. His judgment was intact. His insight and self-awareness were good.

There is no significant drug or alcohol use in this case. Mr. Lewis used marijuana on occasion on an experimental basis. He was never dependent upon it. Alcohol has never been a problem. Drugs or alcohol were not related to his behavior in the commitment offense. There is no need for him to attend Alcoholics Anonymous or Narcotics Anonymous. However, he has been voluntarily attending these two programs on a regular basis over the years.

Mr. Lewis has achieved significant accomplishments while in prison. He has not only obtained his GED, he also has continued his college education. He has received an AA Degree in Business in 1999, and then after that he obtained another AA Degree in Paralegal Studies, which he earned in the year 2000. He is working on his Bachelor of Arts Degree at this time. He is close to finishing this program. In addition, he has finished 6 Federal Emergency Management Agency Courses, in order to learn how to handle emergencies. These achievements are very commendable, and they are very rare in the prison setting.

He also has attended numerous self-help programs over the years. He has attended Alcoholics Anonymous and Narcotics Anonymous since 1991; Alternatives to Violence in 1991; Breaking Barriers Program, a 16 week course in 1992; Hands of Peace Creative Conflict Resolution Workshop in 1995; Introduction to Meditation, 1995; Morals and Values Class, 1996; Breaking Barriers, 1996; Life Plan for Recovery, 1996; another Life Plan for Recovery, 1996; Hands of Peace Workshop, Training in Non-Conflict Resolution, 1996; Life Plan for Recovery, 1996; Breaking Barriers Program, 1997; Creative Conflict Resolution Course, 1997; Hands of Peace Workshop for Training in Non-Violence, 1997; RAPHA Christian Prison Fellowship Workshop, 1997; Hands of Peace Workshop for Training in Non-Violence, 1998; Certification for Facilitator

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 3

Training, 1998; another Facilitator Training in Hands of Peace Workshop in 1998;
Christian Prison Fellowship Seminar, 1998; Parenting Program, 1998; Christian
Prison Fellowship Seminar, Preparing for Employment, 1998; Walk-A-Thon for
Child Abuse Prevention, 1998; Christian Workers Bible Study, 1998; Christian
Living Bible Study, 1998; Christian Living II Bible Study, 1998; Inmate Peer
Education Program in Communicable Disease, 1999; Entrepreneur Development
Class, 1999; Creative Non-Fiction Writing, 2000; Anger Management, 2002;
Impact Workshop Victim's Awareness, 2002; Righting Wrong Relationships
Christian Prison Fellowship, 2003; The Birth of Christ Bible Study, 2004; Anger
Management Course and Family Effectiveness Training, 2005; Anger
Management and Fatherhood, 2005; Anger Management, 2005; Healing the
Angry Heart Anger Management Program, 2006.

There is no evidence of mental or emotional problems in this case. In the past, he
has been given a diagnosis of Antisocial Personality Disorder, significantly
improved. This diagnosis is based upon the fact that as a juvenile and as an adult,
he was involved in illegal activities. Although this label may be of interest for
historical reasons, there is no evidence at this time in his life of features of
Antisocial Personality Disorder. Mr. Lewis does have concern for others,
empathy towards others, and concern towards others who are suffering; and his
values are solidly pro-social. There is no evidence of any antisocial thinking or
values at this point in his life. In the absence of these characteristics, the
diagnostic label of Antisocial Personality Disorder is no longer evident and no
longer appropriate. Therefore, this will not be listed as a current diagnostic
problem.

## CURRENT DIAGNOSTIC IMPRESSION

| Axis I: | No mental disorder |
|---------|--------------------|
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 95 |

## XIII.  REVIEW OF LIFE CRIME

Mr. Lewis accepts full responsibility for his commitment offense. At the time of
this offense he was accompanied by others who were gang members. He was
motivated to act out violently in order to obtain peer approval and gain status.
Unfortunately, a 17 year old, innocent female was killed and others were
wounded.

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 4

Mr. Lewis fully accepts his need for being punished for this crime. There is no evidence of resentment or of criticism towards the sentence that he is serving. He does have a good attitude, and he is willing to serve as much time as necessary. He noted that prison has been in many ways a blessing for him. His prison experience has shown him how to be constructive and successful in life. He is participating in self-improvement activities by taking advantage of the opportunity to acquire higher education and to participate in Bible studies. As a result, he has learned how to stand alone, do that which is right, and not yield to peer pressure, make positive choices in the middle of a crisis situation, and act in a way that is helpful and constructive towards others, rather than being self-centered and destructive in his responses. He commented that living in prison gives an inmate a daily workshop experience in handling confrontations, hostility in others, and abuse from others in a positive, calm and constructive manner.

Mr. Lewis is very aware of the damage that he has done to his victims, to the victims' families, as well as his own family. He spoke at length about how his own daughter, who is now 18, but last year was only 17, comes to visit him, and how he realized that if he were to lose her, due to someone killing her as he did to the victim in the commitment offense, how terrible and disastrous this would be. He does have deep feelings of concern and empathy towards his victims and their families. He speaks openly about how important it is to do the right thing, not just simply to do whatever thing the peers around him expect.

Mr. Lewis has come a long way during the 18 years of his incarceration. The last panel asked that the psychologist give an opinion as to Mr. Lewis' ability to maintain his current gains. In my opinion, his gains are now solidly a part of his thinking and personality. This is not something that he has recently acquired. In my opinion, he will continue to maintain his gains in the future.

XIV.  **ASSESSMENT OF DANGEROUSNESS**

    A.  In considering potential for dangerous behavior in the institution, he has not had a serious disciplinary since 1999. His last cell fight was in 1994. This was 12 years ago. He is no longer the irresponsible 19 year old that he was at the time of the commitment offense. In comparison to other inmates, potential for dangerous behavior is below average.

    B.  In considering potential for dangerous behavior when released to the community, I agree with the previous two psychological evaluations that stated that his potential for violence is no greater than the average citizen

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 5

in the community. This conclusion is supported by the administration of the Level of Service Inventory-Revised, which is an actuarial measure that assesses criminal history, substance abuse history, academic achievements and social factors to determine the risk level on parole. His score on this assessment is 4.2 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 95 of them. This is a very low risk level. He no longer poses a risk to society.

C. There are no significant risk factors in this case.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with parole planning. Mr. Lewis has not only achieved 2 Associate of Arts Degrees while in custody, he has also completed Vocational Dry Cleaning and Vocational Fork Lift Operator. He also has a degree as a paralegal. In addition, he is certified to prepare income taxes. With these skills, employment will not be an issue in this case. He also has the support of his wife who lives in Salinas, California. He also has job offers in the Monterey County area. In addition to these factors that would indicate a positive prognosis on parole, he has strong family support in the community that will ensure that he has all of the resources necessary to do very well on parole. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**D:    4/8/06**

# EXHIBIT 4

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## (REVISED AUGUST 1998)
## PAROLE CONSIDERATION HEARING
## APRIL 2004 LIFER CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
## FEBRUARY 25, 2004

This is a psychological evaluation update for the Board of Prison Terms on inmate Samuel Lewis, CDC# E-05524. This report is based on a personal clinical interview of the inmate on 02/25/04. Additionally, in preparation for this report, the Central file, unit health records, and the previous BPT assessment completed by Dr. J. Reed in 2001 were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Lewis is a 34-year-old, divorced, African-American male whose date of birth is 03/23/69. No obvious unusual physical characteristics were observed, and he denied the use of any nicknames or aliases.

Since his last BPT psychological evaluation in 2001, inmate Lewis has continued to program well within the institutional framework, with no 115s on file. Since 1998, he has been employed in the laundry services, and continues his NA and AA programming.

Inmate Lewis has already served 16 years of a 15-year to life term, and during this time, he has continued to pursue both academic and vocational goals. In 1999, he obtained an associate degree in business management, followed by a paralegal degree in 2001. Currently, he is enrolled in a correspondence program with Indiana Institute of Technology, working toward a Bachelor's degree in business administration.

During the clinical interview, inmate Lewis presented as an articulate, mature, and responsible individual with a clear sense of goals and direction. He has no mental health or drug-related issues which would impede his success in the community. In a previous psychological assessment by Dr. J. Reed, inmate Lewis's risk potential in a community setting is documented as being low, with no significant changes in circumstances since the last evaluation. Currently, inmate Lewis has a risk potential no greater than the average citizen, and is a suitable candidate for release consideration.

If released into the community, inmate Lewis plans to reside with his mother, a registered nurse living in Los Angeles, California. He has strong family support, facilitating reintegration into a community setting.

**E. W. Hewchuk, Ph.D.**
**Staff Psychologist**
**Correctional Training Facility, Soledad**

LEWIS        E-05524        CTF-CENTRAL        02/25/04        gmj

LEWIS, SAMUEL
CDC NUMBER: E-05524
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

EWH/gmj

D: 02/25/04
T: 03/03/04

EXHIBIT 5

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
MARCH 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 15, 2001

This is a mental health evaluation for the Board of Prison
Terms for inmate Samuel Lewis, CDC# E-05524. This report is
based upon a personal clinical interview of the inmate,
conducted on 11/15/01, as well as a review of his Central
file and unit health record. This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

### I.    IDENTIFYING INFORMATION:

Inmate Lewis is a 32-year-old, divorced, African-
American male whose date of birth is 03/23/69. He is
an American citizen. His stated religious preference
is Protestant. He has no obvious unusual physical
characteristics and denied the use of any nicknames or
aliases.

### II.   DEVELOPMENTAL HISTORY:

Inmate Lewis denied any significant developmental
history. He denied any childhood history of physical
or sexual abuse as either a perpetrator or a victim.

### III.  EDUCATIONAL HISTORY:

Inmate Lewis stated that he attended public school and
completed the eleventh grade. In 1990, he said he
received his GED while at Richard J. Donovan
Correctional Facility. In 1999, he reported receiving
his AA degree in business, and in 2000, he reported
receiving his AA degree in paralegal studies.

In 1990, his measured grade point level was 12.9 TABE.
He has no history of special education or behavioral
problems in school. He is currently taking a tax
correspondence course.

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE TWO

IV.  **FAMILY HISTORY**:

Inmate Lewis denied any significant substance abuse or
criminal history in his family.  He described his
current relationships with his family members as warm
and supportive, that he receives monthly visits and
weekly telephone calls.  He stated there is no history
of abuse with his family members.

V.  **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION**:

Inmate Lewis stated that he is a heterosexual male.  He
denied any history of sexual aggression or high-risk
sexual behavior.

VI.  **MARITAL HISTORY**:

Inmate Lewis stated that he been married twice.  His
first marriage began in 1988 and ended in 1990 due to
incarceration-related problems.  He has one child from
this relationship who is 13 years of age.

His second marriage began in 1991 and ended in 1994,
again due to incarceration-related problems.  He said
that there is no history of abuse in any of these
relationships.

He has maintained some contact with both of his
previous wives.  He stated that he has maintained a
warm and supportive relationship with his 13-year-old
daughter.  They communicate through visits, letters and
telephone calls.  He said there is no history of abuse
in this relationship.

VII.  **MILITARY HISTORY**:

This inmate has no record of military history.

VIII.  **EMPLOYMENT/INCOME HISTORY**:

Inmate Lewis' preincarceration work history includes
working two years in an Altadena dairy as a stock
person and cashier.

LEWIS      E-05524      CTF-CENTRAL      11/16/01      gmj

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE THREE


His incarceration work history includes becoming certified in 1997 in vocational dry cleaning, and becoming certified as a forklift operator in 1998. He is currently on the waiting list for data processing.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Lewis denies having a significant substance abuse history. He did acknowledge having used marijuana in the past on occasion.

Notably, in 1997, a psychological report by Dr. Calix suggests continued monitoring for drug and alcohol abuse upon parole. A parole evaluation in 1997 by Rodriguez also indicates a possible history of drug abuse. However, in this writer's opinion, the record does not indicate a significant history of drug abuse.

To his credit, the inmate has attended Alcoholics Anonymous and Narcotics Anonymous since 1991, and he currently attends these groups. In 1996, he attended a Basic and Advanced Life Plan for Recovery From Substance Abuse.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Lewis has a previous psychiatric diagnosis of Antisocial Personality Disorder. He does not have a history of prior hospitalizations. He has no history of suicidal behavior.

He has no significant history of serious accidents, including head injuries. He does not have a history of seizure or other neurological conditions. He has no significant impairments or illnesses. He is currently not taking any significant medications.

## XI.    PLANS IF GRANTED RELEASE:

If granted parole, this inmate plans to live in Los Angeles County with his mother, who has agreed to this arrangement. Alternatively, he prefers to parole to New Orleans and live with his uncle, who has agreed to

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE FOUR

this arrangement.  His financial and vocational plans include working in dry cleaning, as a warehouseman or in labor jobs.  Also, his uncle promised him a job at his trucking company located in New Orleans.

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Lewis was alert and oriented to person, place and time.  He was well dressed and groomed.  His speech was articulate and contextually meaningful.  His mood and affect were within normal limits and his behavior was appropriate to the setting.  No evidence of a mood or thought disorder was demonstrated.  His estimated level of intellectual functioning was within the average range.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    No Contributory Clinical Disorder.
AXIS II:   Antisocial Personality Disorder, significantly improved.

In addition to attending Alcoholics Anonymous and Narcotics Anonymous groups, inmate Lewis has attended a number of other self-help groups.  He attended Breaking Barriers from 1996 to 1997.  In 1996, he attended the Morals and Values class.  In 1995, he completed Conflict Resolution class, and he reports also having worked as a teacher in this subject.  In 1992, he attended Breaking Barriers, and in 1991, he attended the Alternatives to Violence class.  The inmate further states that he has attended numerous other self-help groups.  He does appear to have profited significantly from his participation in these self-help groups.

### XIII. REVIEW OF LIFE CRIME:

Inmate Lewis described the circumstances surrounding his commitment offense, involving Second Degree Murder

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

with a Firearm.  He admitted full responsibility for the death of the victim, a 17-year-old girl.

He recalled how he got into an argument with someone and later returned with four other gang members of the Van Ness Gangsters.  He reported using his shotgun, firing at a group of teenagers, and killing the 17-year-old girl and wounding three others.

Inmate Lewis discussed the damage done to the victims, to the victims' families, and to his own family.  He has gained increased understanding of the damage done and he appears genuinely penitent for his crime.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.  His violence potential within a controlled setting is considered to be below average relative to this Level II inmate population.  This conclusion is based upon several factors.

On the one hand, he has a juvenile criminal history, involving a 1987 arrest for grand theft auto, and being convicted of having a concealed hand gun.  As a juvenile, he also admits to having associated with members of the Van Ness Gangsters, with the Crips and with the Bloods for approximately three years.

While in CDC, he has obtained seven CDC-115 violations and seven CDC-128 disciplinaries.

On the other hand, however, he has not received a significant disciplinary for violent behavior in approximately seven years.  He shows significant improvement over the last six years, and he appears to have profited from his participation in numerous self-help groups.  He has shown consistent goal attainment ability by obtaining his AA degrees in 1999 and 2000.  Moreover, his achievements indicate, over the last six years, good acceptance of responsibility, good behavioral controls, and a strong pattern of

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE SIX

prosocial behavior.  No further association with gangs was found.

Therefore, in light of these factors, his violence potential is considered to be below average relative to this Level II inmate population.

B.  There are no significant risk factors which may be precursors to violence for this individual.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards.

B.  This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

C.  This inmate does not appear to have a significant drug or alcohol problem, and there are no recommendations in this area.

*Joe Reed*

JOE REED, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JR/gmj

D:  11/15/01
T:  11/16/01

# EXHIBIT 6

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| | | | |
|---|---|---|---|
| Date:  10-29-2007 | | | |
| Honorable:  STEVEN R. VAN SICKLEN | Judge | J. DITTMER | Deputy Clerk |
|                    NONE | Bailiff | NONE | Reporter |

| | |
|---|---|
| BH004703 | (Parties and Counsel checked if present) |
| In re, | |
| Samuel Lewis, | Counsel for Petitioner: |
|            Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on May 18, 2007 by the Petitioner.  Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole.  See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on January 4, 1989 after a conviction for murder in the second degree.  He was sentenced to 15 years to life.  His minimum parole eligibility date was February 19, 1998.

The record reflects that on February 15, 1988, the Petitioner got into an argument with Marcos Villegas and challenged him to a fight.  Marcos' brother intervened and the Petitioner was heard saying that he was going to get his homeboys and come back.  The Petitioner then told some gang members who he associated with about the incident.  They gave him a sawed-off shotgun and told him that he could go shoot Marcos as an initiation into the gang.  The Petitioner returned to the area he encountered Marcos and saw him standing among a group of people.  The Petitioner fired several shots toward the group, missing Marcos.  However, Chivogne Perry was shot in the back and killed.  Lovel Bllard was shot in the arm and April Purcel was shot in the hand, but both survived.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on October 12, 2006.  The Petitioner was denied parole for one year.  The Board concluded that the Petitioner was

1

| Minutes Entered |
|---|
| 10-29-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

Date:   10-29-2007

| Honorable:  STEVEN R. VAN SICKLEN | Judge | J. DITTMER | Deputy Clerk |
|---|---|---|---|
| NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004703

In re,

Samuel Lewis,

      Petitioner,

    On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense and his institutional behavior.

The Court finds that there is some evidence to support the Board's findings that the Petitioner's commitment offense killed or injured multiple victims; that it was carried out in a dispassionate and calculated manner; and that his motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subds. (c)(1)(A), (c)(1)(B) and (c)(1)(E). The Petitioner shot into a crowd of people, killing one victim and seriously injuring two others. The Petitioner, with the help of his friends, planned the shooting, armed himself with a shotgun and returned to the area where he had argued with Marcos for that purpose. The offense was planned and calculated and the Petitioner randomly fired into a crowd of unarmed people who posed no threat to him in a very dispassionate manner. His motive for shooting at the crowd was that he had argued with one of the victims' friends and that he wanted to be initiated into the gang that his friends were in. These were an extremely trivial motives for the grave offense.

The Court finds that there is no evidence to support the Board's finding that the offense demonstrated an exceptionally callous disregard for human suffering. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D). The offense was not committed in a more violent manner than is ordinarily shown in the commission of a second-degree murder and there is no evidence on the record of torture, beating, or prolonged suffering inflicted by the Petitioner. Therefore, the offense did not demonstrate an exceptionally callous disregard for human suffering under subdivision (c)(1)(D). See *In re Scott* (2004) 119 Cal.App.4th 871, 891.

2

Minutes Entered
10-29-07
County Clerk

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: 10-29-2007 | | | |
|---|---|---|---|
| Honorable: STEVEN R. VAN SICKLEN | Judge | J. DITTMER | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004703
In re,
Samuel Lewis,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

The Court finds that there is some evidence to support the Board's finding that the Petitioner's institutional behavior supports a finding of unsuitability. Cal. Code Regs., tit. 15, §2402, subd. (c)(6). The Petitioner received seven 115s during his incarceration, two of which were for fighting. Although his violent priors were all prior to 1995, he received a more recent 115 in 1999. His continued violence earlier in prison, as well as his somewhat recent inability to conform to rules weighs against his suitability for parole.

The Board also considered the Petitioner's non-violent prior offenses and his gang association. While these factors, alone, may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole. Cal. Code Regs., tit. 15, §2402(b).

The Board also considered the Petitioner's considerable post-conviction gains, including several self-help programs; vocational certificates in forklift operation and dry cleaning; two Associates degrees and additional college course work; as well as his participation in Alcoholics Anonymous. However, they still concluded that the Petitioner would pose an unreasonable threat to public safety. Penal Code §3041(b). The Court finds that there is some evidence to support this determination because of the grave nature of the commitment offense and his prior behavior problems in prison.

The Petitioner contends that the Board violated his plea agreement in considering the injuries sustained by Lovel Bllard and April Purcel, as the charges of attempted murder of those victims were dismissed according the plea agreement. This argument is without merit. The Petitioner pled to an indeterminate sentence, which is, in legal effect, a sentence for the maximum term unless the parole authority acts to fix a shorter term. See In re Dannenberg (2005) 34 Cal.4th 1061, 1097-1098; In re Honesto (2005) 130 Cal. App. 4th 81, 92-93. In making this determination, the Board may consider all relevant, reliable information, including

3

| Minutes Entered |
|---|
| 10-29-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: 10-29-2007 | | |
|---|---|---|
| Honorable: STEVEN R. VAN SICKLEN | Judge J. DITTMER | Deputy Clerk |
| NONE | Bailiff NONE | Reporter |

(Parties and Counsel checked if present)

BH004703
In re,
Samuel Lewis,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

//

injuries to victims, even if the Petitioner was not convicted of those injuries. Cal. Code Regs., tit. 15, §2402(b).

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Samuel Lewis
E-05524
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Department of Justice – State of California
Office of the Attorney General
300 South Spring St.
Los Angeles, CA 90013

4

Minutes Entered
10-29-07
County Clerk

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | FILED<br>LOS ANGELES SUPERIOR COURT<br><br>DEC 0 3 2007<br><br>JOHN A. CLARKE, CLERK<br>BY_____ DEPUTY |
| PLAINTIFF/PETITIONER:<br><br>Samuel Lewis | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004703 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☐ Order re: Request for Extension of Time
- ☐ Order      Petition
- ☑ Order re: Writ of Habeas Corpus
- ☐ Copy of

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

**12-03-07**
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
      James Dittmer

Samuel Lewis
E-05524
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689


Department of Justice – State of California
Office of the Attorney General
300 South Spring St.
Los Angeles, CA 90013

# EXHIBIT 7

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

In re SAMUEL LEWIS,

    On Habeas Corpus.

B204642

(Super. Ct. No. A964645)

**ORDER**

THE COURT:

    The court has read and considered the petition for writ of habeas corpus filed December 31, 2007.  The petition is summarily denied.

COURT OF APPEAL - SECOND DIST.

**F I L E D**

JAN 1 6 2008

JOSEPH A. LANE _____ Clerk

J. GUZMAN _____ Deputy Clerk

_____
BOREN, P. J.

_____
DOI TODD, J.

_____
CHAVEZ, J.

Samuel Lewis     E-05524
Soledad State Prison
P.O. BOX 689
Soledad, Ca. 93960-0689

# EXHIBIT 8

Court of Appeal, Second Appellate District, Div. 2 - No. B204642
**S160345**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re SAMUEL LEWIS on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

MAR 1 9 2008

Frederick K. Ohlrich Clerk

_____
Deputy

Chief Justice

# EXHIBIT 9



# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
### OCTOBER 2005 CALENDAR

LEWIS, SAMUEL                                                    E-05524

## I.  COMMITMENT FACTORS:

**A.    Life Crime:**  Murder 2nd (PC 187) Count 1, Los Angeles County Case #A964645. Sentence: 15 to Life. MEPD: 3/21/98. Victim: Shivone Perry, age unknown. Received by CDC on 1/4/89.

  **1.    Summary of Crime:**  All relevant documents from the previous hearings including the transcripts have been considered and the information appears valid and the writer has no further information to add.

  **2.    Prisoner's Version:**  Remains the same as stated in the previous hearing.

  **3.    Aggravating/Mitigating Circumstances:**

   **a.    Aggravating Factors:**  Remains the same as stated in the previous hearing.

   **b.    Mitigating Factors:**  Remains the same as stated in the previous hearing.

**B.    Multiple Crime(s):**  None.

  **1.    Summary of Crime:**  None.

  **2.    Prisoner's Version:**  None.

**INMATE COPY**

## II.  PRECONVICTION FACTORS:

**A.    Juvenile Record:**  Remains the same.

**B.    Adult Convictions:**  Remains the same.

**C.    Personal Factors:**  Remains the same.

COPY TO INMATE ON
July 16, 2005

LIFE PRISONER EVALUATI~ ~PORT                                                2
PAROLE CONSIDERATION . ._RING
OCTOBER 2005 CALENDAR

III.    **POSTCONVICTION FACTORS:**

    A.    **Special Programming/Accommodations:** None.

    B.    **Custody History:** Documents from the previous hearings have been considered
and that information remains valid. During the period of time since the last
hearing (10/28/04), Lewis' behavior has been positive in that he has remained
disciplinary free and maintained a stable work program at his assignment as a
wing laundry clerk. He is enrolled in an Independent Study Program through
Coastline Community College and FEMA courses.

    C.    **Therapy and Self-Help Activities:** Lewis attends Alcoholics/Narcotics
Anonymous meetings, completed Dr. Thomas Gordon's Family Effectiveness
Training/Harmony in the Home self-help program and the leadership course.

    D.    **Disciplinary History:** Lewis has received seven CDC 128A's and seven CDC
115's. See disciplinary sheet for details.

    E.    **Other:** A Subsequent Hearing was held on 10/28/04. The BPT denied parole for
an additional one year.

        Recommendations:

        1.    Get self help.
        2.    Stay disciplinary free.

IV.    **FUTURE PLANS:**

    A.    **Residence:** Since Lewis' last Board hearing he has married. His wife, Lisa
Cushman, resides at 1621 Cadiz Circle in Salinas, California (831) 443-6791.
Lewis wishes to parole to Monterey County to reside with his wife who is
manager of a Rite Aide Drug Store in Salinas. His wife is willing to relocate to
another county if the Board does not approve his release to Monterey County.

    B.    **Employment:** Lewis plans to seek employment as a forklift operator or dry-
cleaner as he developed these skills while incarcerated. He has sent resumes and
has applications on file at the following companies: Enterprise Rent-A-Car,
Salvation Army, Monterey/Salinas Transit as well as others (see Lewis' parole
plans on file).

    C.    **Assessment:** Lewis married Lisa Cushman on 3/19/05. She will provide a home
as well as emotional and financial support until Lewis is able to secure
employment and become a product member of his community. Lewis has a valid
residence and viable work skills. He has met the BPT recommendations and

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING                                          3
OCTOBER 2005 CALENDAR

should have a successful parole. This writer has witnessed his growth and
maturity over the years. He has been a positive example to his peers, his daughter
and his nephew.

**V.    USINS STATUS:** No holds.

**VI.   SUMMARY:**

A.    Prior to release, Lewis could benefit by updating his support letters, developing
resources for employment and continuing his positive behavior.

B.    This report is based upon a personal interview, incident contact in the housing
unit and a thorough review of the Central File.

C.    Lewis was afforded the opportunity to review the Central File. See CDC 128B
dated 6/17/05.

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole
Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
OCTOBER 2005 CALENDAR

4

_M. Rubio_    _7-1-05_
M. Rubio                          Date
Correctional Counselor I


_J.L. Sareli_    _7-1-5_
J.L. Sareli                        Date
Correctional Counselor II


_J.L. Clancy_    _7-1-05_
J.L. Clancy                       Date
Facility Captain


_D.S. Levorse C&PR_    _7-5-05_
D. S. Levorse                    Date
Classification and Parole Representative

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/04 to Present | | | **PLACEMENT:** CTF.<br>**CUSTODY:**  Medium A.<br>**VOC. TRAINING:**  None.<br>**ACADEMICS:** Enrolled in Coastline Community College (see CDC 128b 12/15/04), A leadership course (see grade report 11/23/04) and FEMA (see certificates 11/8/04, 11/18/04, 12/2/04, 2/25/05, 5/2/05).<br>**WORK RECORD:**  Assigned as a laundry clerk with exceptional work reports.<br>**GROUP ACTIVITIES:**  Attends AA/NA meeting and completed Family Effectiveness Training (see CDC 128B's 4/18/05, 3/15/05, 1/31/05, 12/22/04, 10/1/04 and 2/24/05).<br>**PSYCH. TREATMENT:**  None.<br>**PRISON BEHAVIOR:**  Remained positive and disciplinary free.<br>**OTHER:**  None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

*M. Rubio ccI*

DATE   7-1-05

| LEWIS | E05524 | CTF-SOLEDAD | OCT/2005 |
|---|---|---|---|

BPT 1004 (REV 7/86)

## DISCIPLINARY SHEET

### CDC 128A's:

| | | |
|---|---|---|
| 02/27/94 | RJD | Out of Bounds. |
| 04/23/93 | RJD | Unissued Property. |
| 11/13/92 | RJD | Delaying Count. |
| 07/21/92 | RJD | Obeying Orders. |
| 03/24/91 | SCC | Failure to Report. |
| 05/19/90 | CTF | Unauthorized Property. |
| 01/12/90 | CTF | Failure to Report. |

### CDC 115's:

| | | | |
|---|---|---|---|
| 08/10/99 | CTF | 3005(b) | Refusing a Direct Order: Guilty, assessed 25 hours extra duty. |
| 09/14/95 | RJD | 3015 | Out of Bounds: Guilty, assessed 30 days loss of privileges and 40 hours extra duty. |
| 12/08/94 | RJD | 3006 | Contraband: Guilty, assessed 40 hours extra duty. |
| 03/10/94 | RJD | 3005(c) | Fighting: Guilty, assessed 90 days credit loss, 30 days loss of privileges and 40 hours extra duty. |
| 07/29/93 | RJD | 3005(b) | Disobeying Orders: Guilty, assessed 30 days loss of credit, 90 days loss of privileges. |
| 10/27/91 | RJD | 3006(a) | Possession of Tattoo Gun; Guilty, assessed 40 hours extra duty. |
| 04/07/90 | CTF | 3005(c) | Physical Altercation with Another Inmate: Guilty assessed 90 days loss of credits, 10 days CTQ. |

# EXHIBIT 10

### LIFE PRISONER EVALUATION REPORT
### SUBSEQUENT PAROLE CONSIDERATION HEARING
### MARCH 2001 CALENDAR

**LEWIS, SAMUEL**                                                    **E-05524**

I.    **COMMITMENT FACTORS:**

A.    **LIFE CRIME:** Murder 2nd (PC 187) Count 1, Los Angeles County Case # A964645. Sentence: 15 to Life. MEPD: 03/21/98. Victim: Shivone Perry, age unknown. Received by CDC on 01/04/89.

1.    **Summary of Crime:** All relevant documents from the previous hearings including the transcripts have been considered and the information appears valid and the writer has no further information to add.

2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

B.    **AGGRAVATING/MITIGATING CIRCUMSTANCES:**

1.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

2.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** Remains the same.

B.    **Adult Convictions:** Remains the same.

C.    **Personal Factors:** Remains the same.

III.    **POSTCONVICTION FACTORS:**

A.    **Special Accommodations/Disability:** None noted.

B.    **Custody History:** Documents from the previous hearings have been considered and that information remains valid. During the period of time since the last hearing, Lewis' behavior has remained the same. Lewis is assigned as the Y-Wing Laundry attendant and has received above average to exceptional work

reports.  Lewis received certificate from College for Professional Studies in Paralegal Studies, Kaplan College in Legal Research Specialty, Real Estate Law

Specialty, Law Office Management Specialty and Litigation Assistantship Specialty and he received a degree of Associate in Specialized Business.

C.      **Therapy & Self-Help Activities:**  Lewis attends Alcoholics Anonymous and Narcotics Anonymous programs.

D.      **Disciplinary History:**  Lewis has received seven CDC 115's and seven CDC 128A's.  See Disciplinary Sheet for details.

## IV.    FUTURE PLANS:

A.      **Residence:**  Lewis plans to reside with his mother, Shirley Lewis, at 4831 3rd Ave., in Los Angeles, CA. (213) 292-1305.

B.      **Employment:**  Lewis plans to seek employment in dry cleaning or as a fork lift operator as he has certificates in these fields.  He also hopes to continue his education and work as a paralegal.

## V.    USINS STATUS:  No holds noted.

## VI.    SUMMARY:

A.      Considering the commitment offense, prior record, and prison adjustment, the writer believes Lewis would probably pose a moderate to low degree of threat to the public at this time, if released from prison.

B.      Prior to release, Lewis could benefit from remaining disciplinary free, maintaining a stable work record and participating in a self-help program.

C.      This Board report is based upon a one hour interview, incidental contact in the housing unit and a thorough review of the Central File.

D.      Lewis reviewed his Central File on 08/07/01.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2001 CALENDAR                                                          3


*M. Rubio*

M. Rubio
Correctional Counselor I


*J. Sisk*

J. Sisk
Correctional Counselor II


*R. Pope*

R. Pope
Facility Captain


*D. Levorse          COPR*

D. Levorse
Classification and Parole Representative


LEWIS, SAMUEL          E-05524          CTF-SOLEDAD          MAR/2001

# DISCIPLINARY SHEET

**CDC 115's:**

| 08/10/99 | CTF | 3005(b) | Refusing a Direct Order: <u>Guilty</u>, assessed 25 hours extra duty. |
|----------|-----|---------|---------------------------------------------------------------------|
| 09/14/95 | RJD | 3015 | Out of Bounds: <u>Guilty</u>, assessed 30 days loss of privileges and 40 hours extra duty. |
| 12/08/94 | RJD | 3006 | Contraband: <u>Guilty</u>, assessed 40 hours extra duty. |
| 03/10/94 | RJD | 3005(c) | Fighting: <u>Guilty</u>, assessed 90 days credit loss, 30 days loss of privileges and 40 hours extra duty. |
| 07/29/93 | RJD | 3005(b) | Disobeying Orders: <u>Guilty</u>, assessed 30 days loss of credit, 90 days loss of privileges. |
| 10/27/91 | RJD | 3006(a) | Possession of Tattoo Gun: <u>Guilty</u>, assessed 40 hours extra duty. |
| 04/07/90 | CTF | 3005(c) | Physical Altercation with Another Inmate: <u>Guilty</u>, assessed 90 days loss of credits, 10 days CTQ. |

**CDC 128-A's:**

| 02/27/94 | RJD | Out of Bounds |
|----------|-----|---------------|
| 04/23/93 | RJD | Unissued Property |
| 11/13/92 | RJD | Delaying Count |
| 07/21/92 | RJD | Obeying Orders |
| 03/24/91 | SCC | Failure to Report |
| 05/19/90 | CTF | Unauthorized Property |
| 01/12/90 | CTF | Failure to Report |

LEWIS, SAMUEL                    E-05524                    CTF-SOLEDAD        MAR/2001

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/97 to 03/98 | | | **PLACEMENT**: R.J. Donovan Correctional Facility. **CUSTODY**: Medium A. **CLASSIFICATION SCORE**: 18 points. **ACADEMIC**: Lewis was taking correspondence courses in Business Management from the center for Degree Studies. **WORK**: Assigned to Textiles with average to above average work reports (see CDC 101 01/26/98). **VOCATION**: Assigned to Vocational dry cleaning. **GROUP ACTIVITIES**: Completed the "Breaking Barriers" Program (see CDC 128B 05/12/97). Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 06/30/97, 10/06/97, 12/97 and 03/98). Completed "Hands of Peace" workshop (see CDC 128B 03/24/98) **PSYCH TREATMENT**: None during this period. **PRISON BEHAVIOR**: No disciplinary problems. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                    DATE

*M. Rubio  cci*                                                        *10-25-01*

LEWIS, SAMUEL          E-05524                   CTF-SOLEDAD            MAR/2001

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 04/98 to 03/99 | | | **PLACEMENT**: Transferred from R.J. Donovan to the Correctional Training Facility on 07/08/98. **CUSTODY**:  Medium A. **CLASSIFICATION SCORE**:  10 points. **ACADEMIC**:  Lewis was taking correspondence courses in Business Management from the Center for Degree Studies (see CDC 128B dated 08/17/98). **WORK**:  Assigned to Textiles and received average to above average work reports (see CDC 101's 04/26/98 and 07/07/98). **VOCATION**:  Received a training certificate of completion for fork lift operator (see certificate dated 04/13/98). **GROUP ACTIVITIES**:  Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 06/98, 11/12/98 and 07/07/98).  Attended Parenting Program (see certificate 04/14/98). **PSYCH TREATMENT**:  None during this period. **PRISON BEHAVIOR**:  No disciplinary problems. |

ORDER:

☐   BPT date advanced by          months.          ☐   BPT date affirmed without change.
☐   PBR date advanced by          months.          ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐   Previously imposed  conditions affirmed.
☐   Add or modify

☐   Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL                 E-05524                        CTF-SOLEDAD                    MAR/2001

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 09/99 to 03/00 | | | **PLACEMENT**: Correctional Training Facility. **CUSTODY**:  Medium A. **CLASSIFICATION SCORE**:  2 points. **ACADEMIC**:  Received a degree in Specialized Business (see certificate dated 07/12/99). **WORK**:   Assigned the wing laundry clerk and received above average to exceptional work reports (see CDC 101's 06/23/99, 10/11/99 and 01/18/00). **VOCATION**:  None during this period. **GROUP ACTIVITIES**:  Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 05/06/99, 05/29/99, 09/08/99, 10/08/99, 01/13/00, 01/20/00, 02/10/00 and 02/23/00). **PSYCH TREATMENT**:  None during this period. **PRISON BEHAVIOR**:  Received a CDC 115 for refusing a direct order. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed  conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| | | | |
|---|---|---|---|
| LEWIS, SAMUEL | E-05524 | CTF-SOLEDAD | MAR/2001 |

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/00 to 03/01 | | | **PLACEMENT**: Correctional Training Facility. <br> **CUSTODY**: Medium A. <br> **CLASSIFICATION SCORE**: Zero points. <br> **ACADEMIC**: Received Certificates of completion in Paralegal Studies (see Certificates from Kaplan College dated 12/12/00, 01/15/01, 02/09/01 and Associates degree college of Professional Studies 03/27/01). <br> **WORK**: Assigned as a wing laundry clerk and received exceptional work reports (see CDC 101 02/12/01). <br> **VOCATION**: None during this period. <br> **GROUP ACTIVITIES**: Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 05/26/00, 06/07/00, 09/28/00, 12/26/00 and 02/13/01). <br> **PSYCH TREATMENT**: None during this period. <br> **PRISON BEHAVIOR**: No disciplinary problems. |

ORDER:

☐ BPT date advanced by _____ months.
☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| LEWIS, SAMUEL | E-05524 | CTF-SOLEDAD | MAR/2001 |
|---|---|---|---|

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

Page __4__

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/01 to Present | | | **PLACEMENT**: Correctional Training Facility. **CUSTODY**: Medium A. **CLASSIFICATION SCORE**: Zero Points. **ACADEMIC**: Received a Certificate of Completion from Kaplan College in Paralegal Studies (see Certificate dated 04/06/01). **WORK**: Assigned as a wing laundry clerk. **VOCATION**: None during this period. **GROUP ACTIVITIES**: Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 04/05/01, 04/27/01, 06/27/01 and 07/10/01). **PSYCH TREATMENT**: None during this period. **PRISON BEHAVIOR**: No disciplinary problems. |

ORDER:

☐  BPT date advanced by          months.          ☐  BPT date affirmed without change.
☐  PBR date advanced by          months.          ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL                 E-05524                 CTF-SOLEDAD                 MAR/2001

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

# EXHIBIT 11

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
### APRIL 2004 CALENDAR

**LEWIS, SAMUEL**

E05524

## I. COMMITMENT FACTORS:

**A.** **Life Crime:** Murder, 2nd Degree, 187 PC, count 1, Case #LA A964645. Sentence 15 years to Life. Victim: Shivone Perry, age: unknown. MEPD: 3/21/98. Received by CDC on 1-4-89.

**1.** **Summary of Crime:** On 2/18/88; Samuel Lewis and Marcus Villegas engaged in a dispute over gang territory. Villegas was then challenged by Lewis to a fight, but this did not occur due to the disapproval of Villegas' brother. After stating that he would be back with his "home boys", Lewis left and returned with his friends. Another argument arose at which time it was stated that it was their neighborhood and he was going to get them both. Later that evening Lewis, carrying a sawed-off shotgun, approached the front porch where Villegas and a number of teenagers were sitting. Five or six rounds were shot, Levelle Bullard was shot in the arm, Shivone Perry was shot in the back, and April Purcell was also shot. Villegas was shot at by Lewis but was not hit. Lewis was later identified by witnesses as the shooter and stated that he was accompanied by Leon Milton. This information was taken from page two and three of the Probation Officer's Report dated 11/16/88.

**2.** **Prisoner's Version:** Regarding his version of the crime, Lewis stated, "On February 15, 1988, I was driving down Tenth Avenue when Marco Villegas and I made eye contact. We began staring at each other. Marcus said something I took as a challenge. I said something in return. I then stopped the car got out, and challenged Marcus to a fight. His brother would not allow Marcus to fight me. His brother was bigger than me, so I left and went and got some guys I knew who were gang members. At this time I was not a gang member, but I wanted to join. We went back to Tenth Avenue, and Marcus' brother wanted to fight me. I did not want to fight him, because he was bigger than me.

As we were leaving Tenth Avenue Leon told me that we would deal with this. Later that night they came and got me from my Mother's house and

INMATE COPY

told me let's go handle this. I drove to Ninth Avenue. When I got out of the car, Leon handed me a shotgun and told me I have to handle this. We then walked from Ninth Avenue to Tenth Avenue. Leon told me which porch they were sitting on. I walked up to the porch, closed my eyes, and began shooting. We then ran back to Ninth Avenue and drove away. We were stopped about an hour later and arrested."

3.    **Aggravating/Mitigating Circumstances:**

   a.    **Aggravating Factors:**

   1..    The crime involved great violence, great bodily harm, and acts disclosing a high degree of cruelty, viciousness and callousness.
   2..    The defendant was armed with a weapon at the time of the crime (shotgun).
   3.    The crime involved multiple victims.
   4.    The manner in which the crime was committed created a potential for serious injury to persons other that the victims of the crime.

   b.    **Mitigating Factors:**  None noted.

B.    **Multiple Crime(s):**  None.

   1.    **Summary of Crime:**  None.

   2.    **Prisoner's Version:**  None.


II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:**
   1.    On 1/24/87, Lewis was arrested by LAPD for Grand Theft Auto (487.3PC). Disposition: unknown.
   2.    On 3/13/87, Lewis was arrested by LAPD for Carrying a Concealed Weapon (12025(B) PC). Disposition: unknown. This information was taken from page #6 of the POR dated 11/15/88.

B.    **Adult Convictions:**
   1.    On 2/5/88, Lewis was arrested by LAPD for Carrying a Concealed Weapon, in a Vehicle (12025(A)PC). Disposition: Released, insufficient evidence. All information regarding arrest and dispositions were obtained

from the Department of Justice Bureau of Criminal Identification Report dated 3/18/89, and POR page #11 dated 11/5/88.

**C.**    **Personal Factors:** Samuel Lewis was born to the union of Samuel Lewis and Shirley Lewis on 3/23/69, in Los Angeles, California. He has three sisters and three brothers. When he was seven years old, his parents were divorced. Lewis has prior work experience with Altadena Dairy. He attended Reseda and Dorsey High School and he was active in sports. Lewis received his GED in 1992 and his second Associate of Arts Degree in 2002. In 1988, Lewis married Joan Moore. One child was born from this union. The couple was divorced in 1990. On 5/16/96, Lewis married Tracee Steele Lewis and he has two step-daughters from that relationship. Lewis and Tracee were divorced in 1997. He used alcohol and marijuana at the age of 18 years. He never served in the military.

# III.    POSTCONVICTION FACTORS:

**A.**    **Special Programming/Accommodations:** None.

**B.**    **Custody History:** Documents from the previous hearings have been considered and that information remains valid. During the period of time since the last hearing (4-30-02) Lewis' behavior has been positive, in that he has remained disciplinary free and received exceptional work reports in his assignment as a wing laundry clerk. Lewis is enrolled in an Independent Study Program and has completed courses in Federal Individual Income Tax and California State Income Tax. He is currently enrolled in the Indiana Institute of Technology majoring in Business.

**C.**    **Therapy and Self-Help Activities:** Lewis has completed the thirteen week Impact Workshop. He has participated as an active member of Alcoholics/Narcotics Anonymous.

**D.**    **Disciplinary History:** Lewis has received sever CDC 128A's and seven CDC 115's. See disciplinary sheet for details.

**E.**    **Other:** A Subsequent Parole Consideration Hearing was held on 4-30-02. The Board recommended:

1.    Become disciplinary free.
2.    Upgrade vocationally.
3.    Participate in self-help and therapy.

Parole was denied for an additional two years.

LEWIS, SAMUEL              E05524                    CTF-SOLEDAD          APR/2004

## IV.    FUTURE PLANS:

A.    **Residence:**  Lewis plans to reside with his mother, Shirley Lewis, 4831 3rd Avenue, Los Angeles, CA.  (213) 292-1305.

B.    **Employment:**  Lewis plans to seek employment in dry cleaning or as a fork lift operator as he has certificates in these fields.  He also hopes to continue his education and work as a paralegal.

C.    **Assessment:**  Lewis has attempted to meet the BPT recommendations and the writer believes he would have a successful parole.  He has obtained marketable skills and has the support of his family.


## V.    USINS STATUS:  No holds.


## VI.    SUMMARY:

A.    Considering the commitment offense, prior record and prison adjustment, the writer believes Lewis would probably pose a low degree of threat to the public at this time, if released from prison.

B.    Prior to release Lewis could benefit from: continuing to remain disciplinary free, continuing his studies and participate in Alcoholics/Narcotics Anonymous.

C.    This report is based upon  a one hour interview, incidental contact in the housing unit and a thorough review of the Central File lasting four hours.

D.    Lewis was afforded an opportunity to examine his Central File.  See chrono dated 12-12-03.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

M. Rubio                    4-15-04
M. Rubio                    Date
Correctional Counselor I


L.R. Baker                  4-15-04
L.R. Baker                  Date
Correctional Counselor II (A)


J. Clancy                   4.16.04
J. Clancy                   Date
Facility Captain


D. S. Levorse               4-19-04
D. S. Levorse               Date
Classification and Parole Representative


LEWIS, SAMUEL          E05524          CTF-SOLEDAD          APR/2004

# DISCIPLINARY SHEET

## CDC 128A's:

| 02/27/94 | RJD | Out of Bounds. |
| 04/23/93 | RJD | Unissued Property. |
| 11/13/92 | RJD | Delaying Count. |
| 07/21/92 | RJD | Obeying Orders. |
| 03/24/91 | SCC | Failure to Report. |
| 05/19/90 | CTF | Unauthorized Property. |
| 01/12/90 | CTF | Failure to Report. |

## CDC 115's:

| 08/10/99 | CTF | 3005(b) | Refusing a Direct Order:  Guilty, assessed 25 hours extra duty. |
| 09/14/95 | RJD | 3015 | Out of Bounds:  Guilty, assessed 30 days loss of privileges and 40 hours extra duty. |
| 12/08/94 | RJD | 3006 | Contraband:  Guilty, assessed 40 hours extra duty. |
| 03/10/94 | RJD | 3005(c) | Fighting:  Guilty, assessed 90 days credit loss, 30 days loss of privileges and 40 hours extra duty. |
| 07/29/93 | RJD | 3005(b) | Disobeying Orders:  Guilty, assessed 30 days loss of credit, 90 days loss of privileges. |
| 10/27/91 | RJD | 3006(a) | Possession of Tattoo Gun:  Guilty, assessed 40 hours extra duty. |
| 04/07/90 | CTF | 3005(c) | Physical Altercation with Another Inmate: Guilty, assessed 90 days loss of credits, 10 days CTQ. |

BOARD OF PRISON TERMS
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| April 2002 to March 2003 | | | **PLACEMENT**: CTF <br> **CUSTODY**: Med A <br> **VOC. TRAINING**: None. <br> **ACADEMICS**: Enrolled in an Independent Study Program and completed courses in Federal and California State Income Taxes (see certificates dated 7-1-02 and 8-1-02). <br> **WORK RECORD**: Assigned as a Wing Laundry Clerk (see CDC 101 4-3-02). Lewis received a Laudatory Chrono from his supervisor (See CDC 128B 6-6-02). <br> **GROUP ACTIVITIES**: Lewis completed the Impact workshop (see CDC 128B 12-16-02) and participated in Alcoholics and Narcotics Anonymous (see CDC 128B's 4-1-02, 4-11-02, 6-26-02, 10-2-02, 10-24-02, 1-6-03). <br> **PSYCH. TREATMENT**: None. <br> **PRISON BEHAVIOR**: No disciplinaries. <br> **OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

*M. Rubio* CCI

LEWIS, SAMUEL     E05524     CTF-SOLEDAD

DATE 4-15-04

APR/2004

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| APRIL 2003 to Present | | | **PLACEMENT:** CTF<br>**CUSTODY:** Med A<br>**VOC. TRAINING:** None.<br>**ACADEMICS:** Enrolled in an Independent Study Program with Indiana Institute of Technology majoring in Business.<br>**WORK RECORD:** Assigned as a Wing Laundry Clerk.<br>**GROUP ACTIVITIES:** Participate in Alcoholics/Narcotic Anonymous (see CDC 128B's 4-2-03, 4-25-03, 6-13-03, 10-7-03).<br>**PSYCH. TREATMENT:** None.<br>**PRISON BEHAVIOR:** No disciplinaries.<br>**OTHER:** None. |

ORDER:

☐   BPT date advanced by        months.            ☐   BPT date affirmed without change.
☐   PBR date advanced by        months.            ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐   .Previously imposed  conditions affirmed.
☐   Add or modify

☐   Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL                E05524                    CTF-SOLEDAD                APR/2004

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

# EXHIBIT 12

STATE· OF CALIFORNIA

| NAME and NUMBER | LEWIS | | DEPARTMENT OF CORRECTIONS CDC-128 B (8-87) |
|---|---|---|---|
| | | E-05524 | YW-322L |

It should be noted that I have observed inmate LEWIS, E-05524, overall efficiency for a period of (17) years since he has been housed here at Correctional Training Facility. Over the years inmate LEWIS has demonstrated the ability to conform to existing /established policies and procedures. I am persuaded by LEWIS' ability to maintain close family ties over this long period of incarceration, his participation in group therapy and his continuing effort to upgrade educationally. He has chosen to use his free time in the pursuit of positive endeavors. His attitude towards staff and inmates is always appropriate. Inmate LEWIS has programmed in an extremely positive way and should be commended for his commitment to change. It is my formal judgment that inmate LEWIS could be a productive citizen in society if given the opportunity to do so.

*A. Ramos*

ORIG    :  C-File
cc         :  Unit File
             :  CC-I
             :  Inmate
                Writer

A. Ramos
Correctional Officer, 2/W
CTF-Central Facility

DATE   2/1/07            **Laudatory Chrono**            **CTF-C**        **CUSTODIAL CHRONO**

NAME and NUMBER:   **LEWIS**            E05524                **YW-332L**

Inmate Lewis has been assigned as the Y Wing laundry attendant for a number of years and who is also a member of the Men's Advisory Counsel (MAC). I have been the Unit II Sergeant and now Lieutenant for the past three years. During this time, I have been able to observe Inmate Lewis's work ethics and his interaction with staff and inmates. I have observed him to be professional, courteous and outgoing with everyone. Lewis never hesitates to be of assistance and takes the initiative when needed. This type of conduct makes him a very reliable worker and a role model for other inmates. His attitude and behavior are positive. In my opinion Inmate Lewis is a work orientated and well behaved individual, who continually strives through his actions and demeanor toward receiving a parole date.

Orig.:    C-File
cc:        CCI
            Inmate

**S.R. VASQUEZ**
Correctional Lieutenant
UNIT II, CTF-Central Facility

DATE   09/26/06        **LAUDATORY CHRONO**        **CTF-C**        **INFORMATIVE CHRONO**

NAME and NUMBER        LEWIS                                        CDC-128 B (8-87)
                                                        E-05524        YW-322-L

Inmate Lewis, S., E-05524 has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned as the Laundry Officer for the Central Facility Laundry in October 1998, I have observed inmate Lewis several times a week. I have observed him to be professional and courteous. I have observed his ability to remain calm and professional when faced with stressful situations or potential confrontations. His attitude and behavior are positive, and he has shown himself punctual and responsible in his assigned duties. Inmate Lewis has been consistent in pursuing a higher education and attaining marketable skills in preparation for his release. I believe his sincere desire to succeed and his positive attitude will carry into his life when he is released.

ORIG    :  C-File
cc          :  Writer
               Inmate

**D. OSBURN**
Laundry Officer
CTF-Central Laundry Room

DATE    5/4/06            **(LAUDATORY CHRONO)**                        **CTF-C**

STATE OF CALIFORNIA

**NAME and NUMBER    LEWIS**                         E05524          YW322L

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

Inmate LEWIS, E05524, YW322L, is to be commended for his ongoing participation as a Y Wing, Men's Advisory Counsel (MAC) member.  Through his care and concern regarding issues which arise in Y Wing and Unit II in general, Inmate LEWIS has actively assisted his peers and the unit staff in maintaining a tension free, environment of cooperation.  I take this opportunity to congratulate Inmate LEWIS for a job well and done and anticipate his continued hard work in the MAC.

ORIG. : C-File
cc    : CC-I .
      : Inmate

J.L. Clancy
Facility Captain
Unit II, CTF - Central

**DATE    9/14/05**                    **LAUDATORY**              **CTF-C    INFORMATIVE CHRONO**

STATE OF CALIFORNIA

**NAME and NUMBER    LEWIS**                         E-05524          YW-322-L

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

have known inmate Lewis, S., E-05524 for more than thirteen (13) years.  I have watched him change from an mmature confused young man into a mature adult who is respectful and responsible. Inmate Lewis has been in Central Facility for the past seven (7) years and I have always observed his behavior to be positive.  I have observed him many times as he interacts with uniformed and free staff easily, always maintaining a professional demeanor even when faced with stressful situations or potential confrontations.  Inmate Lewis is devoted to attaining his marketable skills in preparations for his release.  I believe that his determination to succeed and his positive attitude will carry into his life when he is released.

ORIG : C-File
Cc   : Writer
       Inmate

**S. ROTHMAN**
2nd Watch Yard Officer
CTF-Central Facility

**DATE    8/20/05**              **(LAUDATORY CHRONO)**                **CTF-C**

NAME and NUMBER          LEWIS          E-05524      Y-322L

CDC-128-B (Rev. 4/74)

LAUDATORY CHRONO

Inmate LEWIS, E-05524, Y-322L, has been assigned as the Y-Wing Laundry Attendant since 1998.  Since being assigned as the Laundry Supervisor II, I have worked with and observed Inmate LEWIS.  Consistently I have observed him to be courteous and respectful both to staff and inmates.  His attitude and behavior are always positive, and he has always shown himself punctual and responsible in his assigned duties.

orig: C-File
  CC: Assignment Office
      CCII
      Counselor
      Inmate
      File

C. DIAZ          LSII
LAUNDRY SUPERVISOR II
LAUNDRY ROOM
CTF-CENTRAL

DATE          August 17, 2005

GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER**    **LEWIS**    **E05524**    **YW-322L**

Inmate LEWIS, E05524, YW-322L, has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned to Y-Wing, first as Entrance & Security Officer, and then as a Tier Officer in 2000, I have closely worked with and observed Inmate LEWIS. Inmate LEWIS has consistently demonstrated excellent communication and diplomatic skills. While observing Inmte LEWIS, I have found him to be consistent and dependable in his job assignment. He is always polite and respectful when communicating with staff or inmates. His attitude and behavior have been cosistently positive during the time in which I have observed him.

ORIG    :    C-File
cc      :    Writer
        :    ~~Inmate~~

**J. BROWN**
Correctional Officer, Y-Wing
CTF-Central Facility

**DATE**    11/04/04

CTF-C    **INFORMATIONAL CHRONO**

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER**    **LEWIS**    **E05524**    **YW-322L**

Inmate LEWIS, E05524, has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned as Y-Wing Tier Officer in 1999, I have closely worked with Inmate LEWIS. I have obeserved Inmate LEWIS to be professional and courteousness at all times toward staff and inmate alike. Being a Y-Wing Laundry Attendant requires exceptional communication and diplomatic skills in dealing with the complaints and needs of Y-Wing inmates regarding their laundry and bedding. Inmate LEWIS has consistently demonstrated those skills over the years. LEWIS has also been very instrumental in the successful and efficient operations of the Y-Wing housing unit, ranging from assisting with the smooth conversion of Y-Wing into a housing unit designated for Prison Industry Authority inmate workers in 2002, to assisting in solving daily housing conflicts arising from inmates requiring special housing needs. I have no doubt that Inmate LEWIS' exceptional work and personal ethics will allow him to be a productive member of society when released from custody.

ORIG    :    C-File
cc      :    CC-I
        :    ~~Inmate~~
        :    Writer

**L.J. RODRIGUEZ**
Correctional Officer, Y-Wing (2nd Watch)
CTF-Central Facility

**DATE**    04/13/04    **LAUDATORY CHRONO**    CTF-C

---

**NAME and NUMBER**    **LEWIS**    **E-05524**    **Y-322L**

CDC-128 B (8-87)

As an eighteen (18) year employee of the Department of Corrections, I have been asked by numerous Inmates to write a laudatory chrono for their C-File in preparation for their Parole Board hearings. I have always refused because I believe that laudatory chronos should be given based on merit and not because it "looks good for the Board." To date, I have written only one other chrono. Inmate LEWIS has rightfully deserved this one. I have closely supervised and worked with Inmate LEWIS for the past two and a half (2 1/2 ) years. Inmate LEWIS holds the position of Y-Wing Laundry man, a position that requires diplomacy, tact, patience, and most of all a degree of compassion due to the needs of the CCCMS inmates. He has demonstrated all of those traits admirably and tirelessly. He interacts with uniformed and free staff easily, yet maintains a professional demeanor when faced with stressful situations or potential confrontations. Inmate LEWIS is totally devoted to attaining his educational goals and enhancing his marketable work skills in preparation for his release into society. He is widely known by the inmate population to hold a vast amount of legal knowledge which he doesn't hesitate to share by helping inmate's of all races in their court cases or appeals. This he does freely, receiving no compensation for services rendered, which is almost unheard of in this prison environment. I have witnessed his many high grade (A, B+ averages) test scores, essays and college transcripts. There are many inmates who also have similar traits and a will to succeed; LEWIS is the first that I have witnessed to strive so hard and doggedly to achieve his life, educational and work goals. I feel that Inmate LEWIS"S determination to succeed and his positive attitude will carry into his life once attains his release.

ORIG    :    C-File
cc      :    Unit File
        :    CC-I
        :    Inmate
        :    Writer

**C.A. AGUILAR**
Correctional Officer, Y-Wing, 2/W
CTF-Central Facility

**DATE**    06/06/02    **LAUDATORY CHRONO**    CTF-C    **INFORMATIVE CHRONO**

# EXHIBIT 13

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $              TO: $              FROM: JOB NO.              TO: JOB NO.

TOTAL # Hours Assigned:              TOTAL # Hours Worked:

| INMATE ASSIGNED TO PIRCC.302 | DATE ASSIGNED 12-05-98 | ACTUAL WORK CONSISTS OF COLLECTING, SORTING, & DISTRIBUTING INMATES' LAUNDRY | PERIOD COVERED BY REPORT DEC 2004-MAR 2005 |

RECOMMENDED FOR:    ☐ REASSIGNMENT    ☒ RETAIN    ☐ PAY INCREASE    ☐ PAY DECREASE    | INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE
EXCELLENT WORKER, DISPLAY POSITIVE ATTITUDE EVEN UNDER DURESS

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:              INMATE'S INITIALS:

| SUPERVISOR L. RODRIGUEZ  C/O  (EXT. 4490) | LENGTH OF SUPERVISION SIX YEARS | WORK DETAIL LAUNDRY ATTENDANT | ETHNICITY BLACK |
| INMATE'S NAME LEWIS | CDC NUMBER E-05524 | INSTITUTION CIF-CENTRAL | DATE DEC-01-2004 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $              TO: $              FROM: JOB NO.              TO: JOB NO.

TOTAL # Hours Assigned:              TOTAL # Hours Worked:

| INMATE ASSIGNED TO PIRCC.302 | DATE ASSIGNED 12-05-98 | ACTUAL WORK CONSISTS OF COLLECTING, SORTING, & DISTRIBUTING INMATES' LAUNDRY | PERIOD COVERED BY REPORT APR 2005-JUN 2005 |

RECOMMENDED FOR:    ☐ REASSIGNMENT    ☒ RETAIN    ☐ PAY INCREASE    ☐ PAY DECREASE    | INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE
EXCELLENT WORKER, DISPLAYS POSITIVE ATTITUDE, EVEN UNDER DURESS

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:              INMATE'S INITIALS:

| SUPERVISOR L. RODRIGUEZ  C/O  (EXT. 4490) | LENGTH OF SUPERVISION SIX YEARS | WORK DETAIL LAUNDRY ATTENDANT | ETHNICITY BLACK |
| INMATE'S NAME LEWIS | CDC NUMBER E-05524 | INSTITUTION CIF/CENTRAL | DATE APRIL 01, 2005 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $              TO: $              FROM: JOB NO.              TO: JOB NO.

TOTAL # Hours Assigned:              TOTAL # Hours Worked:

| INMATE ASSIGNED TO PIRCC.302 | DATE ASSIGNED 12-05-98 | ACTUAL WORK CONSISTS OF COLLECTING, SORTING, DISTRIBUTING INMATES' LAUNDRY | PERIOD COVERED BY REPORT JULY 2005-SEPT 2005 |

RECOMMENDED FOR:    ☐ REASSIGNMENT    ☒ RETAIN    ☐ PAY INCREASE    ☐ PAY DECREASE    | INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE
EXCELLENT WORKER, DISPLAY POSITIVE ATTITUDE, EVEN UNDER DURESS

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:              INMATE'S INITIALS:

| SUPERVISOR L. RODRIGUEZ  C/O  (EXT. 4490) | LENGTH OF SUPERVISION SIX YEARS | WORK DETAIL LAUNDRY ATTENDANT | ETHNICITY BLACK |
| INMATE'S NAME LEWIS | CDC NUMBER E-05524 | INSTITUTION CIF/CENTRAL | DATE JULY 01 2005 |

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|--------|-------|---|-------|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PTRCC.302 | 12/5/98 | COLLECTING, SORTING & DISTRIBUTING INMATES' LAUNDRY | APRIL 2002--MARCH 2004 |

INMATE'S INITIALS

RECOMMENDED FOR:   ☐ REASSIGNMENT   ☒ RETAIN   ☐ PAY INCREASE   ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) *Very dependable, excellent worker*   CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS:   INMATE'S INITIALS:
*Displays positive attitude, even under Duress*

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ, C/O (EXT. 4490) | FIVE YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CTF-C | 4/1/2004 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|--------|-------|---|-------|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PTRCC.302 | 12-05-98 | COLLECTING, SORTING, & DISTRIBUTING INMATES' LAUNDRY | APR 2004-JULY 2004 |

INMATE'S INITIALS

RECOMMENDED FOR:   ☐ REASSIGNMENT   ☒ RETAIN   ☐ PAY INCREASE   ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE, EXCELLENT WORKER, DISPLAYS POSITIVE ATTITUDE, EVEN UNDER DURESS   CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS:   INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ  C/O (EXT. 4490) | FIVE YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CTF-CENTRAL | 4-01-2004 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|--------|-------|---|-------|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PTRCC.302 | 12-05-98 | COLLECTING, SORTING, DISTRIBUTING, INMATES' LAUNDRY | AUG 2004-NOV 2004 |

INMATE'S INITIALS

RECOMMENDED FOR:   ☐ REASSIGNMENT   ☒ RETAIN   ☐ PAY INCREASE   ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE, EXCELLENT WORKER, DISPLAYS POSITIVE ATTITUDE, EVEN UNDER DURESS   CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS:   INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ  C/O (EXT. 4490) | FIVE YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CIF-CENTRAL | AUG-01-2004 |

## WORK SUPERVISOR'S REPORT

STATE OF CALIFORNIA
CDC 101 (Rev. 4/82)
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1 = Exceptional | __1__ | A. Demonstrated Skill and Knowledge | | __1__ | F. Teamwork and Participation |
| 2 = Above Average | __1__ | B. Attitude Toward Fellow Inmates and Workers | | __1__ | G. Learning Ability |
| 3 = Satisfactory | __1__ | C. Attitude To Supervisors and Staff | | __1__ | H. Use of Tools and Equipment |
| 4 = Below Average | __1__ | D. Interest in Assigned Work | | __1__ | I. Quality of Work |
| 5 = Unsatisfactory | __1__ | E. Effort Displayed in Assigned Work | | __1__ | J. Quantity of Work |

PAY STATUS: From $ ___ To $ ___ From Job No. ___ To Job No. ___ LENGTH OF SUPERVISION

Total No. Hours Assigned ___ Total No. Hours Worked ___ PERIOD COVERED BY REPORT

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | |
|---|---|---|---|
| Y-WING | 12/05/98 | LAUNDRY/CLERICAL | 11/11/00 - 02/12/01 |

INMATE'S INITIALS

RECOMMEND FOR: ☐ REASSIGNMENT  ☐ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) EXTREMELY CONSCIENTIOUS, METICULOUS AND FAIR IN REGARDS TO INMATES/LAUNDRY, RETAINS COMPOSURE AND RESPECT TOWARDS STAFF, EVEN UNDER DURESS.

| SUPERVISOR | WORK DETAIL | ETHNICITY |
|---|---|---|
| C.A. AGUILAR | 2nd WATCH | BLACK |

| INMATE'S NAME | NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | C.T.F-CENTRAL | |

WHITE: C-FILE        YELLOW: SUPERVISOR        PINK: INMATE

---

## WORK SUPERVISOR'S REPORT

STATE OF CALIFORNIA
CDC 101 (Rev. 4/82)
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1 = Exceptional | | A. Demonstrated skill and knowledge | | __1__ | F. Teamwork and Participation |
| 2 = Above Average | | B. Attitude Toward Fellow Inmates and Workers | | __1__ | G. Learning Ability |
| 3 = Satisfactory | | C. Attitude To Supervisor and Staff | | __1__ | H. Use of Tools and Equipment |
| 4 = Below Average | | D. Interest in Assigned Work | | __1__ | I. Quality of Work |
| 5 = Unsatisfactory | | E. Effort Displayed in Assigned Work | | __1__ | J. Quantity of Work |

PAY STATUS: From $ ___ To $ ___ From Job No. ___ To Job No. ___ LENGTH OF SUPERVISION
33 Months

Total No. Hours Assigned ___ Total no. Hours Worked ___ PERIOD COVERED BY REPORT

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | |
|---|---|---|---|
| PTRCC 302 | 12/05/1998 | Collecting & Passing out Laundry | 6/1--8/31/2001 |

INMATE'S INITIALS

RECOMMENDED FOR: ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

| SUPERVISOR | WORK DETAIL | ETHNICITY |
|---|---|---|
| C.A. Aguilar, C/O | Laundry Man | Black |

| INMATE'S NAME | NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| Lewis | E-05524 | CTF-C | 9/1/2001 |

WHITE: C-FILE        YELLOW: SUPERVISOR        PINK: INMATE

---

## WORK SUPERVISOR'S REPORT

STATE OF CALIFORNIA
CDC 101 (Rev. 4/82)
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1 = Exceptional | __1__ | A. Demonstrated Skill and Knowledge | | | F. Teamwork and Participation |
| 2 = Above Average | __1__ | B. Attitude Toward Fellow Inmates and Workers | | | G. Learning Ability |
| 3 = Satisfactory | __1__ | C. Attitude to Supervisors and Staff | | | H. Use of Tools and Equipment |
| 4 = Below Average | __1__ | D. Interest in Assigned Work | | | I. Quality of Work |
| 5 = Unsatisfactory | __1__ | E. Effort Displayed in Assigned Work | | | J. Quantity of Work |

PAY STATUS: From $ ___ To $ ___ From Job No. ___ To Job No. ___ LENGTH OF SUPERVISION

Total No. Hours Assigned ___ Total No. Hours Worked ___ PERIOD COVERED BY REPORT

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | |
|---|---|---|---|
| PTRCC 302 | 12/5/98 | LAUNDRY DISTRIBUTION IN Y-WING | JANUARY -- MARCH 2002 |

INMATE'S INITIALS

RECOMMEND FOR: ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) Consistently displays conscientious, thorough work habits which are vital to the function of the position, as well as the smooth operation of the LAUNDRY program.

| SUPERVISOR | WORK DETAIL | ETHNICITY |
|---|---|---|
| C.A. AGUILAR C/O | LAUNDRY MAN | BLACK |

| INMATE'S NAME | NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CTF-C | 4/3/2002 |

WHITE: C-FILE        YELLOW: SUPERVISOR        PINK: INMATE

STATE OF CALIFORNIA
CDC 101 (Rev. 4/82)
## WORK SUPERVISOR'S REPORT
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1=Exceptional | 2 | A. Demonstrated Skill and Knowledge | 2 | F. Teamwork and Participation |
| 2=Above Average | 2 | B. Attitude Toward Fellow Inmates and Workers | 2 | G. Learning Ability |
| 3=Satisfactory | 2 | C. Attitude To Supervisors and Staff | 2 | H. Use of Tools and Equipment |
| 4=Below Average | 2 | D. Interest in Assigned Work | 2 | I. Quality of Work |
| 5=Unsatisfactory | 2 | E. Effort Displayed in Assigned Work | 2 | J. Quantity of Work |

PAY STATUS: From $ 0.17    To $ 0.17    From Job No. PTRCC.302    To Job No. SAME

| Total No. Hours Assigned | Total No. Hours Worked | LENGTH OF SUPERVISION 13 MONTHS |
|---|---|---|

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | PERIOD COVERED BY REPORT |
|---|---|---|---|
| Y-WING | 12-5-98 | LAUNDRY ATTENDANT | 90 DAYS |

RECOMMEND FOR: ☐ REASSIGNMENT    ☒ RETAIN    ☐ PAY INCREASE    ☐ PAY DECREASE    INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

I/M LEWIS IS A GOOD WORKER AND NEEDS LITTLE OR NO SUPERVISION

| SUPERVISOR M. PEREZ, C/O *Gil Perez* | WORK DETAIL 2ND WATCH | ETHNICITY BLACK |
|---|---|---|
| INMATE'S NAME LEWIS | NUMBER E-05524 | INSTITUTION CTF-CENTRAL | DATE 1-18-2000 |

---

STATE OF CALIFORNIA
CDC 101 (Rev. 4/82)
## WORK SUPERVISOR'S REPORT
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1=Exceptional | 2 | A. Demonstrated Skill and Knowledge | 2 | F. Teamwork and Participation |
| 2=Above Average | 2 | B. Attitude Toward Fellow Inmates and Workers | 2 | G. Learning Ability |
| 3=Satisfactory | 2 | C. Attitude To Supervisors and Staff | 2 | H. Use of Tools and Equipment |
| 4=Below Average | 2 | D. Interest in Assigned Work | 2 | I. Quality of Work |
| 5=Unsatisfactory | 2 | E. Effort Displayed in Assigned Work | 2 | J. Quantity of Work |

PAY STATUS: From $ 0.17    To $ 0.17    From Job No. PTRCC.302    To Job No. SAME

| Total No. Hours Assigned | Total No. Hours Worked | LENGTH OF SUPERVISION 10 MONTHS |
|---|---|---|

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | PERIOD COVERED BY REPORT |
|---|---|---|---|
| Y-WING | 12-5-98 | ATTENDS LAUNDRY CONCERNS FOR WING | 90 DAYS |

RECOMMEND FOR: ☐ REASSIGNMENT    ☐ RETAIN    ☐ PAY INCREASE    ☐ PAY DECREASE    INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

I/M LEWIS IS A GOOD WORKER AND NEEDS LITTLE OR NO SUPERVISION

| SUPERVISOR M. PEREZ *Gil Perez* | WORK DETAIL 2/W | ETHNICITY BLACK |
|---|---|---|
| INMATE'S NAME LEWIS | NUMBER E-05524 | INSTITUTION CTF-CENTRAL | DATE 10-11-99 |

WHITE: C-FILE          YELLOW: SUPERVISOR          PINK: INMATE

---

STATE OF CALIFORNIA
CDC 101 (Rev. 4/82)
## WORK SUPERVISOR'S REPORT
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1=Exceptional | 1 | A. Demonstrated Skill and Knowledge | 1 | F. Teamwork and Participation |
| 2=Above Average | 2 | B. Attitude Toward Fellow Inmates and Workers | 1 | G. Learning Ability |
| 3=Satisfactory | 2 | C. Attitude To Supervisors and Staff | 1 | H. Use of Tools and Equipment |
| 4=Below Average | 2 | D. Interest in Assigned Work | 2 | I. Quality of Work |
| 5=Unsatisfactory | 2 | E. Effort Displayed in Assigned Work | 2 | J. Quantity of Work |

PAY STATUS: From $ NA    To $ NA    From Job No. PTRCC.302    To Job No. NA

| Total No. Hours Assigned 32.5 | Total No. Hours Worked 32.5 | LENGTH OF SUPERVISION 4 MOS. |
|---|---|---|

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | PERIOD COVERED BY REPORT |
|---|---|---|---|
| LAUNDRY CLERK | 12-8-99 | CLERICAL | 4 MOS. |

RECOMMEND FOR: ☐ REASSIGNMENT    ☒ RETAIN    ☐ PAY INCREASE    ☐ PAY DECREASE    INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

INMATE LEWIS IS AN EXCELLENT WORKER.

| SUPERVISOR | WORK DETAIL 2ND WATCH | ETHNICITY BLACK |
|---|---|---|
| INMATE'S NAME LEWIS | NUMBER E-05524 | INSTITUTION CTF-CENTRAL | DATE 06-23-99 |

WHITE: C-FILE          YELLOW: SUPERVISOR          PINK: INMATE

LEGAL MAIL



SAMUEL LEWIS
E-05524 (Y-322-L)
P.O. BOX: 689
SOLEDAD, CALIFORNIA
93960-0689

UNITED STATES POSTAGE
$ 05.050
02 1M
0004429613   APR 23 2008
MAILED FROM ZIP CODE 93960

CLERK OF THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE
BOX: 36060
SAN FRANCISCO, CALIFORNIA
94102

D. FLORENTINO      4/22/08

**LEGAL MAIL**

**LEGAL MAIL**